

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

BRIAN LOOMIS, DEBRA COGSWELL,
RON WELTE, WAYNE JOHNSON,
and ED SALFELDER,
individually and on behalf of all
those similarly situated

       Plaintiffs,

v.

EXELON CORPORATION, WILLIAM
BERGMAN in his capacity as Exelon
Corporation's Director of Employee Benefit
Plans and Programs; COMPENSATION
COMMITTEE OF EXELON
CORPORATION'S BOARD
OF DIRECTORS; M. WALTER D'ALESSIO,
ROSEMARIE B. GRECO, RONALD RUBIN
AND RICHARD L. THOMAS, all in their
capacities as members of the Compensation
Committee, EMPLOYEE SAVINGS
PLAN INVESTMENT COMMITTEE;
RISK OVERSIGHT COMMITTEE
OF THE EXELON CORPORATION
BOARD OF DIRECTORS; AND
SUE LING GIN, JUDGE NELSON A.
DIAZ, EDGAR D. JANNOTTA,
WILLIAM C. RICHARDSON, PH.D.,
JOHN W. ROGERS, JR. AND
RONALD RUBIN, all in their capacities as
members of the Risk Oversight Committee,

      Defendants.

06CV4900
JUDGE FILIP
MAG. JUDGE ASHMAN

JURY TRIAL DEMANDED
CLASS ACTION COMPLAINT

**FILED**

SEP 1 1 2006 *rq*

**MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT**

## COMPLAINT FOR BREACH OF FIDUCIARY DUTY

### INTRODUCTION

1.    Personal savings accounts, such as 401(k)s, are quickly becoming

employees' primary method of financially planning for retirement. For many employees

in the United States today, an employer-provided defined benefit pension awaiting their retirement is a quaint, historical notion.

2.     In 401(k) plans, employers provide an opportunity for employees to save their own pre-tax dollars in individual 401(k) accounts. The accounts provide a number of investment alternatives into which employees place a portion of their current income with the hope of earning, over time, a return sufficient to support themselves and their families in retirement.

3.     Accordingly, in 401(k) plans, the return on employees' investments is critical. Even seemingly small reductions in a participant's return in one year may substantially impair his or her accumulated savings at retirement.

4.     While such reductions in 401(k) accounts' returns may result from market fluctuations, a consistent, albeit rarely discussed, force reducing 401(k) accounts' earnings is the administrative fees and expenses assessed against account balances.

5.     The most certain means of increasing the return on employees' 401(k) savings is to reduce the fees and expenses employees pay from their 401(k) accounts.

6.     Unlike generalized market fluctuations, employers can control these fees and expenses. Federal law requires them to do so.

7.     Under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"), an employer who provides a 401(k) plan for its employees is a "Plan Sponsor." The employer or its agent may also serve as "Plan Administrator," or the employer may appoint a third party to serve as such. Both the Plan Sponsor and the Plan Administrator are fiduciaries of the 401(k) plan. The Plan Administrator performs or contracts for administrative, record-keeping, investment management, and other

services from entities in the financial and retirement industry. ERISA requires that the fees for these services must be reasonable, incurred solely for the benefit of Plan participants, and fully disclosed.

8.      For providing various services, third-party plan administrators, record-keepers, consultants, investment managers, and other vendors in the 401(k) industry have developed a variety of pricing and fee structures.

9.      At best, these fee structures are complicated and confusing when disclosed to Plan participants. At worst, they are excessive, undisclosed, and illegal.

10.     In this action, pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), Plaintiffs and Class Representatives, on behalf of all similarly situated participants and beneficiaries of the Exelon Corporation Employee Savings Plan, Plan #003, (the "Plan"), seek to recover the losses suffered by the Plan on a plan wide basis and to obtain injunctive and other equitable relief for the Plan from the Plan's fiduciaries based upon their breaches of their fiduciary duties.

11.     As set forth in detail below, the fees and expenses paid by the Plan, and thus borne by Plan participants, were and are unreasonable and excessive; not incurred solely for the benefit of the Plan and its participants; and undisclosed to participants. By subjecting the Plan and its participants to these excessive fees and expenses, and by other conduct set forth below, the Defendants violated their fiduciary obligations under ERISA.

## PARTIES, JURISDICTION AND VENUE

### Plaintiffs

12.     Plaintiff and Class Representative Brian Loomis is a resident of Illinois, living and working in the Northern District of Illinois.

13.     Plaintiff and Class Representative Debra Cogswell is a resident of Illinois, living and working in the Northern District of Illinois.

14.     Plaintiff and Class Representative Gary Welte is a resident of Illinois, living and working in the Northern District of Illinois.

15.     Plaintiff and Class Represenative Wayne Johnson is a resident of Illinois, living and working in the Northern District of Illinois.

16.     Plaintiff and Class Representative Ed Salfelder is a resident of Illinois.

17.     Each Plaintiff and Class Representative is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

### Defendants

18.     Defendant Exelon Corporation is a corporation with its headquarters in Chicago, Illinois. It provides electric and gas utility services to consumers in Illinois and Pennsylvania. It is the sponsor of the Plan within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B), an administrator of the Plan within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1102(16)(A), and is the employer and principal of the Plan's administrator and one or more of its members. It is a fiduciary with respect to the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

19.     Defendant William Bergman, Exelon Corporation's Director of Employee Benefit Plans and Programs, is the current Plan Administrator within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A), and is a "named fiduciary" to the Plan within the meaning of ERISA § 402(a)(2), 29 U.S.C. § 1102(a)(2). He has responsibility for all matters relating to the Plan except for investments, benefits appeals, and the trust

fund. He is also a fiduciary with respect to the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

20.     Defendant Compensation Committee of Exelon Corporation's Board of Directors has the responsibility for appointing, monitoring, and/or removing the Plan Administrator. In this capacity, the Compensation Committee and its members are fiduciaries to the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). The members of the Compensation Committee are Directors M. Walter D'Alessio, Rosemarie B. Greco, Ronald Rubin and Richard L. Thomas.

21.     Defendant Employee Savings Plan Investment Committee currently has responsibility for all matters relating to the investments held by the Plan and its participants. The members of the Investment Committee are William Bergman, as Director of Employee Benefit Plans and Programs, Exelon Corporation's Director of Investments, and Exelon Business Services Company's Manager of Accounts Payable. The Investment Committee is a "named fiduciary" to the Plan within the meaning of ERISA § 402(a)(2), 29 U.S.C. § 1102(a)(2), and is a fiduciary to the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

22.     Defendant Risk Oversight Committee of the Exelon Corporation Board of Directors has responsibility for appointing, monitoring, and removing the members of the Investment Committee. The Members of the Risk Oversight Committee are the independent directors of Exelon Corporation: Sue Ling Gin, Judge Nelson A. Diaz, Edgar D. Jannotta, William C. Richardson, Ph.D., John W. Rogers, Jr. and Ronald Rubin. In this capacity, they are all fiduciaries to the Plan within the meaning of ERISA § (21)(A), 29 U.S.C. § 1002(21)(A).

## Jurisdiction And Venue:

23. Plaintiffs seek relief on behalf of the Plan through the mechanisms found in ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502, 29 U.S.C. § 1132. Therefore, this Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

24. All Defendants are subject to service of process issued from this Court pursuant to 29 U.S.C. § 1132(e)(1)(2).

25. Venue of this action is proper pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the injury occurred directly to Plaintiffs in this district where they live and work, because the breaches of fiduciary duty occurred in this district and because the Defendants may be found in this district.

## The Plaintiff Class

26. Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and all similarly situated Plan participants and beneficiaries. They seek to represent the following class (the "Class"):

> All persons, *excluding the Defendants, the Committees and/or other individuals who are or may be liable for the conduct described in this Complaint,* who are or were participants or beneficiaries of the Plan and who are, were or may have been affected by the conduct set forth in this Complaint, as well as those who will become participants or beneficiaries of the Plan in the future.

27. Certification of this class is proper under Rule 23(a) because all of its prerequisites are satisfied:

a. **Numerosity.** The members of the Class are so numerous that joinder of all members is impracticable. Although the Plaintiffs do not know the exact number of class members as of the date of filing, there were

23,291 participants with account balances in the Plan at the end of the 2004 plan year.

b. **Commonality.** Common issues of fact and law predominate over any issues unique to individual class members. Issues that are common to all class members include, but are not limited to, whether the Defendants:

    i.    Charged fees and expenses to the Plan that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants;

    ii.    Caused the Plan to enter into agreements with third parties which caused and/or allowed the Plan to pay fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants;

    iii.    Failed to monitor the fees and expenses paid by the Plan and, by such failure, caused or allowed the Plan to pay fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants;

    iv.    Failed to inform themselves of, and understand, the various methods by which vendors in the 401(k) retirement industry collect payments and other revenues from 401(k) plans;

    v.    Failed to establish, implement, and follow procedures to properly and prudently determine whether the fees and

expenses paid by the Plan were reasonable and incurred solely for the benefit of Plan participants;

vi. Failed properly to inform and/or disclose to Plan participants the fees and expenses that are, or have been, paid by the Plan;

vii. Failed to inform and/or disclose to Plan participants in proper detail and clarity the transaction fees and expenses which affect participants' accounts balances in connection with the purchase or sale of interests in investment alternatives;

viii. Breached their fiduciary duties by failing to disclose that hidden and excessive fees were and are being assessed against Plan assets and by failing to stop such hidden excessive fees;

ix. Appointed as fiduciaries persons who did not fulfill their fiduciary duties, failed to monitor and/or oversee the performance of those fiduciaries and to ensure that they were fulfilling those duties, and failed to terminate the fiduciaries' appointment after breaches occurred;

x. In charging, causing to be charged or paid, and failing to monitor the fees and expenses of the Plan, failed to exercise the care, skill, prudence, and diligence that a prudent

person would when acting in like capacity and familiar with such matters;

xi. Caused and/or allowed fees and expenses to be paid by the Plan for purposes other than those allowed by ERISA;

xii. By the conduct above and/or by other conduct set forth in this Complaint, revealed in discovery and/or proven at trial, breached their fiduciary and other ERISA-imposed obligations to the Plan, Plan participants, and members of the Class;

xiii. Are liable to the Plan and the Class for losses suffered as a result of the breaches of their fiduciary and other ERISA-imposed obligations; and

xiv. Are responsible to account for the assets and transactions of the Plan and should be charged for any transactions and payments for which they cannot account.

c. **Typicality.** The Claims brought by the Plaintiffs are typical of those of the absent class members because:

i. The Defendants owed the exact same fiduciary and other ERISA-based obligations to each Plan participant and each member of the Class;

ii. The Defendants' breach of those obligations constitutes a breach to each participant and each member of the Class;

      iii.  To the extent that there are any differences among the Class members' damages, such differences would be a product of simple mathematics based upon their account balances in the Plan. Such minimal and formulaic differences are no impediment to class certification.

    d.  **Adequacy of Representation.** The Plaintiffs are adequate representatives of the absent class members and will protect such absent class members' interests in this litigation. The Plaintiffs do not have any interests antagonistic to the other class members nor do they have any unique claims or defenses that might undermine the efficient resolution of the class claims. Plaintiffs have retained competent counsel, versed in ERISA, class actions, and complex litigation.

28.    Class certification is also appropriate under Rule 23(b) and each subpart because:

    a.  Pursuant to Rule 23(b)(1)(B), in the absence of certification, there is a risk of inconsistent adjudications with respect to individual class members;

    b.  Pursuant to Rule 23(b)(2), as set forth above, the Defendants have acted on grounds generally applicable to the Class as a whole;

    c.  Pursuant to Rule 23(b)(3), as set forth above, common issues of law and fact predominate over any purely individual issues and thus a class action is superior to any other method for adjudicating these claims.

## FACTS

## The Plan

29.     As part of their compensation and benefits, Exelon offers certain of its employees the opportunity to participate in the Plan. The Plan is a "defined contribution plan," as defined in ERISA § 3(34), 29 U.S.C. § 1002(34) and contains an employee stock ownership plan provision. It is also a tax-qualified plan of the type popularly known as a "401(k) plan."

30.     Exelon benefits from its sponsorship of the Plan because giving employees the opportunity to participate in the Plan enhances Exelon's ability to recruit and retain qualified personnel, fosters employee loyalty and goodwill, and entitles Exelon to tax advantages under the Internal Revenue Code.

31.     Under the terms of the Plan, qualified employees may contribute certain portions of their before-tax earnings to the Plan. Exelon Corporation will match those contributions in varying percentages. Participants are 100 percent vested in their account, including Exelon's matching contribution portion, and amounts are entirely non-forfeitable at all times.

32.     Each participant's account is credited with the participant's contributions, the participant's share of Exelon's matching and discretionary contributions, and the Plan's earnings.

33.     Participating employees may choose to invest Plan contributions in any of 25 investment options, selected by the Investment Committee and its members. Seventeen of those options are mutual funds, with six of the mutual funds being what are known as lifecycle or target date funds.

34.     In addition to the mutual funds, the Plan offers six "collective trusts." Collective trusts such as the ones in the Plan are similar to mutual funds in that they pool money from more than one investor and invest in many different underlying securities. Unlike mutual funds, however, collective trusts are not available to the retail customer, but are available only to institutional investors such as pension plans or large 401(k) plans.

35.     The Plan also offers participants the option of investing in the Exelon Stock Fund, a fund that holds Exelon Corporation common stock.

36.     By the end of 2005, the Plan had more than $3 billion in assets.

37.     Of the more than $3 billion in assets, nearly $2 billion was held in mutual funds. The majority of the mutual fund assets were held in funds managed by Fidelity Management and Research Company. Fidelity Management Trust Company is the Plan's trustee.

### Fiduciary Duties Owed To The Plan Under ERISA

38.     ERISA §403(c)(1), 29 U.S.C. §1103(c)(1), unambiguously mandates that:

> [T]he assets of a plan shall never inure to the benefit of any employer and shall be held for the **exclusive purposes of providing benefits** to participants in the plan and their beneficiaries **and defraying reasonable expenses of administering the plan.**

(Emphasis added).

39.     ERISA §§ 404(a)(1)(A)&(B) of ERISA, 29 U.S.C. § 1104(a)(1)(A) & (B), require that Plan fiduciaries, including Exelon, "shall discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries" and:

> a. [F]or the exclusive purpose of:
>      i.     providing benefits to participants and their beneficiaries;

and

    ii.    defraying reasonable expenses of administering the plan; and

    b.    [W]ith the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

    40.    ERISA § 405(a), 29 U.S.C. § 1105(a), provides that one fiduciary may be held liable for breaches of fiduciary duty committed by another fiduciary where

(1) the fiduciary "participates knowingly in or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach";
(2) the fiduciary, by his or her "failure to comply with section 1104(a) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary" enables "such other fiduciary to commit such a breach"; or
(3) the fiduciary "has knowledge of a breach by such other fiduciary," and does not make "reasonable efforts under the circumstances to remedy the breach."

    41.    ERISA § 406, 29 U.S.C. § 1106, prohibits certain transactions between the Plan and "parties in interest." This section provides that unless subject to an exemption as set forth in ERISA § 408, 29 U.S.C. § 1108, a fiduciary

shall not cause the plan to engage in a transaction …if he knows or should know that such a transaction constitutes a direct or indirect – sale or exchange, or leasing, of any property between the plan and a party in interest …furnishing of goods, services or facilities between the plan and a party in interest …transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan.

29 U.S.C. § 1106(a)(1).

    42.    For purposes of section 406, a "party in interest" is any plan fiduciary, including the plan administrator, trustee, officer or custodian, any plan services provider, the employer, a relative of any of the above, and certain persons with ownership or leadership roles in any of the above. ERISA § 3(14), 29 U.S.C. § 1002(14).

43. Similarly, a fiduciary (1) shall not "deal with the assets of the plan in his own interest or for his own account"; (2) shall not "act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan" or its participants and beneficiaries; and (3) shall not "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b).

44. ERISA §104(b)(1), 29 U.S.C. § 1024(b)(1), requires that the Plan Administrator periodically provide to Plan participants and beneficiaries a summary plan description (an "SPD").

45. ERISA §104(b)(3), 29 U.S.C. § 1024(b)(3), requires that the Plan Administrator at least annually provide to Plan participants and beneficiaries copies of statements and schedules from the Plan's annual report for the previous year, and such additional information "as is necessary to fairly summarize the latest annual report."

46. The schedules and statements that the Plan Administrator annually must provide to Plan participants and beneficiaries specifically include:

  a. [A] statement of the assets and liabilities of the plan aggregated by categories and valued at their current value, and the same data displayed in comparative form for the end of the previous fiscal year of the plan; and

  b. [A] statement of receipts and disbursements during the preceding twelve-month period aggregated by general sources and applications.

*See* ERISA §103(b)(3), 29 U.S.C. §1023(b)(3).

47. ERISA §104(b)(4), 29 U.S.C. § 1024(b)(4), entitles Plan participants and beneficiaries to receive more detailed information from the Plan Administrator on request:

  The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement,

trust agreement, contract, or other instruments under which the plan is established or operated.

48.     ERISA §103(b)(2)&(3), 29 U.S.C. §1023(b)(2)&(3) mandates that, among other extensive disclosures, Plan fiduciaries must include in the Plan's "Annual Report"

a statement of [the Plan's] assets and liabilities, and a statement of changes in net assets available for plan benefits which shall include details of revenues and expenses and other changes aggregated by general source and application.

49.     ERISA § 404(c) provides to Plan fiduciaries a "Safe Harbor" from liability for losses that a participant suffers in his or her 401(k) accounts to the extent that the participant exercises control over the assets in his or her 401(k) accounts. To be eligible for the protection of this "safe harbor," Plan fiduciaries must, among other things, provide:

a.  an opportunity for a participant or beneficiary to exercise control over assets in his individual account, and
b.  a participant or beneficiary an opportunity to choose, from a broad range of investment alternatives, the manner in which some or all of the assets in his account are invested.

29 C.F.R. §2550.404c-1(b)(1).

50.     For a participant or beneficiary to have "an opportunity to exercise control over assets in his individual account," Plan fiduciaries must provide him or her with "the opportunity to obtain sufficient information to make informed decisions with regard to investment alternatives under the Plan." 29 C.F.R. §2550.404c-1(b)(2)(B).

51.     The "sufficient investment information" Plan fiduciaries must provide includes:

A description of any transaction fees and expenses which affect the participant's or beneficiary's account balance in connection with purchases or sales of interests in investment alternatives (e.g., commissions, sales load, deferred sales charges, redemption or exchange fees).

29 C.F.R. §2550.404c-1(b)(2)(i)(B)*(1)(v)*. At least upon request, it must include

> A description of the annual operating expenses of each designated investment alternative (e.g., investment management fees, administrative fees, transaction costs) which reduce the rate of return to participants and beneficiaries, and the aggregate amount of such expenses expressed as a percentage of average net assets of the designated investment alternative.

29 C.F.R. §2550.404c-1(b)(2)(i)(B)*(2)(i)*.

52.     ERISA's Safe Harbor Regulations state that the imposition of *reasonable* charges for *reasonable* Plan expenses does not interfere with a participant's opportunity to exercise control over his or her individual account so long as *Plan fiduciaries inform the participant* of such actual expenses:

> A plan may charge participants' and beneficiaries' accounts for the reasonable expenses of carrying out investment instructions, *provided that procedures are established under the plan to periodically inform such participants and beneficiaries of actual expenses incurred with respect to their respective individual accounts.*

29 C.F.R. §2550.404c-1(b)(2)(ii)(A) (emphasis added).

## The Fees and Expenses Assessed Against The Plan

53.     The Defendants, directly or indirectly, have caused the Plan to purchase services from various plan service providers, including trustee, record-keeping, administration, investment advisory, investment management, brokerage, insurance, consulting, accounting, legal, printing, mailing, and other services.

54.     The Defendants have caused the amounts that the Plan pays for these services to be assessed against participants' accounts.

55.     The Defendants have caused or allowed these plan service providers to receive payment in at least one of two ways:

a.  By direct disbursement from the Plan to the entity providing the service; and/or

b.  By receiving, or having the opportunity to receive, "Revenue Sharing" payments comprised of Plan assets distributed between and/or among various service providers.

### "Hard Dollar" Payments to Plan Service Providers

56.  Payments in the form of direct disbursements from the Plan to participants or an entity providing a service to the Plan are characterized as "Hard Dollar" payments.

57.  The Plan discloses to government regulators and Plan participants, in one form or another, Hard Dollar payments made from the Plan to service providers. For example, the Plan disclosed in filings with government regulators covering plan year 2003 that it paid Fidelity Institutional Operations Company for recordkeeping services.

58.  Based upon this disclosure, understanding the Plan's record-keeping expense for 2003 *appears* straightforward: The Plan sent a check to Fidelity Institutional Operations Company and, in exchange, Fidelity Institutional Operations Company maintained the Plans' records.

59.  However, these disclosed hard dollar expenses are not all of the fees.

### Revenue Sharing Payments to Plan Service Providers

60.  Revenue Sharing is a common practice in the financial, securities, and investment industry that provides services to 401(k) plans.

61.  Industry commentators and analysts consider Revenue Sharing to be the "big secret of the retirement industry."

62.     Industry commentators and analysts generally define "Revenue Sharing" as the transfer of asset-based compensation from brokers or investment management providers (such as mutual funds, common or collective trusts, insurance companies offering general insurance contracts, and similar pooled investment vehicles) to administrative service providers (record-keepers, administrators, trustees or consultants) in connection with 401(k) and other types of defined contribution plans.

63.     For example, a plan or its agent (a third-party administrator, consultant, or similar fiduciary) seeking to select an investment vehicle (mutual fund, common or collective trust, guaranteed investment contracts, etc. (collectively "Fund")) to be offered to plan participants as an investment option will negotiate an agreement that sets the costs assessed against each dollar invested by specifying the expense ratio and available Revenue Sharing.

64.     In Revenue Sharing arrangements, the Plan and the Fund agree upon an asset-based fee that is not the true price for which the Fund will provide its service.

65.     Instead, the Fund's agreed asset-based fee includes *both* the actual price for which the Fund will provide its service *and* additional amounts that the Fund does not need to cover the cost of its services and to make a profit.

66.     The additional portion of the agreed-upon asset-based charge is "shared" with Plan service providers or others who do business with the Plan or the Fund.

67.     As a result of Revenue Sharing arrangements, Plan service providers or others who do business with the Plan or the Fund receive *both* a Hard Dollar payment from the Plan *and* additional revenue that the Fund "shares" with them.

68.    The total fees a Fund charges to a plan can vary widely based upon a number of factors, including without limitation: the amount that the plan invests in the Fund; the level of sophistication of the plan fiduciary negotiating the fee agreement; the plan fiduciary's awareness of Revenue Sharing and inclination to expend effort monitoring Revenue Sharing transfers; the diligence with which the plan fiduciary conducts such negotiations; and the separate financial interests and/or agendas of the plan fiduciary and the Fund as they negotiate.

69.    Revenue Sharing is not confined to mutual funds. Common or collective trusts, providers of guaranteed insurance contracts, and private investment pools may enter into Revenue Sharing arrangements in connection with the services they provide to 401(k) plans.

70.    Revenue Sharing also occurs between and among brokerage firms, investment managers, fund families and other service providers.

71.    When 401(k) plan service providers receive compensation in the form of both Hard Dollar fees *and* Revenue Sharing payments, determining the total amount of fees and expenses that the Plan incurs for any category of services (*i.e.* recordkeeping and administration, investment advisory, trustee, auditing, and accounting, etc.) requires that *both* the Hard Dollar fees *and* Revenue Sharing payments be taken into account.

72.    Ascertaining whether the Plan Administrator has fulfilled its fiduciary obligation to ensure that the fees and expenses assessed against the 401(k) Plan are reasonable and incurred solely in the interest of Plan participants requires consideration whether the *total of both* the Hard Dollar *and* Revenue Sharing payments paid for any category of services complies with this standard.

73.     Although Revenue Sharing monies arise only as a result of, and in connection with, transactions involving the plan, plan assets and plan service providers; Revenue Sharing is not always captured and used for the benefit of the plan and the participants.

74.     When Revenue Sharing is foregone, the plan will not only pay additional hard dollar fees to the plan service providers (since no Revenue Sharing payments are available to offset those Hard Dollar costs), but it will also pay additional money to the Fund, beyond what the Fund would normally charge and keep.

75.     Consequently, in determining whether a plan administrator or other fiduciary has fulfilled its obligation to ensure that the fees and expenses assessed against the plan are reasonable and incurred solely in the interest of plan participants, foregone Revenue Sharing must also be taken into account.

76.     Such is the case here. The investment managers of the Plan investment options, including at least some of the collective trusts, charged fees to the Plan that included money with which to make Revenue Sharing payments. However, the Defendants failed to capture the available Revenue Sharing and use it solely in the interest of the Plan and the participants and beneficiaries.

77.     As a result, when the foregone Revenue Sharing – consisting of millions of dollars – is taken into account, the participants and beneficiaries of the Plan paid unreasonably high fees for the administrative services and/or investment management they received.

**Revenue Sharing Arrangements Are Not Disclosed to Plan Participants**

78. Revenue Sharing is not disclosed to Plan participants and government regulators, even though it may account for a greater portion of certain categories of service provider payments than do Hard Dollar disbursements to those same providers.

79. Accordingly, industry commentators and experts have dubbed Revenue Sharing payments to be "hidden fees" that are assessed against 401(k) plans and thus reduce plan participants' retirement savings.

80. By entering into, allowing, and/or failing to monitor, discover, and prevent or recover these undisclosed Revenue Sharing arrangements, Exelon and the Committees deprived Plan participants of true and accurate information regarding:

    a. How much they are paying in fees and expenses for the Plan;

    b. Who is receiving Plan assets through Revenue Sharing;

    c. How much service providers are paid in addition to their disclosed, hard dollar fees; and

    d. Whether the total amount paid to services providers (*i.e.* disclosed, hard dollar fees *combined with* Revenue Sharing payments) is reasonable and incurred solely for the participants' benefit.

**Defendants' Non-Compliance with §404(c)'s Safe Harbor Requirements and Concealment of Their Fiduciary Breaches**

81. As set forth above, the Defendants did not disclose, and to this day have not disclosed, the fact that plan service providers were and/or engaging in Revenue Sharing; nor that Revenue Sharing was available for the benefit of the Plan and its

participants, nor the amount of Revenue Sharing payments, made by or to Plan service providers.

82.     Plan participants did not have, and do not have, complete and actual knowledge of the fees and expenses being charged to the Plan that reduced their account balances.

83.     Thus, Plan fiduciaries, including the Defendants, have not told Plan participants, and Plan participants do not know:

> a.     the "annual operating expenses" of the investment options in the Plan, as required by 29 C.F.R. §2550.404c-1(b)(2)(i)(B)*(2)(i)*; and
>
> b.     the actual expenses incurred with respect to their respective individual accounts, as required by 29 C.F.R. §2550.404c-1(b)(2)(ii)(A).

84.     As a result of the Defendants' failure and refusal to provide such information, and the general failure on the part of the Plan fiduciaries to disclose the actual Plan expenses, including available Revenue Sharing, the participants have not been provided with "the opportunity to obtain sufficient information to make informed decisions with regard to investment alternatives under the plan." 29 C.F.R. §2550.404c-1(b)(2)(1)(B).

85.     Because the Defendants failed and refused to provide them with this information, and concealed this information from them, the participants have lacked the information necessary to understand and protect their interests in the Plan and/or to have knowledge of, the Defendants' breaches of fiduciary duty.

86. In fact, in their fiduciary roles, the Defendants are the parties with the information necessary to know and understand whether the participants' rights and protections under ERISA are being, or have been, violated.

87. Defendants have an affirmative obligation to provide full and accurate information to the Plan participants regarding the administration of the Plan.

88. Defendants' silence and/or non-disclosure in the face of such a duty to disclose is tantamount to an affirmative misrepresentation.

89. Here, despite the Defendants' duty to disclose full and accurate information regarding the fees and expenses assessed against participants' accounts, on an ongoing basis Defendants failed and refused to disclose to, and inform the participants of:

    a.    the total amount of fees and expenses reasonable and necessary to operate the plan;

    b.    the total amount of amount of fees and expenses the Plan actually paid to service providers in the form of Hard Dollar payments and Revenue Sharing;

    c.    the availability of Revenue Sharing;

    d.    the true and accurate details regarding the revenues and expenses of the Plan;

    e.    the true and accurate operating expenses which reduce participants' returns, including both Hard Dollar payments and Revenue Sharing, for each of the Plan's investment alternatives;

f. the true and accurate transaction fees and expenses which affect the participants' account in connection with the purchase or sale of investment alternatives;

g. the amount, when both Hard Dollar Payments and Revenue Sharing are considered, by which the Plan's expenses exceeded those which were reasonable and incurred solely in participants' interests; and

h. other revenue and expense information necessary for the participants to understand and protect their interests in the Plan.

90. Based upon the foregoing, Defendants are not entitled to the safe harbor protections of ERISA § 404(c).

91. Based upon the foregoing, the statue of limitations was tolled on the breaches set forth in this Complaint and did not begin to run until such time as Plaintiffs actually discovered them.

**COUNT I:**
**Breach of Fiduciary Duty – ERISA §502(a)(2)**

92. Plaintiffs restate and incorporate the allegations contained in paragraphs 1 through 91 as though fully set forth here.

93. As set forth in detail above, the Defendants owe the Plan, its participants and beneficiaries, and the Class extensive fiduciary duties including, without limitation:

a. To conduct themselves as Plan fiduciaries with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent ERISA professional fiduciary would in operating and administering a 401(k) plan the size and character of the Plan;

b.   To perform their duties as fiduciaries with the utmost loyalty and fidelity to the Plan and its participants and beneficiaries, avoiding at all times conflicts of interest, self-interest, and duplicity;

c.   To ensure, at all times, that Plan assets "shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan;"

d.   To track and account for all transactions involving the Plan and Plan assets so as to ensure that Plan assets are retained, managed, and disbursed in compliance with the Plan Document and ERISA;

e.   To track and account for all transactions involving the Plan and Plan assets so as to ensure that Plan assets "never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan;"

f.   To ensure that the fees and expenses incurred by the Plan are reasonable and incurred for the sole and exclusive benefit of Plan participants and beneficiaries;

g.   In entering into agreements with service providers to the Plan, to ensure that the payments from the Plan – whether they are direct or indirect – are reasonable for the services provided and made for the sole and exclusive benefit of Plan participants and beneficiaries;

h. In operating and administering the Plan, to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plan were reasonable and incurred solely for the benefit of Plan participants;

i. In operating and administering the Plan, on an ongoing basis to monitor the payments made by the Plan to service providers – whether they are direct or indirect – are and remain reasonable for the services provided and made for the sole and exclusive benefit of Plan participants and beneficiaries;

j. To inform themselves of, and understand, the various methods by which vendors in the 401(k) industry collect payments and other revenues from 401(k) plans;

k. To inform themselves of trends, developments, practices, and policies in the retirement, financial investment and securities industry which affect the Plan; and to remain aware and knowledgeable of such trends, practices and policies on an ongoing basis;

l. To communicate with Plan participants and beneficiaries regarding the Plan honestly, clearly and accurately;

m. To affirmatively and without request provide Plan participants and beneficiaries with honest, accurate and complete information they need to understand their investments in the Plan; the management, risk, potential returns of such investments, and the fees and expenses incurred in connection with those investments;

n.  Upon request, to provide further any information to Plan participants and beneficiaries regarding the operation and administration of the Plan and the expenses incurred in doing so; and

o.  To provide honest, accurate and complete information to Plan participants and beneficiaries regarding the costs associated with their various investment choices and directions

p.  To appoint fiduciaries who lived up to their fiduciary duties, to monitor and oversee those fiduciaries in the performance of their duties, and to remove fiduciaries who breached their fiduciary duties.

94.     As set forth in detail above, the Defendants breached their fiduciary obligations to the Plan, Plan participants and beneficiaries and the Class by, among other conduct to be proven at trial:

a.  Causing the Plan to enter into agreements with service providers under which the Plan pays/paid – directly or indirectly – fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants and beneficiaries;

b.  Allowing the Plan to pay – directly on indirectly – fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants and beneficiaries;

c.  Failing to monitor the fees and expenses paid by the Plan and, by such failure, causing and/or allowing the Plan to pay fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants and beneficiaries;

d.  Failing to inform themselves of trends, developments, practices, and policies in the retirement, financial investment and securities industry which affect the Plan; and failing to remain aware and knowledgeable of such trends, practices and policies on an ongoing basis;

e.  Failing to inform themselves of, and understand, the various methods by which vendors in the 401(k) industry collect payments and other revenues from 401(k) plans;

f.  Failing to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plan were reasonable and incurred solely for the benefit of Plan participants;

g.  Failing to communicate with Plan participants and beneficiaries regarding the Plan honestly, clearly and accurately;

h.  Failing properly to inform and/or disclose to Plan participants the fees and expenses that are, or have been, paid by the Plan;

i.  Failing to inform and/or disclose to Plan participants in proper detail and clarity the transactions, fees and expenses which affect participants' accounts balances in connection with the purchase or sale of interests in investment alternatives;

j.  Failing to discover, disclose and stop the charging of hidden and excessive fees to the Plan;

k.  Failing to appoint fiduciaries who lived up to their fiduciary duties, failing to monitor and oversee those fiduciaries in the performance of

their duties, and failing to remove fiduciaries who breached their fiduciary duties;

l. By the foregoing conduct, failing to exercise the care, skill, prudence and diligence that a prudent person would when acting in like capacity and familiar with such matters.

95.     As set forth in detail above, as a result of these breaches, Plaintiffs, the Class, the Plan, and the Plan's participants and beneficiaries have suffered financial losses and damages.

96.     Further, as set forth in detail above, the Defendants failed to provide participants and beneficiaries with sufficient investment information to qualify for the Safe Harbor immunity of ERISA § 404(c), 29 U.S.C. 1104(c). Accordingly, the Defendants are liable for participants and beneficiaries' investment losses in the Plan.

97.     Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a), the Defendants are liable to restore to the Plan the losses it experienced as a direct result of the Defendants' breaches of fiduciary duty and are liable for any other available and appropriate equitable relief, including prospective injunctive relief and declaratory relief, and attorney's fees.

## COUNT II:
### Other Remedies for Breach of Fiduciary Duty – ERISA §502(a)(3)

98.     Plaintiffs restate and incorporate the allegations contained in paragraphs 1 through 97 as though fully set forth here.

99.     As an alternative to the causes of action stated in Count I, Plaintiffs seek further relief pursuant to ERISA § 502(a)(3), 29 U.S.C., § 1132(a)(3).

100.     Under section 502(a)(3), a participant may enjoin any act which violates ERISA or may obtain other appropriate equitable relief to redress such violations or enforce the terms of ERISA.

101.     Defendants are the primary fiduciaries of the Plan and occupy a position of trust and confidence in connection with the Plan, the Plan's assets, and the Plan's participants and beneficiaries.

102.     Defendants have exclusive discretion and control over the Plan's assets and are strictly obligated to exercise that control "for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan."

103.     Although *only* Plan participants and beneficiaries are entitled to Plan assets and to the benefit of Plan assets, in the absence of full and candid disclosure from the Defendants, Plan participants and beneficiaries do not know, and have no means of knowing, how their assets have been managed and disbursed.

104.     Accordingly, the Defendants occupy the position of a common law trustee in connection with the Plan, its assets, and its participants and beneficiaries.

105.     As set forth in detail above, the Defendants have caused and/or allowed the plan to pay – directly or indirectly – excess fees and expenses to Plan service providers.

106.     The Defendants, and not the Plaintiffs, are the entities which have and/or should have specific and detailed information regarding how Plan assets have been treated and disbursed in this regard.

107.    Accordingly, the Court should order that the Defendants render an accounting of all transactions, disbursements and dispositions occurring in, in connection with, and/or in respect of, the Plan and its assets.

108.    The Plaintiffs respectfully request that the Court order that such an accounting include, without limitation, detailed and specific information regarding all fees and expenses incurred by the Plan and/or paid to third parties, whether paid directly by the Plan or indirectly transferred among Plan service providers or other third parties.

109.    Plaintiffs respectfully request that to the extent the Defendants do not or cannot account for all such transactions and their property under ERISA, the plan document and other applicable law, the Court surcharge against the Defendants and in favor of the Plan all amounts for which they cannot account.

110.    Plaintiffs further seek injunctive and other appropriate equitable relief to redress the wrongs described above, and to cause them to cease in order for the Plan's participants and beneficiaries to receive the full benefit of their retirement savings in the future.

WHEREFORE Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the court:

- find and declare that the Defendants have breached their fiduciary duties as described above;

- order the Defendants to make good to the Plan all losses that the Plan incurred as a result of the conduct described above and to restore the Plan to the position it would have been in but for the breaches of fiduciary duty;

31

- impose a constructive trust on any monies by which the Defendants were unjustly enriched as a result of their breaches of fiduciary duty and/or cause the Defendants to disgorge such monies and return them to the Plan;

- remove the fiduciaries who have breached their fiduciary duties and/or enjoin them from future breaches of ERISA;

- award actual damages to the Plan in the amount of its monetary losses;

- require Defendants to render an accounting as set forth above;

- surcharge against Defendants and in favor of the Plan all amounts involved in transaction which such accounting reveals were or are improper, excessive and/or in violation of ERISA;

- permanently enjoin Defendants from breaching their fiduciary duties in each respect set forth in the Complaint;

- order costs and attorneys fees pursuant to ERISA § 502(g) and the common fund doctrine;

- order equitable restitution or other available equitable relief against the Defendants;

- order the payment of interest to the extent it is allowed by law; and

    grant any other and further relief the Court deems appropriate

**PLAINTIFFS DEMAND A TRIAL BY JURY OF ALL COUNTS SO TRIABLE.**

Dated:  September 11, 2006

Respectfully submitted,


**Schlichter, Bogard & Denton**

Jerome J. Schlichter
Elizabeth J. Hubertz
Heather Lea
120 W. Main Street, Ste 208
Belleville, IL  62220

100 South Fourth Street
Suite 900
St. Louis, MO 63102
Tel:    314-621-6115
Fax:    314-621-7151
ehubertz@uselaws.com
Lead Counsel for Plaintiffs