**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| BRIAN LOOMIS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 06 CV 4900 |
| | ) | |
| v. | ) | Hon. John W. Darrah |
| | ) | |
| EXELON CORPORATION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
MOTION TO DISMISS THE AMENDED COMPLAINT**

This case is one of more than a dozen ERISA class actions filed by the same law firm, all alleging claims arising from payment of allegedly excessive fees for services provided to 401(k) savings plans.  When one of those cases, *Hecker v. Deere*, was dismissed by a district court in Wisconsin, this Court entered a stay so that the Seventh Circuit could rule on the viability of Plaintiffs' theories.  Both parties acknowledged that a stay was appropriate because it would have determinative significance on the outcome of this case.  If the Seventh Circuit affirmed the dismissal, then the identical claims asserted in this case were doomed; if the Seventh Circuit reversed, then the claims here were plainly viable.

In February 2009, the Seventh Circuit affirmed the dismissal of the Wisconsin case on all grounds, holding that the fees that plaintiffs challenged – fees that are materially indistinguishable from those at issue here – did not violate ERISA.  *Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009).  After *Hecker* was decided, Defendants sought to lift the stay and moved for judgment on the pleadings, but Plaintiffs requested that the stay be continued pending a ruling on the petition for rehearing in *Hecker*.  After the Seventh Circuit denied rehearing and

affirmed its earlier holding, 569 F.3d 708 (7th Cir. 2009), Defendants again moved for judgment

on the pleadings. In response, Plaintiffs asked the Court to continue the stay pending a ruling on

an anticipated petition for certiorari in *Hecker*; in the alternative, they sought leave to amend

their complaint. *See* Doc. 124. This Court denied the first request but granted the second.

Plaintiffs subsequently filed an amended complaint, but that complaint is no better than

the original – it asserts the same claims that the Seventh Circuit rejected in *Hecker*. As explained

below, while Plaintiffs have made some superficial revisions to their allegations, none of these

changes alters the substance of what they are alleging. The changes in their amended complaint

do not change the nature of their theories, the fee arrangements and amounts at issue, or the

similarity between the Exelon Plan's fee arrangements and amounts and those found lawful in

*Hecker*. And the fact that the new complaint is really no different should come as little surprise,

because Plaintiffs themselves admitted before filing it that the new complaint "does not seek to

add any new substantive claims," but instead "merely provide[s] more specificity" to the claims

they had already asserted. *See* Doc. 124, at 9. Because no amount of tinkering will enable

Plaintiffs to plead around *Hecker*, the amended complaint should be dismissed with prejudice.

## Factual and Procedural Background

1. The *Hecker* and *Loomis* Complaints

The original complaint in this case was essentially identical to the complaint in *Hecker*.

Other than allegations about such things as the identity of the defendants,[1] the size of the plans

and the particular investment options they offer, they were carbon copies. *Compare Hecker* Sec.

Am. Compl. (Exhibit A hereto) *with* Doc. 1 (Exhibit B hereto) ("Compl."). Thus, the theories of

liability in both cases were the same:

---

[1] In *Hecker*, plaintiffs named Deere & Co. and two Fidelity entities as the defendants. In this case, the
defendants are Exelon Corporation and various individuals who allegedly have responsibility for
overseeing the Exelon Plan.

- Both complaints alleged breach of fiduciary duty under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, for "providing investment options that required the payment of excessive fees and costs and by failing adequately to disclose the fee structure to plan participants." *See Hecker*, 556 F.3d at 578; *see also* Exhibit A ¶¶ 8-9, 11, 28, 68-90; Compl. ¶¶ 8-9, 11, 27, 60-80.

- Both complaints challenged a fee structure that has become known as "revenue sharing," whereby a portion of the expense ratio charged by a plan investment fund is paid to the company that provides recordkeeping and other services to the plan. *Hecker*, 556 F.3d at 588; Compl. ¶¶ 62-64.

- Both complaints made specific allegations about why plaintiffs' claims are supposedly not barred by the safe harbor defense provided by Section 404(c) of ERISA, 29 U.S.C. § 1104(c). *Compare Hecker* Compl. ¶¶ 58-61, 91-102 *with* Compl. ¶¶ 49-52, 81-91.

Moreover, the complaints in both cases, along with materials that *Hecker* found appropriate to consider on a motion to dismiss, demonstrate that the facts alleged in both cases are also substantially the same:

- Both cases involve 401(k) plans that allowed participants to choose the funds in which participants could invest their accounts. The Deere plan offered 25 Fidelity investment funds with expense ratios ranging from .07% to 1%, a company stock fund, and access to a Fidelity brokerage account. *Hecker*, 556 F.3d at 586. The Exelon Plan offered roughly the same number of investment funds from various investment firms with expense ratios ranging from .03% to 0.96%, plus a

company stock fund. *See* Summary Plan Description (excerpted at Exhibit C

hereto) at 10, App. A 35-51; Mar. 31, 2006 BGI Equity Index Fund Prospectus at

2, EX 000298 (Exhibit D hereto) (disclosing 0.03% expense ratio); Sept. 29, 2006

Fidelity Growth Company Fund Prospectus (and Apr. 18, 2006 Supplement)

(excerpted at Exhibit E hereto) at 4-5, EX 000336-37 (disclosing 0.96% expense

ratio).

- In both cases, the funds offered to plan participants were generally available on

   the open market for the same fee. *Hecker*, 556 F.3d at 579; Compl. ¶¶ 24-25, 34.

- In both cases, the company that provided the recordkeeping and other services

   and that received the revenue sharing payments at issue was the same – Fidelity.

   *Hecker*, 556 F.3d at 578; Compl. ¶¶ 53, 57.

- In both cases, participants received general information about fees in the summary

   plan description and related documents, and were referred for complete fee

   information to prospectuses that were available publicly and upon request to

   Fidelity. *Hecker*, 556 F.3d at 585; Exhibit C at 8-11.

2.  The *Hecker* Decision

On June 20, 2007, the district court dismissed the *Hecker* complaint with prejudice. 496

F. Supp. 2d 967 (W.D. Wis. 2007). Defendants here promptly moved for a stay of proceedings

until the Seventh Circuit resolved the anticipated appeal. Doc. 82. Without objection from

Plaintiffs, this Court granted the stay. Doc. 87.

On February 12, 2009, the Seventh Circuit affirmed the dismissal of *Hecker*. 556 F.3d

575 (7th Cir. 2009). Every issue was resolved in favor of the defendants. The Seventh Circuit

held that Deere had no duty to disclose the arrangements by which Fidelity received asset-based

fees from the expense ratios of the investment funds. *Id.* at 589. Plaintiffs contended that "there is something wrong, for ERISA purposes, in that [revenue sharing] arrangement," but the Seventh Circuit agreed with the district court that "such an arrangement (assuming at this stage that the Complaint accurately described it) violates no statute or regulation." *Id*. at 585.

The Seventh Circuit also rejected the theory that Deere could be liable for "selecting investment options with excessive fees." *Id.* at 586. The court noted that Deere's plans offered a "wide range of expense ratios," from .07% at the low end to just over 1% at the high end. *Id*. The court concluded, "The fact that it is possible that some other funds might have had even lower ratios is beside the point; nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)." *Id*.

As an alternative holding, the Seventh Circuit also found that Deere qualified for the immunity provided by Section 404(c) of ERISA, 29 U.S.C. § 1104(c), which protects fiduciaries of 401(k) plans from liability if the plan allows a participant "to exercise control over the assets in his account." *Id.* at 587. Although Section 404(c) is an affirmative defense, the Seventh Circuit found that plaintiffs had included allegations in their complaint that pleaded them out of court. *Id.* at 588. Because Deere had provided "a sufficient range of options so that participants have control over the risk of loss," the safe harbor defense applied. *Id.* at 589.

The *Hecker* plaintiffs filed a petition for rehearing, and while it was pending, this Court continued the stay of proceedings in this case. The Seventh Circuit ultimately denied the petition for rehearing, upholding its prior ruling in all respects. 569 F.3d 708 (7th Cir. 2009).

3.     The Amended Complaint

After the Seventh Circuit issued its order on rehearing, Defendants here again moved for judgment on the pleadings.  *See* Doc. 121.  In response, Plaintiffs moved to extend the stay yet again pending an anticipated petition for certiorari in *Hecker* or, in the alternative, for leave to amend their complaint.  *See* Doc. 124.  Plaintiffs described the main changes they intended to make if granted leave to amend, but they conceded that their new complaint "does not seek to add any substantive claims" and "merely provide[s] more specificity to the claims" asserted in their original complaint.  *See* Doc. 124, at 9.  The Court rejected Plaintiffs' request to extend the stay, but permitted them to amend their complaint.

On August 19, 2009, Plaintiffs filed their amended complaint.  *See* Doc. 128 ("Am. Compl.").  As Plaintiffs explained in their motion for leave to amend (Doc. 124), the amended complaint makes three main changes to the prior complaint.  First, Plaintiffs deleted the allegations that *Hecker* held pleaded plaintiffs out of court under ERISA Section 404(c), 29 U.S.C. § 1104(c).  *See* Doc. 124 at 4 (describing these allegations as "superfluous").  Second, the amended complaint identifies what Plaintiffs allege are "the specific services (i.e. investment management and administrative services) that resulted in excessive and unreasonable charges against the Plan."  *Id.* at 5.  Third, with respect to these two types of fees, Plaintiffs contend that they were excessive because (a) the fees were allowed to "increase as the assets in the Plan increased" and (b) the Plan received no additional services in exchange for these additional fees. *See id.* at 6.

## Argument

To survive a motion to dismiss under Rule 12(b)(6), a complaint must state a claim that is "plausible on its face," with factual allegations that "raise a right to relief above the speculative

level." *Bell Atl. Corp. v. Twombly,* 127 S. Ct. 1955, 1965 (2007); *Pugh v. Tribune Co.*, 521 F.3d

686, 699 (7th Cir. 2008); *Davis v. LeClair Ryan P.C.*, No. 08 C 6425, 2009 WL 1360868, at

*2 (N.D. Ill. May 12, 2009) (Darrah, J.). Factual allegations that are "merely consistent with"

liability will not suffice. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). Nor may a plaintiff

rely on mere "labels and conclusions." *Twombly,* 127 S. Ct. at 1964-65; *Davis*, 2009 WL

1360868, at *2. Moreover, because basic deficiencies in claims "should be exposed at the point

of minimum expenditure of time and money by the parties," the court must balance the pleading

standards against the need to protect against needless expense and an "*in terrorem* increment of

the settlement value." *Twombly*, 127 S. Ct. at 1965-67.

The Seventh Circuit held that the complaint in *Hecker* failed to state a claim on which

relief could be granted. Even taking into account the changes that Plaintiffs have made in their

amended complaint, the substantive allegations here remain identical in all material respects to

those at issue in *Hecker*. Because these allegations, however worded, cannot state a claim upon

which relief could be granted, the amended complaint should be dismissed with prejudice.

**I.      Under *Hecker*, Plaintiffs' Complaint Does Not State an ERISA Claim.**

In *Hecker*, the Seventh Circuit held that the complaint failed to state a claim that a 401(k)

plan's fee arrangements with its service provider gave rise to liability. 556 F.3d at 585-90.

Specifically, the court held that the same fee arrangements at issue here did not violate any

statute or regulation, that the failure to disclose details about that arrangement was immaterial in

light of the fact that the total expense ratios for the funds were disclosed, and that the fees were

not excessive given the range of fees among the investment options. *Id.* at 585.

The same conclusions are inescapable in this case. As explained below, the fee

arrangements described in the amended complaint, and the amounts of the fees themselves, are

the same in all material respects as those described in *Hecker*. Both cases even involve the same

fee recipient, Fidelity. *See* 556 F.3d at 578-79, 585-86; *compare* Exhibit A ¶¶ 62-90 *with*

Compl. ¶¶ 53-80; Am. Compl. ¶ 32.

Moreover, although Plaintiffs repackaged their earlier non-disclosure allegations into

accusations of "duplicity and deceit," the substantive claim underlying these accusations – lack

of fee transparency – also remains the same. *See* Am. Compl. ¶¶ 38a, 39, 42a, 44. As in *Hecker*,

any non-disclosure of the arrangement would be immaterial because the total expense ratio for

each fund was disclosed. *See* Exhibit C at 8-10; *see e.g.,* Feb. 28, 2006 Prospectus for Fidelity

Contrafund (Exhibit F hereto) at 4-5, EX 000380-81. Participants were informed that the

investment options were subject to fees, and that their account balances would be charged "a

proportionate share of any applicable fees and expenses attributable to the investment funds in

which your Account is invested." *See* Exhibit C at 10. The Exelon Plan's summary plan

description referred participants to each fund's prospectus for additional information about the

funds and any fees associated with them. *Id.* at 8, 10-11.[2] These prospectuses were available

publicly and upon request from Fidelity. *Id*. at 8.

The prospectuses furnished detailed fee information, including information about each

fund's total annual operating expenses. *See, e.g.,* Exhibit F hereto at 4-5, EX 000380-81. These

expenses are expressed in the form of an "expense ratio," a percentage of the money invested in

the fund that is deducted before investment returns are determined. For example, a prospectus

for the Fidelity Contrafund disclosed that the fund's expense ratio was 0.91% and explained that

this sum was broken down as follows: management fee, 0.71%; distribution or service fees,

---

[2] The Seventh Circuit took judicial notice of the publicly available prospectuses, even though they were
not mentioned in the complaint, and affirmed the district court's consideration of the prospectuses and its
decision not to convert the motion to dismiss into a motion for summary judgment. *Hecker*, 556 F.3d at
583 (citing *Menominee Indian Tribe of Wisc. v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998)).

none; other expenses, 0.20%. Exhibit F at EX 000380-81. Under *Hecker*, even if less expensive options may be available in the marketplace, that would make no difference because "nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund." 556 F.3d at 586.[3] Accordingly, Plaintiffs' theory that Defendants could have found cheaper investment options does not state a claim.

## II.     The Changes to the Amended Complaint Do Not Allow Plaintiffs to Avoid the Holding In *Hecker.*

In an effort to avoid *Hecker*, Plaintiffs have filed an amended complaint that makes three principal changes to the allegations in their original complaint. As explained below, however, none of the changes permits the claims asserted in the amended complaint – which Plaintiffs admit are same substantive claims that they asserted previously – to survive this motion to dismiss.

### A.     Elimination of 404(c) Allegations.

The fact that the amended complaint omits certain allegations that formed the basis for the Section 404(c) defense in *Hecker* is of no moment. As the Seventh Circuit noted, this defense merely provided an "alternative ground for affirmance" and was not the primary basis for the Court's decision. 556 F.3d at 587. As a result, Plaintiffs' deletion of those allegations does not change the outcome here; at best, it postpones consideration of the second of two independent grounds for the inevitable dismissal of Plaintiffs' claims.

### B.     Identification of the Fee Components Claimed to Be Excessive.

In the amended complaint, Plaintiffs identify two components of the fees they are challenging as excessive: investment management fees and administrative services fees. Am.

---

[3] For the same reason, Plaintiffs' allegations that the Exelon Plan recently switched to a service provider with a per-participant charge rather than percentage fees, Am. Compl. ¶ 36, does nothing to show that the earlier percentage structure – one blessed by the Seventh Circuit in *Hecker* – was somehow unlawful.

Compl. ¶ 39(b-l) (investment management) & 44(b-k) (administrative services). But *Hecker* demonstrates that the relevant inquiry is not whether the various components of plan fees were individually reasonable; rather, it is whether the total fees were reasonable. In rejecting a similar theory in *Hecker* that participants should have been told the amount of revenue sharing (one component of the fees), the Seventh Circuit specifically held that it was the "total fees" that matter, not the way they are divided. 556 F.3d at 585.

Moreover, *Hecker* holds that defendants cannot be liable for "selecting investment options with excessive fees" where, as here, the Plan offers "a sufficient mix of investments" with a "wide range of expense ratios." 556 F.3d at 586. *Hecker* held that fees ranging from .07% at the low end to just over 1% at the high end do not violate ERISA. *Id.* Because the fees at issue in the Exelon Plan fall in the same range – specifically, from .03% to 0.96%, or slightly *lower* than the expense ratios upheld in *Hecker* – "no rational trier of fact could find" them illegal. *Id.* While it may have been possible to find funds with lower fees, "nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)." *Id.* Thus, the amended complaint's identification of particular components of fees does not distinguish this case from the similar facts found insufficient in *Hecker*.

**C.    "New" Allegations Relating to Fees.**

Finally, in addition to specifying the types of fees being challenged, Plaintiffs have included in their amended complaint two allegations about those fees: that the fees were excessive because they were asset-based and therefore increased as the amount of plan assets increased, and that the fees were excessive because the Plan did not receive additional services in

exchange for the fees it paid. Am. Compl. ¶¶ 18, 39, 44. Neither of these allegations – either individually or together – permits Plaintiffs to circumvent the holding in *Hecker*.

First, the fact that the fees increased as the assets in the Plan increased is hardly a basis for distinguishing the allegations here from those in *Hecker*. On the contrary, exactly the same sort of fees were at issue in *Hecker*. The court explained that revenue sharing was the practice by which "Fidelity Research would assess asset-based fees against the various mutual funds, and then transfer some of the money it collected to Fidelity Trust." 556 F.3d at 585. The court described the asset-based fees associated with the Deere plan as ranging from .07% at the low end to just over 1% at the high end. *Id.* at 586. By definition, these percentage-based fees, like the fees associated with the Exelon Plan, increase as the plan's assets increase (and, as recent market experience suggests, decrease as the plan's assets fall in value). The court explicitly held that this type of asset-based arrangement was lawful. *Id.* The fact that *Hecker* found nothing wrong with these fees confirms that such asset-based charges cannot form the basis for a viable claim. *See also* 29 C.F.R. § 2550.404c-1(b)(2)(B)(2)(i) (requiring that fees be disclosed as a "percentage of average net assets"). Thus, Plaintiffs' inclusion of these allegations in their amended complaint does not save their claims.

Second, Plaintiffs allege that the fees were excessive because they were the same as those paid by other investors, but the Plan did not receive "any additional services beyond that received by non-institutional investors." Am. Compl. ¶¶ 39(d), 44(e). Plaintiffs apparently are referring to the Seventh Circuit's order denying rehearing, in which it noted that plans paying "retail" fees may actually receive services that cause their effective cost of participation to approach wholesale levels. 569 F.3d 708. Specifically, the court speculated that participants in the Deere plan might have "received extra investment advice from someone dedicated to the

11

Deere accounts" or might have "received other extra services." *Id.* at 711. But the court did not hold that such a showing was required to dismiss a claim that the fees were excessive – to the contrary, it reaffirmed its earlier holdings, including the holdings that no reasonable trier of fact could find a breach of fiduciary duty under a plan offering funds with expense ratios like those offered under the Exelon Plan, and that there is no duty to find and offer the funds with the lowest possible fees. 569 F.3d 708; 556 F.3d at 586.

In any event, the governing plan documents confirm that the Exelon Plan did indeed receive extra services from Fidelity. *See Hecker*, 556 F.3d at 582-83 (considering plan documents, including trust agreement, in connection with motion to dismiss). The Master Trust Agreement between Exelon and Fidelity (excerpted at Exhibit G, filed under seal) sets forth a laundry list of special services provided to plan participants. *Id.* Schedule A. For example, Fidelity agreed to provide various communication and education services specifically for Plan participants. *Id.* at 43, § F. In addition to these services, Fidelity also waived fees that plan participants would otherwise have incurred. *Id.* Schedule B. For example, Fidelity agreed to waive annual participant fees, in-service withdrawal fees and dividend pass-through fees. Schedule B, at 45-46. All of these fee waivers provided Plan participants with additional features, services, and cost reductions that would not have been available to ordinary mutual fund customers.

\*      \*      \*

As shown above, none of the changes in the amended complaint allows Plaintiffs to avoid the clear holdings in *Hecker* that the claims asserted here are not viable. Accordingly, this Court should grant Defendants' motion and dismiss these claims with prejudice.

12

### III.    Plaintiffs Fail to State a Plausible Claim Against the Board Defendants.

The claims against the Compensation and Risk Oversight Committees of Exelon's Board

of Directors, together with the claims against the members of those committees[4] (collectively,

the "Board Defendants"), should be dismissed for the additional and independent reason that

Plaintiffs have failed to allege that the Board Defendants had any involvement in the selection of

Plan investments or service providers.  General allegations that "defendants" were responsible

for these activities (Am. Compl. ¶¶ 25, 27-28, 30, 32) are not sufficient to state a claim and are

expressly contradicted by the Exelon Plan, which limits the Board Defendants' responsibilities

with respect to the Plan to the appointment and removal of other fiduciaries and specifically

excludes "other duties or responsibilities with respect to the Plan."  Mar. 30, 2001 Plan, §

11.1(b), (d) (excerpted at Exhibit H); *see Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002)

(affirming dismissal after considering documents referenced in a complaint).

Plaintiffs' conclusory allegations that the Board Defendants should have discovered the

alleged breaches of other fiduciaries and either fired those fiduciaries or sued them, *see* Am.

Compl. ¶¶ 10, 12-13, do not pass muster under *Twombly* and *Iqbal*.  *See In re Calpine Corp.*,

2005 WL 1431506, at *6 (N.D. Cal. Mar. 31, 2005).  Indeed, their boilerplate allegations about

the Board Defendants are exactly the kinds of "unadorned, the-defendant-unlawfully-harmed-

me" claims that the Supreme Court has said are insufficient.  *Iqbal*, 129 S. Ct. at 1949.  *See also*

*Twombly*, 127 S. Ct. at 545.

Finally, plaintiffs' claims against the committees themselves (as opposed to individual

defendants) must be dismissed for the independent reason that committees cannot be liable for

breach of fiduciary duty under ERISA.  *Tatum v. R.J. Reynolds Tobacco Co.*, 2007 WL 1612580,

---

[4] The Board Committee member defendants are M. Walter D'Alessio, R. Greco, R. Rubin, R. Thomas, S. Gin, N. Diaz, E. Jannota, W. Richardson, and J. Rogers, Jr..

at *8 (M.D.N.C. 2007) (dismissing claims because committee was not a "person" subject to

liability for breach of fiduciary duty, as defined by 29 U.S.C. § 1002(9)); *see also In re RCN*

*Litig.*, 2006 WL 753149, at *5 (D.N.J. Mar. 21, 2006); *see also Oyler v. National Guard Ass'n of*

*U.S.*, 743 F.2d 545, 550 (7th Cir. 1984) ("It is well-settled under Illinois law that an

unincorporated association may not sue or be sued in its own name for any remedy at law.").

### <u>Conclusion</u>

In light of the Seventh Circuit's decision in *Hecker*, the claims in the amended complaint

fail as a matter of law.  Defendants respectfully request that this Court grant their motion and

dismiss all counts of the amended complaint with prejudice.

Respectfully submitted,

EXELON CORPORATION; WILLIAM BERGMAN, in
his capacity as Exelon Corporation's Director of
Employee Benefit Plans and Programs;
COMPENSATION COMMITTEE OF EXELON
CORPORATION'S BOARD OF DIRECTORS; M.
WALTER D'ALESSIO, ROSEMARIE B. GRECO,
RONALD RUBIN and RICHARD L. THOMAS, all in
their capacities as members of the Compensation
Committee; EMPLOYEE SAVINGS PLAN
INVESTMENT COMMITTEE; RISK OVERSIGHT
COMMITTEE OF THE EXELON CORPORATION
BOARD OF DIRECTORS; and SUE LING GIN,
JUDGE NELSON A. DIAZ, EDGAR D. JANNOTTA,
WILLIAM C. RICHARDSON, Ph.D., JOHN W.
ROGERS, JR. and RONALD RUBIN, all in their
capacities as members of the Risk Oversight Committee

By:  /s/ Eric S. Mattson
     One of their attorneys

Mark B. Blocker
Eric S. Mattson
Kevin M. Fee
Alison V. Potter
Sidley Austin LLP
One S. Dearborn Street
Chicago, IL  60603
(312) 853-7000
(312) 853-7036 (facsimile)

Robert B. Stutz
Exelon Business Services Company
10 S. Dearborn Street
Chicago, IL  60603
(312) 394-3605

## CERTIFICATE OF SERVICE

Eric S. Mattson, an attorney, hereby certifies that on September 11, 2009, he caused the

foregoing Defendants' Memorandum in Support of Their Motion to Dismiss the Amended

Complaint to be served on the following counsel via the Court's Electronic Case Filing system:

> Jerome J. Schlichter
> Daniel V. Conlisk
> Nelson G. Wolff
> Schlichter, Bogard & Denton
> 100 South Fourth Street
> Suite 900
> St. Louis, MO 63102

/s/ Eric S. Mattson

**INDEX OF EXHIBITS TO DEFENDANTS' MEMORANDUM IN SUPPORT
OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT**

| Exhibit | Description |
|---------|-------------|
| A | Second Amended Complaint, *Hecker v. Deere*, No. 06-0719 S (W.D. Wis.) (filed Mar. 6, 2007) |
| B | Docket no. 1, Original Complaint |
| C | Excerpts from 2002 Summary Plan Description ("SPD") for Exelon Savings Plan |
| D | March 31, 2006 BGI Equity Index Fund Prospectus |
| E | September 29, 2006 Fidelity Growth Company Fund Prospectus (and April 18, 2006 Supplement) |
| F | February 28, 2006 Fidelity Contrafund Prospectus |
| G | **SEALED** Excerpts from January 1, 2006 Master Trust Agreement |
| H | Excerpts from March 30, 2001 Exelon Savings Plan Document |

# EXHIBIT A

 

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

DENNIS HECKER, JONNA DUANE,
WILLIAM WALLACE, ROGER BRADLEY,
and JANICE RIGGINS,
 individually and on behalf of all those
similarly situated

                                         CASE NUMBER: 06-C-0719-S

     Plaintiffs,

                                         JURY TRIAL DEMANDED
v.                                          AMENDED CLASS ACTION
                                          COMPLAINT

DEERE & COMPANY, FIDELITY
MANAGEMENT TRUST COMPANY, and
FIDELITY MANAGEMENT & RESEARCH
COMPANY,

     Defendants.

## SECOND AMENDED COMPLAINT FOR BREACH OF FIDUCIARY DUTY

### INTRODUCTION

    1.    Personal savings accounts, such as 401(k)s, are quickly becoming employees' primary method of financially planning for retirement. For many employees in the United States today, an employer-provided defined benefit pension awaiting their retirement is a quaint, historical notion.

    2.    In 401(k) plans, employers provide an opportunity for employees to save their own pre-tax dollars in individual 401(k) accounts. The accounts provide a number of investment alternatives into which employees place a portion of their current income with the hope of earning, over time, a return sufficient to support themselves and their families in retirement.

3.    Accordingly, in 401(k) plans, the return on employees' investments is critical. Even seemingly small reductions in a participant's return in one year may substantially impair his or her accumulated savings at retirement.

4.    While such reductions in 401(k) accounts' returns may result from market fluctuations, a consistent, albeit rarely discussed, force reducing 401(k) accounts' earnings is the administrative fees and expenses assessed against account balances.

5.    The most certain means of increasing the return on employees' 401(k) savings is to reduce the fees and expenses employees pay from their 401(k) accounts.

6.    Unlike generalized market fluctuations, employers can control these fees and expenses. Federal law requires them to do so.

7.    Under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"), an employer who provides a 401(k) plan for its employees is a "Plan Sponsor." The employer or its agent may also serve as "Plan Administrator," or the employer may appoint a third party to serve as such. The Plan Sponsor and the Plan Administrator, among others, are fiduciaries of the 401(k) plan. The Plan Administrator performs or contracts for administrative, record-keeping, investment management, and other services from entities in the financial and retirement industry. ERISA requires that the fees for these services must be reasonable, incurred solely for the benefit of Plan participants, and fully disclosed.

8.    For providing various services, third-party plan administrators, record-keepers, consultants, investment managers, and other vendors in the 401(k) industry have developed a variety of pricing and fee structures.

2

9.    At best, these fee structures are complicated and confusing when disclosed to Plan participants. At worst, they are excessive, undisclosed, and illegal.

10.    In this action, pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), Plaintiffs and Class Representatives, on behalf of all similarly situated participants and beneficiaries of the John Deere Savings & Investment Plan, Plan No. 003 and the John Deere Tax Deferred Savings Plan, Plan No. 008 (herein the "Plan" or "Plans"), seek to recover the losses suffered by the Plans on a plan wide basis and to obtain injunctive and other equitable relief for the Plans from the Plans' fiduciaries based upon the fiduciaries' breaches of fiduciary duties.

11.    As set forth in detail below, the fees and expenses paid by the Plans, and thus borne by Plan participants, were and are unreasonable and excessive; not incurred solely for the benefit of the Plans and the Plans' participants; and undisclosed to participants. By subjecting the Plans and the participants to these excessive fees and expenses, and by other conduct set forth below, the Defendants violated their fiduciary obligations under ERISA.

## PARTIES, JURISDICTION AND VENUE

### Plaintiffs

12.    Plaintiff and Class Representative Dennis Hecker lives in Mercer, Wisconsin, within the Western District of Wisconsin. He is a participant in the John Deere Tax Deferred Savings Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

13.    Plaintiff and Class Representative Jonna Duane lives in Madison, Wisconsin, within the Western District of Wisconsin. She is a participant in the John

3

 

Deere Savings & Investment Plan within the meaning of ERISA § 3(7), 29 U.S.C. §
1002(7).

14.    Plaintiff and Class Representative William Wallace lives in Horicon,
Wisconsin. He is a participant in the John Deere Tax Deferred Savings Plan within the
meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

15.    Plaintiff and Class Representative Roger Bradley lives in Beaver Dam,
Wisconsin. He is a participant in the John Deere Tax Deferred Savings Plan within the
meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

16.    Plaintiff and Class Representative Janice Riggins lives in Coal Valley,
Illinois. She is a participant in the John Deere Savings & Investment Plan within the
meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

### Defendants

17.    Defendant Deere & Company ("Deere") manufactures heavy equipment
for use in the agriculture, construction, forestry and landscaping sectors. It is one of the
world's two leading agricultural machinery manufacturers and employs more than 47,000
people in 26 countries. Within the United States, it has major operations in Illinois,
Wisconsin, Minnesota, North Dakota, Iowa, Louisiana, and Georgia. It is registered to
do business in Wisconsin and employs several hundred people at its Madison and
Horicon facilities.

18.    Deere is the sponsor of the Plans within the meaning of ERISA § 3(16)(B),
29 U.S.C. § 1002(16)(B), and is also an administrator of the Plans within the meaning of
ERISA § 3(16)(A), 29 U.S.C. § 1102(16)(A). In its role as administrator, it has the
authority and discretion to select the investments available to Plan participants and

4

beneficiaries, and to control and manage the operation and administration of the Plans. It is a "named fiduciary" within the meaning of ERISA § 402, 29 U.S.C. § 1102, and is also a fiduciary with respect to the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

19.     Defendant Fidelity Management Trust Company ("FMTC") is a Massachusetts corporation with its headquarters in Boston. FMTC is a trust company and manages assets for approximately 550 institutional clients worldwide with $113 billion in assets under management as of March 2006. FMTC is a subsidiary of Fidelity Investments, one of the world's largest money managers.

20.     Because ERISA requires that the assets of the Plans be held in trust, pursuant to a written trust agreement, ERISA, § 403, 29 U.S.C. § 1103(a), Defendant Deere, as Plan sponsor and administrator, designated FMTC the trustee of the Plans. In addition, FMTC is the Plans' record keeper, performing a variety of administrative tasks for the Plans. FMTC also directly manages at least two of the investment options available to Plan participants in each of the Plans and is thus a fiduciary to the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

21.     FMTC also played a role in the selection of the investment options the Plans make available to participants. Although Deere as Plan Administrator had final authority for the selection of the investment options, Deere and FMTC agreed that Deere would limit its selection to those securities issued by investment companies for which FMTC's affiliate company, Fidelity Management & Research Company, serves as investment advisor or for which FMTC itself provides investment advice, subject to an exception for certain pre-existing guaranteed investment contracts (GICs) and the Deere

Common Stock Fund. For these reasons, FMTC is a fiduciary for both Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

22.     Defendant Fidelity Management & Research Company ("FMRCo") is a subsidiary of Fidelity Investments and an affiliate of FMTC. FMRCo is a registered investment company that acts as the leading manager and investment advisor to the Fidelity family of mutual funds and other fiduciary accounts. The Fidelity funds are marketed throughout the United States through a variety of distribution channels, including Fidelity investment centers and over the internet at Fidelity.com. FMRCo exercises discretion in the selection of the investment options the Plans make available to participants and has an obligation to obtain and analyze all material information in selecting these options. In addition, FMRCo exercises discretion over Plan assets when it decides how much Revenue Sharing to send to Fidelity affiliates, like FMTC, and thus offset the Plans' expenses. For these reasons, FMRCo is a fiduciary for both Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

23.     For each Plan, FMRCo is the investment advisor for 23 out of the 26 investment options available to Plan participants. It is paid by the Plans (and thus by the participants and beneficiaries) for its services. It maintains an active Revenue Sharing program, charging more for its services than it expects to keep in order to have additional monies with which to pay its affiliates and business partners. FMTC and FMRCo are referred to herein as "Fidelity."



### Jurisdiction And Venue:

24.     Plaintiffs seek relief on behalf of the Plans through the mechanisms found in ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502, 29 U.S.C. § 1132. Therefore, this Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

25.     The Defendants are subject to service of process issued from this Court pursuant to 29 U.S.C. § 1132(e)(1)(2).

26.     Venue of this action is proper pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the injury occurred directly to Plaintiffs in this district where they live and work, because the breaches of fiduciary duty occurred in this district and because the Defendants may be found in this district.

### The Plaintiff Class

27.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and all similarly situated Plan participants and beneficiaries. They seek to represent the following two classes (herein referred to as "Class" or "Classes"):

> All persons, *excluding individual employees who are or may be liable for the conduct described in this Complaint,* who are or were participants or beneficiaries of the John Deere Savings & Investment Plan, Plan No. 003, and who are, were or may have been affected by the conduct set forth in this Complaint, as well as those who will become participants or beneficiaries of the Plan in the future.

> and

> All persons, *excluding individual employees who are or may be liable for the conduct described in this Complaint,* who are or were participants or beneficiaries of the John Deere Tax Deferred Savings Plan, Plan No. 008, and who are, were or may have been affected by the conduct set

 

forth in this Complaint, as well as those who will become participants or beneficiaries of the Plan in the future.

28.     Certification of each these Classes is proper under Rule 23(a) because all of its prerequisites are satisfied:

    a.   **Numerosity.** The members of each Class is so numerous that joinder of all members is impracticable. Although the Plaintiffs do not know the exact number of class members as of the date of filing, there were 21,009 participants with account balances in the John Deere Savings & Investment Plan at the end of the 2004 plan year, and 10,186 participants with account balances in the John Deere Tax Deferred Savings Plan at the end of the 2004 plan year.

    b.   **Commonality.** Common issues of fact and law predominate over any issues unique to individual class members. Issues that are common to all class members include, but are not limited to, whether one or more of the Defendants:

        i.   Charged fees and expenses to the Plans that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants;

        ii.   Caused the Plans to enter into agreements which in turn caused and/or allowed the Plans to pay fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants;

        iii.   Failed to monitor the fees and expenses paid by the Plans and, by such failure, caused or allowed the Plans to pay

8

 

 fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants;

iv. Failed to inform themselves of, and understand, the various methods by which vendors in the 401(k) retirement industry collect payments and other revenues from 401(k) plans;

v. Failed to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plans were reasonable and incurred solely for the benefit of Plan participants;

vi. Failed properly to inform and/or disclose to Plan participants the fees and expenses that are, or have been, paid by the Plans;

vii. Failed to inform and/or disclose to Plan participants in proper detail and clarity the transaction fees and expenses which affect participants' accounts balances in connection with the purchase or sale of interests in investment alternatives;

viii. Failed to disclose that hidden and excessive fees were and are being assessed against Plan assets and failed to stop such hidden excessive fees;

ix. Failed to exercise the care, skill, prudence, and diligence that a prudent person would when acting in like capacity

 

and familiar with such matters when charging, causing to be charged or paid, or failing to monitor the fees and expenses of the Plans;

x. Caused and/or allowed fees and expenses to be paid by the Plans for purposes other than those allowed by ERISA;

xi. Breached their fiduciary and other ERISA-imposed obligations to the Plans, Plan participants, and members of the Classes by engaging in the conduct set forth in this Complaint, revealed in discovery and/or proven at trial;

xii. Are liable to the Plans and the Classes for losses suffered as a result of the breaches of their fiduciary and other ERISA-imposed obligations;

xiii. Are responsible to account for the assets and transactions of the Plans and should be charged for any transactions and payments for which they cannot account;

xiv. Are responsible in equity to make restitution of monies that in good conscience belong to each Plan and the participants and beneficiaries.

c. **Typicality.** The Claims brought by the Plaintiffs are typical of those of the absent class members because:

i. The Defendants owed the exact same fiduciary and other ERISA-based obligations to each Plan participant and each member of both Classes;

10

 

ii. The Defendants' breach of those obligations constitutes a breach to each Plan participant and each member of both Classes;

iii. To the extent that there are any differences among the Class members' damages, such differences would be a product of simple mathematics based upon their account balances in the Plans. Such minimal and formulaic differences are no impediment to class certification.

d. **Adequacy of Representation.** The Plaintiffs are adequate representatives of the absent class members and will protect such absent class members' interests in this litigation. The Plaintiffs do not have any interests antagonistic to the other class members nor do they have any unique claims or defenses that might undermine the efficient resolution of the class claims. Plaintiffs have retained competent counsel, versed in ERISA, class actions, and complex litigation.

29. Class certification is also appropriate under Rule 23(b) and each subpart because:

a. Pursuant to Rule 23(b)(1), in the absence of certification, there is a risk of inconsistent adjudications with respect to individual class members and adjudications with respect to individual class members would be dispositive of the interests of the other members not parties to the adjudications or would substantially impair or impede their ability to protect their interests;

11

 

    b.  Pursuant to Rule 23(b)(2), as set forth above, the Defendants have acted on grounds generally applicable to each Class as a whole;

    c.  Pursuant to Rule 23(b)(3), as set forth above, common issues of law and fact predominate over any purely individual issues and thus a class action is superior to any other method for adjudicating these claims.

### FACTS

### The Plans

30.    Deere offers certain of its employees the opportunity to participate in the Plans, as part of their compensation and benefits. Each Plan is a "defined contribution plan," as defined in ERISA § 3(34), 29 U.S.C. § 1002(34) and contains an employee stock ownership plan provision. Each Plan is also a tax-qualified plan of the type popularly known as a "401(k) plan."

31.    Deere benefits from its sponsorship of the Plans because giving employees the opportunity to participate in the Plans enhances Deere's ability to recruit and retain qualified personnel, fosters employee loyalty and goodwill, and entitles Deere to tax advantages under the Internal Revenue Code.

### Savings & Investment Plan

32.    The Savings & Investment Plan ("SIP") was established and is operated under a Plan Document. Under the terms of the SIP qualified employees may contribute certain portions of their before-tax earnings to the Plan. Deere will match those contributions in varying percentages up to 6 %. It may also make a profit-sharing contribution to some participants. All participants are 100 percent vested in their contributions and allocated net earnings. Some participants – those electing the

12

"Traditional Option" – are 100% vested in the matching contribution portion at all times, while other participants – those electing the "Contemporary Option – are not fully vested in their matching contributions until after three years of service.

33. Each participant's account is credited with the participant's contributions, the participant's share of Deere's matching contributions and discretionary profit-sharing contributions, if any, and the SIP's earnings and losses allocated daily based on the ratio of the participants respective account balances. FMTC, in its role as Plan record keeper, has the responsibility for keeping track of the individual accounts.

34. As noted above, the assets of the SIP are held in the "John Deere Savings and Investment Plan Trust." In 1990, Defendants Deere and FMTC entered into a trust agreement in which FMTC agreed to provide trustee and recordkeeping services to the SIP, and to be a fiduciary with respect to certain investments.

35. In the document, which has been amended at least 27 times without substantially changing this provision, FMTC disavows any responsibility for selecting the investment options or for rendering advice regarding the selection of investment options. However, the parties agreed that Deere's selection of mutual funds would be limited to funds operated, managed, and/or advised by Fidelity, with an exception for certain pre-existing investments and for the company stock fund.

36. Thus, as of approximately 2004, participating employees could invest Plan contributions in any of 26 investment options selected by Deere subject to the limitations imposed in the agreement with FMTC. Twenty-three of the available options are retail mutual funds operated and managed by FMRCo – the same mutual funds that FMRCo

13

and its parent Fidelity Investments make available to investors large or small on the open market.

37.     In addition to the retail mutual funds, the SIP offers two funds managed directly by Fidelity, the "Blended Interest Fund" and the "Fidelity Intermediate Collective Pool." These two options are similar to mutual funds in that they pool money and invest in many different underlying securities. FMTC acts as the investment advisor to these two funds, choosing the amount of each security held. In the agreement, it acknowledges that it is a fiduciary with respect to these funds.

38.     The SIP also offers participants the option of investing in the Deere Common Stock Fund, a fund that holds Deere & Company common stock.

39.     By the end of 2005, the SIP had more than $2 billion in assets. More than $1.3 billion of those Plan assets are held in Fidelity retail mutual funds.

**Tax Deferred Savings Plan**

40.     The Tax Deferred Savings Plan ("TDS Plan") was established in 1987, and is operated under Plan Documents. Under the terms of the TDS Plan, qualified employees may contribute certain portions of their before-tax earnings to the Plan. Deere will match those contributions in varying percentages up to 6%. All participants are 100 percent vested in their contributions and allocated net earnings. The Deere matching contributions are vested after a participant has three years of service with the company.

41.     Each participant's account is credited with the participant's contributions, the participant's share of Deere's matching contributions, and the Plan's earnings and losses allocated daily based on the ratio of the participants respective account balances.

14

FMTC, in its role as Plan record keeper, has the responsibility for keeping track of the individual accounts.

42.     As noted with the SIP, the assets of the TDS Plan are held in trust. Also, as with the SIP, in addition to being the record keeper, FMTC is the Trustee and Investment Manager for the TDS Plan. In addition, FMTC is a fiduciary with respect to certain TDS Plan investments.

43.     As with the SIP, the selection of mutual funds made available in the TDS Plan are limited to funds operated, managed, and/or advised by Fidelity, with an exception for certain pre-existing investments and for the company stock fund.

44.     Thus, as of approximately 2004, participating employees could invest TDS Plan contributions in any of 26 investment options selected by Deere subject to the limitations imposed in an agreement with FMTC. Twenty-three of the available options are retail mutual funds operated and managed by FMRCo – the same mutual funds that FMRCo and its parent Fidelity Investments make available to investors large or small on the open market.

45.     In addition to the retail mutual funds, the TDS Plan offers two funds managed directly by Fidelity, the "Blended Interest Fund" and the "Fidelity Intermediate Bond Commingled Pool." These two options are similar to mutual funds in that they pool money and invest in many different underlying securities. FMTC acts as the investment advisor to these two funds, choosing the amount of each security held. FMTC is a fiduciary with respect to these funds.

46.     The TDS Plan also offers participants the option of investing in the Deere & Company Common Stock Fund, a fund that holds Deere & Company common stock.

15

 

By the end of 2005, the TDS Plan had more than $500 million in assets. More than $244

million of those TDS Plan assets are held in Fidelity retail mutual funds.

### Fiduciary Duties Owed To The Plan Under ERISA

47.      ERISA §403(c)(1), 29 U.S.C. §1103(c)(1), unambiguously mandates that:

> [T]he assets of a plan shall never inure to the benefit of any employer and
> shall be held for the **exclusive purposes of providing benefits** to
> participants in the plan and their beneficiaries **and defraying reasonable
> expenses of administering the plan.**

(Emphasis added).

48.      ERISA §§ 404(a)(1)(A)&(B) of ERISA, 29 U.S.C. § 1104(a)(1)(A) & (B),

require that Plan fiduciaries, including the Defendants, "shall discharge [their] duties with

respect to a plan solely in the interest of the participants and beneficiaries" and:

a. [F]or the exclusive purpose of:
   i.   providing benefits to participants and their beneficiaries;
        and
   ii.  defraying reasonable expenses of administering the plan;
        and
b. [W]ith the care, skill, prudence, and diligence under the circumstances
   then prevailing that a prudent man acting in a like capacity and
   familiar with such matters would use in the conduct of an enterprise of
   a like character and with like aims.

49.      ERISA § 405(a), 29 U.S.C. § 1105(a), provides that one fiduciary may be

held liable for breaches of fiduciary duty committed by another fiduciary where

> (1) the fiduciary "participates knowingly in or knowingly undertakes to conceal,
> an act or omission of such other fiduciary, knowing such act or omission is a
> breach";
> (2) the fiduciary, by his or her "failure to comply with section 1104(a) of this title
> in the administration of his specific responsibilities which give rise to his status as
> a fiduciary" enables "such other fiduciary to commit such a breach"; or
> (3) the fiduciary "has knowledge of a breach by such other fiduciary," and does
> not make "reasonable efforts under the circumstances to remedy the breach."

16

50.     ERISA § 406, 29 U.S.C. § 1106, prohibits certain transactions between a

plan and "parties in interest." This section provides that unless subject to an exemption

as set forth in ERISA § 408, 29 U.S.C. § 1108, a fiduciary

> shall not cause the plan to engage in a transaction …if he knows or should
> know that such a transaction constitutes a direct or indirect – sale or
> exchange, or leasing, of any property between the plan and a party in
> interest …furnishing of goods, services or facilities between the plan and a
> party in interest …transfer to, or use by or for the benefit of, a party in
> interest, of any assets of the plan.

29 U.S.C. § 1106(a)(1).

51.     For purposes of section 406, a "party in interest" is any plan fiduciary,

including the plan administrator, trustee, officer or custodian, any plan services provider,

the employer, a relative of any of the above, and certain persons with ownership or

leadership roles in any of the above. ERISA § 3(14), 29 U.S.C. § 1002(14).

52.     Similarly, a fiduciary such as Deere or Fidelity (1) shall not "deal with the

assets of the plan in his own interest or for his own account"; (2) shall not "act in any

transaction involving the plan on behalf of a party (or represent a party) whose interests

are adverse to the interests of the plan" or its participants and beneficiaries; and (3) shall

not "receive any consideration for his own personal account from any party dealing with

such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. §

1106(b).

53.     ERISA §104(b)(1), 29 U.S.C. § 1024(b)(1), requires that Deere, as the

Plan Administrator, periodically provide to Plan participants and beneficiaries a summary

plan description (an "SPD").

54.     ERISA §104(b)(3), 29 U.S.C. § 1024(b)(3), requires that Deere, as the

Plan Administrator, at least annually provide to Plan participants and beneficiaries copies

17

 

of statements and schedules from the Plans' annual report for the previous year, and such additional information "as is necessary to fairly summarize the latest annual report."

55. The schedules and statements that Deere, as the Plan Administrator, annually must provide to Plan participants and beneficiaries specifically include:

    a. [A] statement of the assets and liabilities of the plan aggregated by categories and valued at their current value, and the same data displayed in comparative form for the end of the previous fiscal year of the plan; and

    b. [A] statement of receipts and disbursements during the preceding twelve-month period aggregated by general sources and applications.

*See* ERISA §103(b)(3), 29 U.S.C. §1023(b)(3).

56. ERISA §104(b)(4), 29 U.S.C. § 1024(b)(4), entitles Plan participants and beneficiaries to receive more detailed information from Deere, as the Plan Administrator, on request:

The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated.

57. ERISA §103(b)(2)&(3), 29 U.S.C. §1023(b)(2)&(3) mandates that, among other extensive disclosures, Deere, as a Plan fiduciary, must include in a Plan's "Annual Report"

a statement of [the Plan's] assets and liabilities, and a statement of changes in net assets available for plan benefits which shall include details of revenues and expenses and other changes aggregated by general source and application.

58. ERISA § 404(c) provides to Plan fiduciaries a "Safe Harbor" from liability for losses that a participant suffers in his or her 401(k) accounts to the extent that the participant exercises control over the assets in his or her 401(k) accounts. To be eligible



for the protection of this "safe harbor," Deere, as a Plan fiduciary, must, among other

things, have provided:

>    a. an opportunity for a participant or beneficiary to exercise control over
>       assets in his individual account, and
>    b. a participant or beneficiary an opportunity to choose, from a broad
>       range of investment alternatives, the manner in which some or all of
>       the assets in his account are invested.

29 C.F.R. §2550.404c-1(b)(1).

59.     For a participant or beneficiary to have "an opportunity to exercise control

over assets in his individual account," Plan fiduciaries must provide him or her with "the

opportunity to obtain sufficient information to make informed decisions with regard to

investment alternatives under the Plan." 29 C.F.R. §2550.404c-1(b)(2)(B).

60.     The "sufficient investment information" that Deere, as a Plan fiduciary,

must have provided includes:

>    A description of any transaction fees and expenses which affect the
>    participant's or beneficiary's account balance in connection with purchases
>    or sales of interests in investment alternatives (e.g., commissions, sales
>    load, deferred sales charges, redemption or exchange fees).

29 C.F.R. §2550.404c-1(b)(2)(i)(B)*(1)(v)*.  At least upon request, it must include

>    A description of the annual operating expenses of each designated
>    investment alternative (e.g., investment management fees, administrative
>    fees, transaction costs) which reduce the rate of return to participants and
>    beneficiaries, and the aggregate amount of such expenses expressed as a
>    percentage of average net assets of the designated investment alternative.

29 C.F.R. §2550.404c-1(b)(2)(i)(B)*(2)(i)*.

61.     ERISA's Safe Harbor Regulations state that the imposition of *reasonable*

charges for *reasonable* Plan expenses does not interfere with a participant's opportunity

to exercise control over his or her individual account so long as *Plan fiduciaries inform*

*the participant* of such actual expenses:

19



> A plan may charge participants' and beneficiaries' accounts for the
> reasonable expenses of carrying out investment instructions, *provided that
> procedures are established under the plan to periodically inform such
> participants and beneficiaries of actual expenses incurred with respect to
> their respective individual accounts.*

29 C.F.R. §2550.404c-1(b)(2)(ii)(A) (emphasis added).

### The Fees and Expenses Assessed Against The Plans

62.     Defendant Deere, directly or indirectly, has caused the Plans to purchase services from various plan service providers, including trustee, record-keeping, administration, investment advisory, investment management, brokerage, insurance, consulting, accounting, legal, printing, mailing, and other services.

63.     Plan service providers, such as Fidelity, receive payment in at least one of two ways:

    a.  By direct disbursement from the Plan; and/or

    b.  By receiving, or having the opportunity to receive, "Revenue Sharing" payments comprised of Plan assets distributed between and/or among various service providers.

### "Hard Dollar" Payments to Plan Service Providers

64.     Payments in the form of direct disbursements from a 401(k) plan to participants or an entity providing a service to the plan are characterized as "Hard Dollar" payments.

65.     401(k) plans must disclose to government regulators and plan participants, in one form or another, Hard Dollar payments made from the plan to service providers.

66.     The Plans have stated in filings with the government regulators that the Plans pay no administrative expenses. Upon further inquiry by participants, the Plans



stated that Deere, as Plan Sponsor, pays all of the expenses of the Plans in accordance with the Plan documents.

67.    Whether or not this is correct with respect to Hard Dollar expenses, these Hard Dollar expenses are not all of the fees that Fidelity charges or collects in exchange for the services it provides to the Plans.

## Revenue Sharing Payments to Plan Service Providers

68.    Revenue Sharing is a common practice in the financial, securities, and investment industry that provides services to 401(k) plans.

69.    Industry commentators and analysts consider Revenue Sharing to be the "big secret of the retirement industry."

70.    Industry commentators and analysts generally define "Revenue Sharing" as the transfer of asset-based compensation from brokers or investment management providers (such as the mutual funds advised and managed by FMRCo, and also common or collective trusts, insurance companies offering GICs, and similar pooled investment vehicles) to administrative service providers (such as FMTC in its role as record-keeper and trustee, as well as administrators and/or consultants) in connection with 401(k) and other types of defined contribution plans.

71.    For example, a plan or its agent (a third-party administrator, consultant, or similar fiduciary) seeking to select an investment vehicle (mutual fund, common or collective trust, guaranteed investment contracts, etc. (collectively "Fund")) to be offered to plan participants as an investment option will negotiate an agreement that sets the costs assessed against each dollar invested by specifying the expense ratio and available Revenue Sharing.

21

72.     In Revenue Sharing arrangements, the plan and the Fund agree upon an asset-based fee that is not the true price for which the Fund will provide its service.

73.     Instead, the Fund's agreed asset-based fee includes *both* the actual price for which the Fund will provide its service *and* additional amounts that the Fund does not need to cover the cost of its services and to make a profit.

74.     The additional portion of the agreed-upon asset-based charge is "shared" with plan service providers or others who do business with the plan or the Fund.

75.     As a result of Revenue Sharing arrangements, plan service providers, such as Fidelity, or others who do business with the plan or the Fund receive *both* a Hard Dollar payment from the plan *and* additional revenue that the Fund "shares" with them.

76.     The total fees a Fund charges to a plan can vary widely based upon a number of factors, including without limitation: the amount invested; the level of sophistication of the plan fiduciary negotiating the fee agreement; the plan fiduciary's awareness of Revenue Sharing and inclination to expend effort monitoring Revenue Sharing transfers; the diligence with which the plan's representative conducts such negotiations; and the separate financial interests and/or agendas of the plan fiduciary and the Fund as they negotiate.

77.     Revenue Sharing also occurs between and among brokerage firms, investment managers, fund families and other service providers.

78.     When 401(k) plan service providers receive compensation in the form of both Hard Dollar fees *and* Revenue Sharing payments, determining the total amount of fees and expenses that the plan incurs for any category of services (*i.e.* recordkeeping and



administration, investment advisory, trustee, auditing, and accounting, etc.) requires that *both* the Hard Dollar fees *and* Revenue Sharing payments be taken into account.

79.    Ascertaining whether the Plan Administrator -- in this case Deere -- has fulfilled its fiduciary obligation to ensure that the fees and expenses assessed against the 401(k) plan are reasonable and incurred solely in the interest of plan participants requires consideration whether the *total of both* the Hard Dollar *and* Revenue Sharing payments paid for any category of services complies with this standard.

80.    It is especially important to consider the Revenue Sharing payments because they are based on the total assets under management, rather than on the number of participant accounts serviced. Thus, as the years pass, and the participants' retirement savings grow, the amount of money available for Revenue Sharing payments increases, even though no additional services may be provided to the plan.

81.    Although Revenue Sharing monies arise only as a result of, and in connection with, transactions involving the plan, plan assets and plan service providers; Revenue Sharing is not always captured and used for the benefit of the plan and the participants.

82.    When Revenue Sharing is foregone, the plan will not only pay additional Hard Dollar fees to the plan service providers (since no Revenue Sharing payments are available to offset those Hard Dollar costs), but it will also pay additional money to the Fund, beyond what the Fund would normally charge and keep.

83.    Consequently, in determining whether a plan administrator or other fiduciary has fulfilled its obligation to ensure that the fees and expenses assessed against

23



the plan are reasonable and incurred solely in the interest of plan participants, foregone Revenue Sharing must also be taken into account.

84.     Such is the case here. The Plans and the participants and beneficiaries of the Plans have been charged fees and expenses that include monies with which to make Revenue Sharing payments. In many cases, the amounts allocated for Revenue Sharing payments are more than 1/3 of the total amount collected by Fidelity and its affiliates that operate the mutual funds.

85.     In this case, these Revenue Sharing amounts were retained by Fidelity and its affiliates as fees for their services. The Revenue Sharing payments kept by Fidelity and its affiliates are in addition to any Hard Dollar Fees paid directly to them by the Plans or by Deere.

86.     These Revenue Sharing amounts are in excess of the fees that Fidelity would retain if non-affiliated plan service providers were involved. Fidelity was able to retain these additional payments because the Plans employ FMTC as both recordkeeper and trustee and because it uses investment options advised and managed by FMRCo and operated by other Fidelity affiliates.

87.     These Revenue Sharing payments -- consisting of millions of dollars -- were far in excess of reasonable fees for the administrative and/or investment services provided to the Plans by the Fidelity affiliates and far in excess of what plans of this type must pay for similar services or investment options.

 

## Revenue Sharing Arrangements Are Not Disclosed to Plan Participants

88.     Revenue Sharing is not disclosed to Plan participants and government regulators, even though it accounts for a greater portion of service provider payments than do Hard Dollar disbursements to those same providers.

89.     Accordingly, industry commentators and experts have dubbed Revenue Sharing payments to be "hidden fees" that are assessed against 401(k) plans and thus reduce plan participants' retirement savings.

90.     By entering into agreements with FMTC, FMRCo and other Fidelity affiliates, and by allowing, and/or failing to monitor, discover, and prevent or recover these undisclosed Revenue Sharing arrangements, Deere deprived Plan participants of true and accurate information regarding:

      a.  How much they are paying in fees and expenses for each Plan;

      b.  Who is receiving Plan assets through Revenue Sharing;

      c.  How much specific service providers are paid by the Plans; and

      d.  Whether the total amount paid to services providers (*i.e.* disclosed, hard dollar fees *combined with* Revenue Sharing payments) is reasonable and incurred solely for the participants' benefit.

## Defendants' Non-Compliance with §404(c)'s Safe Harbor Requirements and Concealment of Its Fiduciary Breaches

91.     Neither Deere nor Fidelity disclosed, and to this day have not disclosed, the fact that Fidelity and/or other plan service providers were engaging in Revenue Sharing. They did not disclose that Revenue Sharing was available for the benefit of the Plans and the participants, and they did not disclose the amount of Revenue Sharing payments, made by or to Plan service providers.



92.     In fact, Deere stated exactly the opposite when asked.

93.     Plan participants did not have, and do not have, complete and actual knowledge of the fees and expenses being charged to the Plans that reduced their account balances.

94.     Thus, the Plans' fiduciaries, including Defendants, have not told Plan participants, and Plan participants do not know:

> a.     the "annual operating expenses" of the investment options in the Plans, as required by 29 C.F.R. §2550.404c-1(b)(2)(i)(B)*(2)(i)*; and

> b.     the actual expenses incurred with respect to their respective individual accounts, as required by 29 C.F.R. §2550.404c-1(b)(2)(ii)(A).

95.     As a result of Defendants' failure and refusal to provide accurate information, and the general failure on the part of either Deere or Fidelity to disclose the actual Plans' expenses, and the specific amounts paid to specific service providers, including the available Revenue Sharing and the fact that Deere and Fidelity have long-standing agreements that Deere will only choose Fidelity-related funds for the Plans, the participants have not been provided with "the opportunity to obtain sufficient information to make informed decisions with regard to investment alternatives under the plan." 29 C.F.R. §2550.404c-1(b)(2)(I)(B).

96.     Because none of the Defendants has provided the participants with this information, and because the Defendants concealed this information from them, the participants have lacked the information necessary to understand and protect their interests in the Plans and/or to have knowledge of, these Defendants' breaches of fiduciary duty.



97.    In fact, in their fiduciary roles, Deere and Fidelity are the parties with the information necessary to know and understand whether the participants' rights and protections under ERISA are being, or have been, violated.

98.    Defendants have an affirmative obligation to provide full and accurate information to Plan participants regarding the administration of the Plans.

99.    Their silence and/or non-disclosure in the face of such a duty to disclose is tantamount to an affirmative misrepresentation.

100.    Here, despite the duty to disclose full and accurate information regarding the fees and expenses assessed against participants' accounts, on an ongoing basis these Defendants failed and refused to disclose to, and inform the participants of:

a.    the total amount of fees and expenses reasonable and necessary to operate the Plans;

b.    the total amount of amount of fees and expenses the Plans actually paid to service providers;

c.    the availability of Revenue Sharing;

d.    the true and accurate details regarding the revenues and expenses of the Plans;

e.    the true and accurate operating expenses which reduce participants' returns, including both Hard Dollar payments and Revenue Sharing, for each of the Plans' investment alternatives;

f.    the true and accurate transaction fees and expenses which affect the participants' account in connection with the purchase or sale of investment alternatives;

27

 

g.   the amount, when both Hard Dollar Payments and Revenue Sharing are considered, by which the Plans' expenses exceeded those which were reasonable and incurred solely in participants' interests;

h.   other revenue and expense information necessary for the participants to understand and protect their interests in the Plans; and,

i.   the Defendants' agreement to limit the Plans' investment options to Fidelity affiliated funds, thereby benefiting Fidelity and/or other Fidelity affiliates.

101.   Based upon the foregoing, the Defendants are not entitled to the safe harbor protections of ERISA § 404(c).

102.   Based upon the foregoing, the statue of limitations was tolled on the breaches set forth in this Complaint and did not begin to run until such time as Plaintiffs actually discovered them.

**COUNT I:**
**Breach of Fiduciary Duty Against Defendants Deere, FMTC and FMRCo**
**ERISA §502(a)(2)**

103.   Plaintiffs restate and incorporate the allegations contained in paragraphs 1 through 102 as though fully set forth here.

104.   As set forth in detail above, Defendants owe the Plans, the participants and beneficiaries, and the Classes extensive fiduciary duties including, without limitation:

a.   To conduct themselves as Plan fiduciaries with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent ERISA professional fiduciary would in operating and administering a 401(k) plan the size and character of the Plans;

 

b. To perform their duties as fiduciaries with the utmost loyalty and fidelity to the Plans and the participants and beneficiaries, avoiding at all times conflicts of interest, self-interest, and duplicity;

c. To ensure, at all times, that Plan assets "shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan;"

d. To track and account for all transactions involving the Plans and the Plans' assets so as to ensure that the Plans' assets are retained, managed, and disbursed in compliance with the Plans' Documents and ERISA;

e. To track and account for all transactions involving the Plans and the Plans' assets so as to ensure that the Plans' assets "never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan;"

f. To ensure that the fees and expenses incurred by the Plans are reasonable and incurred for the sole and exclusive benefit of Plan participants and beneficiaries;

g. In entering into agreements with service providers to the Plans, or in Fidelity's case, in entering into agreements with Deere, to ensure that the payments from the Plans – whether they are direct or indirect – are

29

 

reasonable for the services provided and made for the sole and exclusive benefit of the Plans' participants and beneficiaries;

h. In operating and administering the Plans, to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plans were reasonable and incurred solely for the benefit of the Plans' participants;

i. In operating, managing, advising, and administering the Plans, on an ongoing basis to monitor the payments made by the Plans to service providers, advisors, and/or managers such as Fidelity – whether they are direct or indirect – are and remain reasonable for the services provided and made for the sole and exclusive benefit of the Plans' participants and beneficiaries;

j. To inform themselves of, and understand, the various methods by which vendors in the 401(k) industry, including Fidelity and other Fidelity affiliates, collect payments and other revenues from 401(k) plans;

k. To inform themselves of trends, developments, practices, and policies in the retirement, financial investment and securities industry which affect the Plans; and to remain aware and knowledgeable of such trends, practices and policies on an ongoing basis;

l. To communicate with Plan participants and beneficiaries regarding the Plans honestly, clearly and accurately;



m. To affirmatively and without request provide Plan participants and beneficiaries with honest, accurate and complete information they need to understand their investments in the Plans; the management, risk, potential returns of such investments, and the fees and expenses incurred in connection with those investments;

n. Upon request, to provide further any information to Plan participants and beneficiaries regarding the operation and administration of the Plans and the expenses incurred in doing so; and

o. To provide honest, accurate and complete information to Plan participants and beneficiaries regarding the costs associated with their various investment choices and directions.

105.     As set forth in detail above, Deere and/or Fidelity breached their fiduciary obligations to the Plans, the Plans' participants and beneficiaries and the Classes by, among other conduct to be proven at trial, one or more of the following acts:

a. Agreeing that the Plans would pay – directly or indirectly – fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of the Plans' participants and beneficiaries;

b. Allowing or causing the Plans to pay – directly on indirectly – fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of the Plans' participants and beneficiaries;

c. Failing to monitor the fees and expenses paid by the Plans and, by such failure, causing and/or allowing the Plans to pay fees and

31

 

expenses that were, or are, unreasonable and/or not incurred solely for the benefit of the Plans' participants and beneficiaries;

d. Failing to inform itself of trends, developments, practices, and policies in the retirement, financial investment and securities industry which affect the Plans; and failing to remain aware and knowledgeable of such trends, practices and policies on an ongoing basis;

e. Failing to inform itself of, and understand, the various methods by which vendors in the 401(k) industry collect payments and other revenues from 401(k) plans;

f. Failing to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plans were reasonable and incurred solely for the benefit of the Plans' participants;

g. Failing to communicate with Plan participants and beneficiaries regarding each Plan honestly, clearly and accurately;

h. Failing properly to inform and/or disclose to Plan participants the fees and expenses that are, or have been, paid by the Plans;

i. Failing to inform and/or disclose to Plan participants in proper detail and clarity the transactions, fees and expenses which affect participants' accounts balances in connection with the purchase or sale of interests in investment alternatives;

j. Failing to discover, disclose and stop the charging of hidden and excessive fees to the Plans;

32

k.  By the foregoing conduct, failing to exercise the care, skill, prudence and diligence that a prudent person would when acting in like capacity and familiar with such matters.

106.    As set forth in detail above, as a result of these breaches, Plaintiffs, the Classes, the Plans, and the Plans' participants and beneficiaries have suffered financial losses and damages.

107.    Further, as set forth in detail above, the Defendants failed to provide participants and beneficiaries with sufficient investment information to qualify for the Safe Harbor immunity of ERISA § 404(c), 29 U.S.C. § 1104(c). Accordingly, the Defendants are not able to make use of this section to avoid liability for any investment losses participants and beneficiaries may have experienced in the Plans caused by the above-referenced breaches.

108.    Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a), the Defendants are liable to restore to the Plans the losses experienced as a direct result of the Defendants' breaches of fiduciary duty and are liable for any other available and appropriate equitable relief, including prospective injunctive relief and declaratory relief, and attorney's fees.

**COUNT II:**
**Other Remedies for Breach of Fiduciary Duty Against Deere, FMTC and FMRCo**
**– ERISA §502(a)(3)**

109.    Plaintiffs restate and incorporate the allegations contained in paragraphs 1 through 108 as though fully set forth here.

110.    As an alternative to the causes of action stated in Count I, Plaintiffs seek further relief pursuant to ERISA § 502(a)(3), 29 U.S.C., § 1132(a)(3).

33

111.     Under section 502(a)(3), a participant may enjoin any act which violates ERISA or may obtain other appropriate equitable relief to redress such violations or enforce the terms of ERISA.

112.     Defendants are the primary fiduciaries of the Plans and occupy a position of trust and confidence in connection with the Plans, the Plans' assets, and the Plans' participants and beneficiaries.

113.     These Defendants have exclusive discretion and control over the Plans' assets and are strictly obligated to exercise that control "for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan."

114.     Although *only* Plan participants and beneficiaries are entitled to Plan assets and to the benefit of Plan assets, in the absence of full and candid disclosure from the Defendants, Plan participants and beneficiaries do not know, and have no means of knowing, how their assets have been managed and disbursed.

115.     Accordingly, these Defendants occupy the position of a common law trustee in connection with the Plans, the assets of the Plans, and the participants and beneficiaries of the Plans.

116.     As set forth in detail above, these Defendants have caused and/or allowed the Plans to pay – directly or indirectly – excess fees and expenses to Plan service providers.

117.     These Defendants, and not the Plaintiffs, are the entities which have and/or should have specific and detailed information regarding how Plan assets have been treated and disbursed in this regard.

34

 

118.     Accordingly, the Court should order that these Defendants render an accounting of all transactions, disbursements and dispositions occurring in, in connection with, and/or in respect of, the Plans and the assets of the Plans.

119.     The Plaintiffs respectfully request that the Court order that such an accounting include, without limitation, detailed and specific information regarding all fees and expenses incurred by the Plans and/or paid to third parties, whether paid directly by the Plans or indirectly transferred among Plan service providers or other third parties.

120.     Plaintiffs respectfully request that to the extent these Defendants do not or cannot account for all such transactions and their property under ERISA, Plan documents and other applicable law, the Court surcharge against these Defendants and in favor of the Plans all amounts for which they cannot account.

121.     Plaintiffs further seek injunctive and other appropriate equitable relief to redress the wrongs described above, and to cause them to cease in order for the Plans' participants and beneficiaries to receive the full benefit of their retirement savings in the future.

## COUNT III:
### Other Remedies for Breach of Fiduciary Duty Against FMTC and FMRCo
### ERISA §502(a)(3)

122.     Plaintiffs restate and incorporate the allegations contained in paragraphs 1 through 121 as though fully set forth here.

123.     As a further alternative to the causes of action stated in Count I, Plaintiffs seek further relief against Defendants FMTC and FMRCo pursuant to ERISA § 502(a)(3), 29 U.S.C., § 1132(a)(3).

124.     One form of equitable relief available under section 503(a)(3) is equitable restitution.

125.     By secretly charging the Plans for and retaining the Revenue Sharing payments described above, Defendants FMTC and FMRCo obtained funds that should have been used solely for the benefit of Plans' participants and beneficiaries for the exclusive purposes of providing benefits to participants in the Plans and their beneficiaries and defraying reasonable expenses of administering the Plans.

126.     FMTC and FMRCo knew or should have known that those Revenue Sharing payments were the Plans' assets and that they should have been used solely for the benefit of the Plans' participants and beneficiaries for the exclusive purposes of providing benefits to participants in the Plans and their beneficiaries and defraying reasonable expenses of administering the Plans.

127.     Because the Revenue Sharing payments were used for purposes not permitted by ERISA, these monies rightfully and in good conscience belong to the Plans, and the participants and beneficiaries of the Plans.

128.     The Revenue Sharing payments are specifically identifiable funds.

129.     The Revenue Sharing payments are in the possession, control, and/or custody of FMTC or FMRCo.

130.     Plaintiffs, on behalf of the Plans, seek equitable restitution of the Revenue Sharing payments, along with any profit, from FMTC and/or FMRCo.

WHEREFORE Plaintiffs, on behalf of the Plans and all similarly situated participants and beneficiaries of the Plans, respectfully request that the court:

36

 

- find and declare that the Defendants have breached their fiduciary duties as described above;

- order the Defendants to make good to the Plans all losses that the Plans incurred as a result of the conduct described above and to restore the Plans to the position they would have been in but for the breaches of fiduciary duty;

- impose a constructive trust on any monies by which the Defendants were unjustly enriched as a result of their breaches of fiduciary duty and/or cause the Defendants to disgorge such monies and return them to the Plans;

- remove any fiduciary who has breached his or her fiduciary duties and/or enjoin the fiduciary from future breaches of ERISA;

- award actual damages to the Plans in the amount of its monetary losses;

- require Defendants to render an accounting as set forth above;

- surcharge against Defendants and in favor of the Plans all amounts involved in transaction which such accounting reveals were or are improper, excessive and/or in violation of ERISA;

- permanently enjoin Defendants from breaching their fiduciary duties in each respect set forth in the Complaint;

- order costs and attorneys fees pursuant to ERISA § 502(g) and the common fund doctrine;

- order equitable restitution or other available equitable relief against the Defendants;

37

 

- order the payment of interest to the extent it is allowed by law; and

  grant any other and further relief the Court deems appropriate

## PLAINTIFFS DEMAND A TRIAL BY JURY OF ALL COUNTS SO TRIABLE.

Dated: March 6, 2007

Respectfully submitted,

Schlichter, Bogard & Denton

Jerome J. Schlichter
Elizabeth J. Hubertz
Troy A. Doles
Nicole Bolton
100 South Fourth Street
Suite 900
St. Louis, MO 63102
Tel:    314-621-6115
Fax:    314-621-7151

Lead Counsel for Plaintiffs

SOLHEIM BILLING & GRIMMER S.C.
Kim Grimmer
Jennifer L. Amundsen
U.S. Bank Plaza, Suite 301
One South Pinckney Street
P.O. Box 1644
Madison, WI 53701
Tel:    608-282-1200
Fax:    608-282-1218

Local Counsel for Plaintiffs

38

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was served on March 6, 2007 upon the following parties via electronic transmission and regular mail:

Sari M. Alamuddin
Morgan, Lewis & Bockius
LLP
77 West Wacker Drive,
Sixth Floor
Chicago, IL 60601
Tel: 312.324.1158
Fax: 877.432.9652

Counsel for Deere &
Company

Mark A. Camelli
Lewis W. Beilin
Reinhart Boerner Van Deuren
1000 North Water Street
P.O. Box 2965
Milwaukee, WI 53201
Tel: 414.298.1000
Fax: 414.298.8097

Counsel for Fidelity
Management Trust Company
and Fidelity Management &
Research Company

Robert Eccles
Brian Brooks
O'Melveny & Myers LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Tel: 202.383.5300
Fax: 202.383.5414

Counsel for Fidelity
Management Trust
Company and Fidelity
Management & Research
Company

_Counsel for Plaintiffs_

39

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

BRIAN LOOMIS, DEBRA COGSWELL,
RON WELTE, WAYNE JOHNSON,
and ED SALFELDER,
individually and on behalf of all
those similarly situated

      Plaintiffs,

v.

EXELON CORPORATION, WILLIAM
BERGMAN in his capacity as Exelon
Corporation's Director of Employee Benefit
Plans and Programs; COMPENSATION
COMMITTEE OF EXELON
CORPORATION'S BOARD
OF DIRECTORS; M. WALTER D'ALESSIO,
ROSEMARIE B. GRECO, RONALD RUBIN
AND RICHARD L. THOMAS, all in their
capacities as members of the Compensation
Committee, EMPLOYEE SAVINGS
PLAN INVESTMENT COMMITTEE;
RISK OVERSIGHT COMMITTEE
OF THE EXELON CORPORATION
BOARD OF DIRECTORS; AND
SUE LING GIN, JUDGE NELSON A.
DIAZ, EDGAR D. JANNOTTA,
WILLIAM C. RICHARDSON, PH.D.,
JOHN W. ROGERS, JR. AND
RONALD RUBIN, all in their capacities as
members of the Risk Oversight Committee,

      Defendants.

06CV4900
JUDGE FILIP
MAG. JUDGE ASHMAN

JURY TRIAL DEMANDED
CLASS ACTION COMPLAINT

**JUDGE'S COPY**

SEP 1 1 2006

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

### COMPLAINT FOR BREACH OF FIDUCIARY DUTY

### INTRODUCTION

1.     Personal savings accounts, such as 401(k)s, are quickly becoming

employees' primary method of financially planning for retirement.  For many employees

in the United States today, an employer-provided defined benefit pension awaiting their
retirement is a quaint, historical notion.

2.      In 401(k) plans, employers provide an opportunity for employees to save
their own pre-tax dollars in individual 401(k) accounts.  The accounts provide a number
of investment alternatives into which employees place a portion of their current income
with the hope of earning, over time, a return sufficient to support themselves and their
families in retirement.

3.      Accordingly, in 401(k) plans, the return on employees' investments is
critical.  Even seemingly small reductions in a participant's return in one year may
substantially impair his or her accumulated savings at retirement.

4.      While such reductions in 401(k) accounts' returns may result from market
fluctuations, a consistent, albeit rarely discussed, force reducing 401(k) accounts'
earnings is the administrative fees and expenses assessed against account balances.

5.      The most certain means of increasing the return on employees' 401(k)
savings is to reduce the fees and expenses employees pay from their 401(k) accounts.

6.      Unlike generalized market fluctuations, employers can control these fees
and expenses.  Federal law requires them to do so.

7.      Under the Employee Retirement Income Security Act of 1974, 29 U.S.C.
§ 1001 *et seq.* ("ERISA"), an employer who provides a 401(k) plan for its employees is a
"Plan Sponsor."  The employer or its agent may also serve as "Plan Administrator," or
the employer may appoint a third party to serve as such.  Both the Plan Sponsor and the
Plan Administrator are fiduciaries of the 401(k) plan.  The Plan Administrator performs
or contracts for administrative, record-keeping, investment management, and other

services from entities in the financial and retirement industry. ERISA requires that the fees for these services must be reasonable, incurred solely for the benefit of Plan participants, and fully disclosed.

8.      For providing various services, third-party plan administrators, record-keepers, consultants, investment managers, and other vendors in the 401(k) industry have developed a variety of pricing and fee structures.

9.      At best, these fee structures are complicated and confusing when disclosed to Plan participants. At worst, they are excessive, undisclosed, and illegal.

10.     In this action, pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), Plaintiffs and Class Representatives, on behalf of all similarly situated participants and beneficiaries of the Exelon Corporation Employee Savings Plan, Plan #003, (the "Plan"), seek to recover the losses suffered by the Plan on a plan wide basis and to obtain injunctive and other equitable relief for the Plan from the Plan's fiduciaries based upon their breaches of their fiduciary duties.

11.     As set forth in detail below, the fees and expenses paid by the Plan, and thus borne by Plan participants, were and are unreasonable and excessive; not incurred solely for the benefit of the Plan and its participants; and undisclosed to participants. By subjecting the Plan and its participants to these excessive fees and expenses, and by other conduct set forth below, the Defendants violated their fiduciary obligations under ERISA.

## PARTIES, JURISDICTION AND VENUE

### Plaintiffs

12.     Plaintiff and Class Representative Brian Loomis is a resident of Illinois, living and working in the Northern District of Illinois.

13.     Plaintiff and Class Representative Debra Cogswell is a resident of Illinois, living and working in the Northern District of Illinois.

14.     Plaintiff and Class Representative Gary Welte is a resident of Illinois, living and working in the Northern District of Illinois.

15.     Plaintiff and Class Represenative Wayne Johnson is a resident of Illinois, living and working in the Northern District of Illinois.

16.     Plaintiff and Class Representative Ed Salfelder is a resident of Illinois.

17.     Each Plaintiff and Class Representative is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

## Defendants

18.     Defendant Exelon Corporation is a corporation with its headquarters in Chicago, Illinois. It provides electric and gas utility services to consumers in Illinois and Pennsylvania. It is the sponsor of the Plan within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B), an administrator of the Plan within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1102(16)(A), and is the employer and principal of the Plan's administrator and one or more of its members. It is a fiduciary with respect to the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

19.     Defendant William Bergman, Exelon Corporation's Director of Employee Benefit Plans and Programs, is the current Plan Administrator within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A), and is a "named fiduciary" to the Plan within the meaning of ERISA § 402(a)(2), 29 U.S.C. § 1102(a)(2). He has responsibility for all matters relating to the Plan except for investments, benefits appeals, and the trust

fund. He is also a fiduciary with respect to the Plan within the meaning of ERISA §
3(21)(A), 29 U.S.C. § 1002(21)(A).

20.     Defendant Compensation Committee of Exelon Corporation's Board of
Directors has the responsibility for appointing, monitoring, and/or removing the Plan
Administrator. In this capacity, the Compensation Committee and its members are
fiduciaries to the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).
The members of the Compensation Committee are Directors M. Walter D'Alessio,
Rosemarie B. Greco, Ronald Rubin and Richard L. Thomas.

21.     Defendant Employee Savings Plan Investment Committee currently has
responsibility for all matters relating to the investments held by the Plan and its
participants. The members of the Investment Committee are William Bergman, as
Director of Employee Benefit Plans and Programs, Exelon Corporation's Director of
Investments, and Exelon Business Services Company's Manager of Accounts Payable.
The Investment Committee is a "named fiduciary" to the Plan within the meaning of
ERISA § 402(a)(2), 29 U.S.C. § 1102(a)(2), and is a fiduciary to the Plan within the
meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

22.     Defendant Risk Oversight Committee of the Exelon Corporation Board of
Directors has responsibility for appointing, monitoring, and removing the members of the
Investment Committee. The Members of the Risk Oversight Committee are the
independent directors of Exelon Corporation: Sue Ling Gin, Judge Nelson A. Diaz,
Edgar D. Jannotta, William C. Richardson, Ph.D., John W. Rogers, Jr. and Ronald Rubin.
In this capacity, they are all fiduciaries to the Plan within the meaning of ERISA §
(21)(A), 29 U.S.C. § 1002(21)(A).

## Jurisdiction And Venue:

23.     Plaintiffs seek relief on behalf of the Plan through the mechanisms found in ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502, 29 U.S.C. § 1132.  Therefore, this Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

24.     All Defendants are subject to service of process issued from this Court pursuant to 29 U.S.C. § 1132(e)(1)(2).

25.     Venue of this action is proper pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the injury occurred directly to Plaintiffs in this district where they live and work, because the breaches of fiduciary duty occurred in this district and because the Defendants may be found in this district.

## The Plaintiff Class

26.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and all similarly situated Plan participants and beneficiaries.  They seek to represent the following class (the "Class"):

> All persons, *excluding the Defendants, the Committees and/or other individuals who are or may be liable for the conduct described in this Complaint,* who are or were participants or beneficiaries of the Plan and who are, were or may have been affected by the conduct set forth in this Complaint, as well as those who will become participants or beneficiaries of the Plan in the future.

27.     Certification of this class is proper under Rule 23(a) because all of its prerequisites are satisfied:

a. **Numerosity.**  The members of the Class are so numerous that joinder of all members is impracticable.  Although the Plaintiffs do not know the exact number of class members as of the date of filing, there were

6

23,291 participants with account balances in the Plan at the end of the 2004 plan year.

b. **Commonality.** Common issues of fact and law predominate over any issues unique to individual class members. Issues that are common to all class members include, but are not limited to, whether the Defendants:

  i.    Charged fees and expenses to the Plan that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants;

  ii.    Caused the Plan to enter into agreements with third parties which caused and/or allowed the Plan to pay fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants;

  iii.    Failed to monitor the fees and expenses paid by the Plan and, by such failure, caused or allowed the Plan to pay fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants;

  iv.    Failed to inform themselves of, and understand, the various methods by which vendors in the 401(k) retirement industry collect payments and other revenues from 401(k) plans;

  v.    Failed to establish, implement, and follow procedures to properly and prudently determine whether the fees and

7

expenses paid by the Plan were reasonable and incurred

solely for the benefit of Plan participants;

vi.    Failed properly to inform and/or disclose to Plan

participants the fees and expenses that are, or have been,

paid by the Plan;

vii.    Failed to inform and/or disclose to Plan participants in

proper detail and clarity the transaction fees and expenses

which affect participants' accounts balances in connection

with the purchase or sale of interests in investment

alternatives;

viii.  Breached their fiduciary duties by failing to disclose that

hidden and excessive fees were and are being assessed

against Plan assets and by failing to stop such hidden

excessive fees;

ix.    Appointed as fiduciaries persons who did not fulfill their

fiduciary duties, failed to monitor and/or oversee the

performance of those fiduciaries and to ensure that they

were fulfilling those duties, and failed to terminate the

fiduciaries' appointment after breaches occurred;

x.    In charging, causing to be charged or paid, and failing to

monitor the fees and expenses of the Plan, failed to exercise

the care, skill, prudence, and diligence that a prudent

person would when acting in like capacity and familiar with such matters;

xi. Caused and/or allowed fees and expenses to be paid by the Plan for purposes other than those allowed by ERISA;

xii. By the conduct above and/or by other conduct set forth in this Complaint, revealed in discovery and/or proven at trial, breached their fiduciary and other ERISA-imposed obligations to the Plan, Plan participants, and members of the Class;

xiii. Are liable to the Plan and the Class for losses suffered as a result of the breaches of their fiduciary and other ERISA-imposed obligations; and

xiv. Are responsible to account for the assets and transactions of the Plan and should be charged for any transactions and payments for which they cannot account.

c. **Typicality.** The Claims brought by the Plaintiffs are typical of those of the absent class members because:

i. The Defendants owed the exact same fiduciary and other ERISA-based obligations to each Plan participant and each member of the Class;

ii. The Defendants' breach of those obligations constitutes a breach to each participant and each member of the Class;

    iii.    To the extent that there are any differences among the Class members' damages, such differences would be a product of simple mathematics based upon their account balances in the Plan. Such minimal and formulaic differences are no impediment to class certification.

    d.  **Adequacy of Representation.** The Plaintiffs are adequate representatives of the absent class members and will protect such absent class members' interests in this litigation. The Plaintiffs do not have any interests antagonistic to the other class members nor do they have any unique claims or defenses that might undermine the efficient resolution of the class claims. Plaintiffs have retained competent counsel, versed in ERISA, class actions, and complex litigation.

28.    Class certification is also appropriate under Rule 23(b) and each subpart because:

    a.  Pursuant to Rule 23(b)(1)(B), in the absence of certification, there is a risk of inconsistent adjudications with respect to individual class members;

    b.  Pursuant to Rule 23(b)(2), as set forth above, the Defendants have acted on grounds generally applicable to the Class as a whole;

    c.  Pursuant to Rule 23(b)(3), as set forth above, common issues of law and fact predominate over any purely individual issues and thus a class action is superior to any other method for adjudicating these claims.

## FACTS

## The Plan

29.     As part of their compensation and benefits, Exelon offers certain of its employees the opportunity to participate in the Plan. The Plan is a "defined contribution plan," as defined in ERISA § 3(34), 29 U.S.C. § 1002(34) and contains an employee stock ownership plan provision. It is also a tax-qualified plan of the type popularly known as a "401(k) plan."

30.     Exelon benefits from its sponsorship of the Plan because giving employees the opportunity to participate in the Plan enhances Exelon's ability to recruit and retain qualified personnel, fosters employee loyalty and goodwill, and entitles Exelon to tax advantages under the Internal Revenue Code.

31.     Under the terms of the Plan, qualified employees may contribute certain portions of their before-tax earnings to the Plan. Exelon Corporation will match those contributions in varying percentages. Participants are 100 percent vested in their account, including Exelon's matching contribution portion, and amounts are entirely non-forfeitable at all times.

32.     Each participant's account is credited with the participant's contributions, the participant's share of Exelon's matching and discretionary contributions, and the Plan's earnings.

33.     Participating employees may choose to invest Plan contributions in any of 25 investment options, selected by the Investment Committee and its members. Seventeen of those options are mutual funds, with six of the mutual funds being what are known as lifecycle or target date funds.

34.    In addition to the mutual funds, the Plan offers six "collective trusts." Collective trusts such as the ones in the Plan are similar to mutual funds in that they pool money from more than one investor and invest in many different underlying securities. Unlike mutual funds, however, collective trusts are not available to the retail customer, but are available only to institutional investors such as pension plans or large 401(k) plans.

35.    The Plan also offers participants the option of investing in the Exelon Stock Fund, a fund that holds Exelon Corporation common stock.

36.    By the end of 2005, the Plan had more than $3 billion in assets.

37.    Of the more than $3 billion in assets, nearly $2 billion was held in mutual funds. The majority of the mutual fund assets were held in funds managed by Fidelity Management and Research Company. Fidelity Management Trust Company is the Plan's trustee.

## Fiduciary Duties Owed To The Plan Under ERISA

38.    ERISA §403(c)(1), 29 U.S.C. §1103(c)(1), unambiguously mandates that:

> [T]he assets of a plan shall never inure to the benefit of any employer and shall be held for the **exclusive purposes of providing benefits** to participants in the plan and their beneficiaries **and defraying reasonable expenses of administering the plan.**

(Emphasis added).

39.    ERISA §§ 404(a)(1)(A)&(B) of ERISA, 29 U.S.C. § 1104(a)(1)(A) & (B), require that Plan fiduciaries, including Exelon, "shall discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries" and:

    a.  [F]or the exclusive purpose of:
        i.    providing benefits to participants and their beneficiaries;

12

    and

  ii.  defraying reasonable expenses of administering the plan; and

  b.  [W]ith the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

40.    ERISA § 405(a), 29 U.S.C. § 1105(a), provides that one fiduciary may be held liable for breaches of fiduciary duty committed by another fiduciary where

(1) the fiduciary "participates knowingly in or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach";
(2) the fiduciary, by his or her "failure to comply with section 1104(a) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary" enables "such other fiduciary to commit such a breach"; or
(3) the fiduciary "has knowledge of a breach by such other fiduciary," and does not make "reasonable efforts under the circumstances to remedy the breach."

41.    ERISA § 406, 29 U.S.C. § 1106, prohibits certain transactions between the Plan and "parties in interest." This section provides that unless subject to an exemption as set forth in ERISA § 408, 29 U.S.C. § 1108, a fiduciary

shall not cause the plan to engage in a transaction …if he knows or should know that such a transaction constitutes a direct or indirect – sale or exchange, or leasing, of any property between the plan and a party in interest …furnishing of goods, services or facilities between the plan and a party in interest …transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan.

29 U.S.C. § 1106(a)(1).

42.    For purposes of section 406, a "party in interest" is any plan fiduciary, including the plan administrator, trustee, officer or custodian, any plan services provider, the employer, a relative of any of the above, and certain persons with ownership or leadership roles in any of the above. ERISA § 3(14), 29 U.S.C. § 1002(14).

13

43.     Similarly, a fiduciary (1) shall not "deal with the assets of the plan in his own interest or for his own account"; (2) shall not "act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan" or its participants and beneficiaries; and (3) shall not "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b).

44.     ERISA §104(b)(1), 29 U.S.C. § 1024(b)(1), requires that the Plan Administrator periodically provide to Plan participants and beneficiaries a summary plan description (an "SPD").

45.     ERISA §104(b)(3), 29 U.S.C. § 1024(b)(3), requires that the Plan Administrator at least annually provide to Plan participants and beneficiaries copies of statements and schedules from the Plan's annual report for the previous year, and such additional information "as is necessary to fairly summarize the latest annual report."

46.     The schedules and statements that the Plan Administrator annually must provide to Plan participants and beneficiaries specifically include:

     a. [A] statement of the assets and liabilities of the plan aggregated by categories and valued at their current value, and the same data displayed in comparative form for the end of the previous fiscal year of the plan; and
     b. [A] statement of receipts and disbursements during the preceding twelve-month period aggregated by general sources and applications.

See ERISA §103(b)(3), 29 U.S.C. §1023(b)(3).

47.     ERISA §104(b)(4), 29 U.S.C. § 1024(b)(4), entitles Plan participants and beneficiaries to receive more detailed information from the Plan Administrator on request:

     The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement,

14

trust agreement, contract, or other instruments under which the plan is established or operated.

48.     ERISA §103(b)(2)&(3), 29 U.S.C. §1023(b)(2)&(3) mandates that, among other extensive disclosures, Plan fiduciaries must include in the Plan's "Annual Report"

a statement of [the Plan's] assets and liabilities, and a statement of changes in net assets available for plan benefits which shall include details of revenues and expenses and other changes aggregated by general source and application.

49.     ERISA § 404(c) provides to Plan fiduciaries a "Safe Harbor" from liability for losses that a participant suffers in his or her 401(k) accounts to the extent that the participant exercises control over the assets in his or her 401(k) accounts. To be eligible for the protection of this "safe harbor," Plan fiduciaries must, among other things, provide:

a. an opportunity for a participant or beneficiary to exercise control over assets in his individual account, and
b. a participant or beneficiary an opportunity to choose, from a broad range of investment alternatives, the manner in which some or all of the assets in his account are invested.

29 C.F.R. §2550.404c-1(b)(1).

50.     For a participant or beneficiary to have "an opportunity to exercise control over assets in his individual account," Plan fiduciaries must provide him or her with "the opportunity to obtain sufficient information to make informed decisions with regard to investment alternatives under the Plan." 29 C.F.R. §2550.404c-1(b)(2)(B).

51.     The "sufficient investment information" Plan fiduciaries must provide includes:

A description of any transaction fees and expenses which affect the participant's or beneficiary's account balance in connection with purchases or sales of interests in investment alternatives (e.g., commissions, sales load, deferred sales charges, redemption or exchange fees).

15

29 C.F.R. §2550.404c-1(b)(2)(i)(B)*(1)(v)*. At least upon request, it must include

> A description of the annual operating expenses of each designated
> investment alternative (e.g., investment management fees, administrative
> fees, transaction costs) which reduce the rate of return to participants and
> beneficiaries, and the aggregate amount of such expenses expressed as a
> percentage of average net assets of the designated investment alternative.

29 C.F.R. §2550.404c-1(b)(2)(i)(B)*(2)(i)*.

52.     ERISA's Safe Harbor Regulations state that the imposition of *reasonable*

charges for *reasonable* Plan expenses does not interfere with a participant's opportunity

to exercise control over his or her individual account so long as *Plan fiduciaries inform*

*the participant* of such actual expenses:

> A plan may charge participants' and beneficiaries' accounts for the
> reasonable expenses of carrying out investment instructions, *provided that*
> *procedures are established under the plan to periodically inform such*
> *participants and beneficiaries of actual expenses incurred with respect to*
> *their respective individual accounts.*

29 C.F.R. §2550.404c-1(b)(2)(ii)(A) (emphasis added).

## The Fees and Expenses Assessed Against The Plan

53.     The Defendants, directly or indirectly, have caused the Plan to purchase

services from various plan service providers, including trustee, record-keeping,

administration, investment advisory, investment management, brokerage, insurance,

consulting, accounting, legal, printing, mailing, and other services.

54.     The Defendants have caused the amounts that the Plan pays for these

services to be assessed against participants' accounts.

55.     The Defendants have caused or allowed these plan service providers to

receive payment in at least one of two ways:

    a. By direct disbursement from the Plan to the entity providing the service; and/or

    b. By receiving, or having the opportunity to receive, "Revenue Sharing" payments comprised of Plan assets distributed between and/or among various service providers.

### "Hard Dollar" Payments to Plan Service Providers

56.    Payments in the form of direct disbursements from the Plan to participants or an entity providing a service to the Plan are characterized as "Hard Dollar" payments.

57.    The Plan discloses to government regulators and Plan participants, in one form or another, Hard Dollar payments made from the Plan to service providers. For example, the Plan disclosed in filings with government regulators covering plan year 2003 that it paid Fidelity Institutional Operations Company for recordkeeping services.

58.    Based upon this disclosure, understanding the Plan's record-keeping expense for 2003 *appears* straightforward: The Plan sent a check to Fidelity Institutional Operations Company and, in exchange, Fidelity Institutional Operations Company maintained the Plans' records.

59.    However, these disclosed hard dollar expenses are not all of the fees.

### Revenue Sharing Payments to Plan Service Providers

60.    Revenue Sharing is a common practice in the financial, securities, and investment industry that provides services to 401(k) plans.

61.    Industry commentators and analysts consider Revenue Sharing to be the "big secret of the retirement industry."

17

62.     Industry commentators and analysts generally define "Revenue Sharing" as the transfer of asset-based compensation from brokers or investment management providers (such as mutual funds, common or collective trusts, insurance companies offering general insurance contracts, and similar pooled investment vehicles) to administrative service providers (record-keepers, administrators, trustees or consultants) in connection with 401(k) and other types of defined contribution plans.

63.     For example, a plan or its agent (a third-party administrator, consultant, or similar fiduciary) seeking to select an investment vehicle (mutual fund, common or collective trust, guaranteed investment contracts, etc. (collectively "Fund")) to be offered to plan participants as an investment option will negotiate an agreement that sets the costs assessed against each dollar invested by specifying the expense ratio and available Revenue Sharing.

64.     In Revenue Sharing arrangements, the Plan and the Fund agree upon an asset-based fee that is not the true price for which the Fund will provide its service.

65.     Instead, the Fund's agreed asset-based fee includes *both* the actual price for which the Fund will provide its service *and* additional amounts that the Fund does not need to cover the cost of its services and to make a profit.

66.     The additional portion of the agreed-upon asset-based charge is "shared" with Plan service providers or others who do business with the Plan or the Fund.

67.     As a result of Revenue Sharing arrangements, Plan service providers or others who do business with the Plan or the Fund receive *both* a Hard Dollar payment from the Plan *and* additional revenue that the Fund "shares" with them.

68.     The total fees a Fund charges to a plan can vary widely based upon a number of factors, including without limitation: the amount that the plan invests in the Fund; the level of sophistication of the plan fiduciary negotiating the fee agreement; the plan fiduciary's awareness of Revenue Sharing and inclination to expend effort monitoring Revenue Sharing transfers; the diligence with which the plan fiduciary conducts such negotiations; and the separate financial interests and/or agendas of the plan fiduciary and the Fund as they negotiate.

69.     Revenue Sharing is not confined to mutual funds. Common or collective trusts, providers of guaranteed insurance contracts, and private investment pools may enter into Revenue Sharing arrangements in connection with the services they provide to 401(k) plans.

70.     Revenue Sharing also occurs between and among brokerage firms, investment managers, fund families and other service providers.

71.     When 401(k) plan service providers receive compensation in the form of both Hard Dollar fees *and* Revenue Sharing payments, determining the total amount of fees and expenses that the Plan incurs for any category of services (*i.e.* recordkeeping and administration, investment advisory, trustee, auditing, and accounting, etc.) requires that *both* the Hard Dollar fees *and* Revenue Sharing payments be taken into account.

72.     Ascertaining whether the Plan Administrator has fulfilled its fiduciary obligation to ensure that the fees and expenses assessed against the 401(k) Plan are reasonable and incurred solely in the interest of Plan participants requires consideration whether the *total of both* the Hard Dollar *and* Revenue Sharing payments paid for any category of services complies with this standard.

73.     Although Revenue Sharing monies arise only as a result of, and in connection with, transactions involving the plan, plan assets and plan service providers; Revenue Sharing is not always captured and used for the benefit of the plan and the participants.

74.     When Revenue Sharing is foregone, the plan will not only pay additional hard dollar fees to the plan service providers (since no Revenue Sharing payments are available to offset those Hard Dollar costs), but it will also pay additional money to the Fund, beyond what the Fund would normally charge and keep.

75.     Consequently, in determining whether a plan administrator or other fiduciary has fulfilled its obligation to ensure that the fees and expenses assessed against the plan are reasonable and incurred solely in the interest of plan participants, foregone Revenue Sharing must also be taken into account.

76.     Such is the case here. The investment managers of the Plan investment options, including at least some of the collective trusts, charged fees to the Plan that included money with which to make Revenue Sharing payments. However, the Defendants failed to capture the available Revenue Sharing and use it solely in the interest of the Plan and the participants and beneficiaries.

77.     As a result, when the foregone Revenue Sharing – consisting of millions of dollars – is taken into account, the participants and beneficiaries of the Plan paid unreasonably high fees for the administrative services and/or investment management they received.

## Revenue Sharing Arrangements Are Not Disclosed to Plan Participants

78.     Revenue Sharing is not disclosed to Plan participants and government regulators, even though it may account for a greater portion of certain categories of service provider payments than do Hard Dollar disbursements to those same providers.

79.     Accordingly, industry commentators and experts have dubbed Revenue Sharing payments to be "hidden fees" that are assessed against 401(k) plans and thus reduce plan participants' retirement savings.

80.     By entering into, allowing, and/or failing to monitor, discover, and prevent or recover these undisclosed Revenue Sharing arrangements, Exelon and the Committees deprived Plan participants of true and accurate information regarding:

    a.   How much they are paying in fees and expenses for the Plan;

    b.   Who is receiving Plan assets through Revenue Sharing;

    c.   How much service providers are paid in addition to their disclosed, hard dollar fees; and

    d.   Whether the total amount paid to services providers (*i.e.* disclosed, hard dollar fees *combined with* Revenue Sharing payments) is reasonable and incurred solely for the participants' benefit.

## Defendants' Non-Compliance with §404(c)'s Safe Harbor Requirements and Concealment of Their Fiduciary Breaches

81.     As set forth above, the Defendants did not disclose, and to this day have not disclosed, the fact that plan service providers were and/or engaging in Revenue Sharing; nor that Revenue Sharing was available for the benefit of the Plan and its

participants, nor the amount of Revenue Sharing payments, made by or to Plan service providers.

82.     Plan participants did not have, and do not have, complete and actual knowledge of the fees and expenses being charged to the Plan that reduced their account balances.

83.     Thus, Plan fiduciaries, including the Defendants, have not told Plan participants, and Plan participants do not know:

> a.     the "annual operating expenses" of the investment options in the Plan, as required by 29 C.F.R. §2550.404c-1(b)(2)(i)(B)*(2)(i)*; and

> b.     the actual expenses incurred with respect to their respective individual accounts, as required by 29 C.F.R. §2550.404c-1(b)(2)(ii)(A).

84.     As a result of the Defendants' failure and refusal to provide such information, and the general failure on the part of the Plan fiduciaries to disclose the actual Plan expenses, including available Revenue Sharing, the participants have not been provided with "the opportunity to obtain sufficient information to make informed decisions with regard to investment alternatives under the plan." 29 C.F.R. §2550.404c-1(b)(2)(1)(B).

85.     Because the Defendants failed and refused to provide them with this information, and concealed this information from them, the participants have lacked the information necessary to understand and protect their interests in the Plan and/or to have knowledge of, the Defendants' breaches of fiduciary duty.

86.     In fact, in their fiduciary roles, the Defendants are the parties with the information necessary to know and understand whether the participants' rights and protections under ERISA are being, or have been, violated.

87.     Defendants have an affirmative obligation to provide full and accurate information to the Plan participants regarding the administration of the Plan.

88.     Defendants' silence and/or non-disclosure in the face of such a duty to disclose is tantamount to an affirmative misrepresentation.

89.     Here, despite the Defendants' duty to disclose full and accurate information regarding the fees and expenses assessed against participants' accounts, on an ongoing basis Defendants failed and refused to disclose to, and inform the participants of:

a.      the total amount of fees and expenses reasonable and necessary to operate the plan;

b.      the total amount of amount of fees and expenses the Plan actually paid to service providers in the form of Hard Dollar payments and Revenue Sharing;

c.      the availability of Revenue Sharing;

d.      the true and accurate details regarding the revenues and expenses of the Plan;

e.      the true and accurate operating expenses which reduce participants' returns, including both Hard Dollar payments and Revenue Sharing, for each of the Plan's investment alternatives;

    f.     the true and accurate transaction fees and expenses which affect the participants' account in connection with the purchase or sale of investment alternatives;

    g.     the amount, when both Hard Dollar Payments and Revenue Sharing are considered, by which the Plan's expenses exceeded those which were reasonable and incurred solely in participants' interests; and

    h.     other revenue and expense information necessary for the participants to understand and protect their interests in the Plan.

90.    Based upon the foregoing, Defendants are not entitled to the safe harbor protections of ERISA § 404(c).

91.    Based upon the foregoing, the statue of limitations was tolled on the breaches set forth in this Complaint and did not begin to run until such time as Plaintiffs actually discovered them.

## COUNT I:
### Breach of Fiduciary Duty – ERISA §502(a)(2)

92.    Plaintiffs restate and incorporate the allegations contained in paragraphs 1 through 91 as though fully set forth here.

93.    As set forth in detail above, the Defendants owe the Plan, its participants and beneficiaries, and the Class extensive fiduciary duties including, without limitation:

    a.   To conduct themselves as Plan fiduciaries with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent ERISA professional fiduciary would in operating and administering a 401(k) plan the size and character of the Plan;

b. To perform their duties as fiduciaries with the utmost loyalty and fidelity to the Plan and its participants and beneficiaries, avoiding at all times conflicts of interest, self-interest, and duplicity;

c. To ensure, at all times, that Plan assets "shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan;"

d. To track and account for all transactions involving the Plan and Plan assets so as to ensure that Plan assets are retained, managed, and disbursed in compliance with the Plan Document and ERISA;

e. To track and account for all transactions involving the Plan and Plan assets so as to ensure that Plan assets "never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan;"

f. To ensure that the fees and expenses incurred by the Plan are reasonable and incurred for the sole and exclusive benefit of Plan participants and beneficiaries;

g. In entering into agreements with service providers to the Plan, to ensure that the payments from the Plan – whether they are direct or indirect – are reasonable for the services provided and made for the sole and exclusive benefit of Plan participants and beneficiaries;

h.  In operating and administering the Plan, to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plan were reasonable and incurred solely for the benefit of Plan participants;

i.  In operating and administering the Plan, on an ongoing basis to monitor the payments made by the Plan to service providers – whether they are direct or indirect – are and remain reasonable for the services provided and made for the sole and exclusive benefit of Plan participants and beneficiaries;

j.  To inform themselves of, and understand, the various methods by which vendors in the 401(k) industry collect payments and other revenues from 401(k) plans;

k.  To inform themselves of trends, developments, practices, and policies in the retirement, financial investment and securities industry which affect the Plan; and to remain aware and knowledgeable of such trends, practices and policies on an ongoing basis;

l.  To communicate with Plan participants and beneficiaries regarding the Plan honestly, clearly and accurately;

m.  To affirmatively and without request provide Plan participants and beneficiaries with honest, accurate and complete information they need to understand their investments in the Plan; the management, risk, potential returns of such investments, and the fees and expenses incurred in connection with those investments;

26

n. Upon request, to provide further any information to Plan participants and beneficiaries regarding the operation and administration of the Plan and the expenses incurred in doing so; and

o. To provide honest, accurate and complete information to Plan participants and beneficiaries regarding the costs associated with their various investment choices and directions

p. To appoint fiduciaries who lived up to their fiduciary duties, to monitor and oversee those fiduciaries in the performance of their duties, and to remove fiduciaries who breached their fiduciary duties.

94. As set forth in detail above, the Defendants breached their fiduciary obligations to the Plan, Plan participants and beneficiaries and the Class by, among other conduct to be proven at trial:

a. Causing the Plan to enter into agreements with service providers under which the Plan pays/paid – directly or indirectly – fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants and beneficiaries;

b. Allowing the Plan to pay – directly on indirectly – fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants and beneficiaries;

c. Failing to monitor the fees and expenses paid by the Plan and, by such failure, causing and/or allowing the Plan to pay fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants and beneficiaries;

d. Failing to inform themselves of trends, developments, practices, and policies in the retirement, financial investment and securities industry which affect the Plan; and failing to remain aware and knowledgeable of such trends, practices and policies on an ongoing basis;

e. Failing to inform themselves of, and understand, the various methods by which vendors in the 401(k) industry collect payments and other revenues from 401(k) plans;

f. Failing to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plan were reasonable and incurred solely for the benefit of Plan participants;

g. Failing to communicate with Plan participants and beneficiaries regarding the Plan honestly, clearly and accurately;

h. Failing properly to inform and/or disclose to Plan participants the fees and expenses that are, or have been, paid by the Plan;

i. Failing to inform and/or disclose to Plan participants in proper detail and clarity the transactions, fees and expenses which affect participants' accounts balances in connection with the purchase or sale of interests in investment alternatives;

j. Failing to discover, disclose and stop the charging of hidden and excessive fees to the Plan;

k. Failing to appoint fiduciaries who lived up to their fiduciary duties, failing to monitor and oversee those fiduciaries in the performance of

their duties, and failing to remove fiduciaries who breached their fiduciary duties;

l. By the foregoing conduct, failing to exercise the care, skill, prudence and diligence that a prudent person would when acting in like capacity and familiar with such matters.

95.     As set forth in detail above, as a result of these breaches, Plaintiffs, the Class, the Plan, and the Plan's participants and beneficiaries have suffered financial losses and damages.

96.     Further, as set forth in detail above, the Defendants failed to provide participants and beneficiaries with sufficient investment information to qualify for the Safe Harbor immunity of ERISA § 404(c), 29 U.S.C. 1104(c). Accordingly, the Defendants are liable for participants and beneficiaries' investment losses in the Plan.

97.     Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a), the Defendants are liable to restore to the Plan the losses it experienced as a direct result of the Defendants' breaches of fiduciary duty and are liable for any other available and appropriate equitable relief, including prospective injunctive relief and declaratory relief, and attorney's fees.

## COUNT II:
### Other Remedies for Breach of Fiduciary Duty – ERISA §502(a)(3)

98.     Plaintiffs restate and incorporate the allegations contained in paragraphs 1 through 97 as though fully set forth here.

99.     As an alternative to the causes of action stated in Count I, Plaintiffs seek further relief pursuant to ERISA § 502(a)(3), 29 U.S.C., § 1132(a)(3).

100. Under section 502(a)(3), a participant may enjoin any act which violates ERISA or may obtain other appropriate equitable relief to redress such violations or enforce the terms of ERISA.

101. Defendants are the primary fiduciaries of the Plan and occupy a position of trust and confidence in connection with the Plan, the Plan's assets, and the Plan's participants and beneficiaries.

102. Defendants have exclusive discretion and control over the Plan's assets and are strictly obligated to exercise that control "for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan."

103. Although *only* Plan participants and beneficiaries are entitled to Plan assets and to the benefit of Plan assets, in the absence of full and candid disclosure from the Defendants, Plan participants and beneficiaries do not know, and have no means of knowing, how their assets have been managed and disbursed.

104. Accordingly, the Defendants occupy the position of a common law trustee in connection with the Plan, its assets, and its participants and beneficiaries.

105. As set forth in detail above, the Defendants have caused and/or allowed the plan to pay – directly or indirectly – excess fees and expenses to Plan service providers.

106. The Defendants, and not the Plaintiffs, are the entities which have and/or should have specific and detailed information regarding how Plan assets have been treated and disbursed in this regard.

107.     Accordingly, the Court should order that the Defendants render an accounting of all transactions, disbursements and dispositions occurring in, in connection with, and/or in respect of, the Plan and its assets.

108.     The Plaintiffs respectfully request that the Court order that such an accounting include, without limitation, detailed and specific information regarding all fees and expenses incurred by the Plan and/or paid to third parties, whether paid directly by the Plan or indirectly transferred among Plan service providers or other third parties.

109.     Plaintiffs respectfully request that to the extent the Defendants do not or cannot account for all such transactions and their property under ERISA, the plan document and other applicable law, the Court surcharge against the Defendants and in favor of the Plan all amounts for which they cannot account.

110.     Plaintiffs further seek injunctive and other appropriate equitable relief to redress the wrongs described above, and to cause them to cease in order for the Plan's participants and beneficiaries to receive the full benefit of their retirement savings in the future.

WHEREFORE Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the court:

- find and declare that the Defendants have breached their fiduciary duties as described above;

- order the Defendants to make good to the Plan all losses that the Plan incurred as a result of the conduct described above and to restore the Plan to the position it would have been in but for the breaches of fiduciary duty;

- impose a constructive trust on any monies by which the Defendants were unjustly enriched as a result of their breaches of fiduciary duty and/or cause the Defendants to disgorge such monies and return them to the Plan;

- remove the fiduciaries who have breached their fiduciary duties and/or enjoin them from future breaches of ERISA;

- award actual damages to the Plan in the amount of its monetary losses;

- require Defendants to render an accounting as set forth above;

- surcharge against Defendants and in favor of the Plan all amounts involved in transaction which such accounting reveals were or are improper, excessive and/or in violation of ERISA;

- permanently enjoin Defendants from breaching their fiduciary duties in each respect set forth in the Complaint;

- order costs and attorneys fees pursuant to ERISA § 502(g) and the common fund doctrine;

- order equitable restitution or other available equitable relief against the Defendants;

- order the payment of interest to the extent it is allowed by law; and

  grant any other and further relief the Court deems appropriate

**PLAINTIFFS DEMAND A TRIAL BY JURY OF ALL COUNTS SO TRIABLE.**

Dated:  September 11, 2006          Respectfully submitted,


**Schlichter, Bogard & Denton**

Jerome J. Schlichter
Elizabeth J. Hubertz
Heather Lea
120 W. Main Street, Ste 208
Belleville, IL  62220

100 South Fourth Street
Suite 900
St. Louis, MO 63102
Tel:     314-621-6115
Fax:    314-621-7151
ehubertz@uselaws.com
Lead Counsel for Plaintiffs

33

# EXHIBIT C

# Employee Savings Plan

## Investments

You are responsible for deciding how your Account is invested. Your Account will be invested as you direct among any or all of the investment funds available under the ESP in whole percentage increments. Your investment elections for contributions to be made to your Account in the future need not be the same as your investment elections for your current Account balance. The percentages you specify for any investment option will apply to all of your contributions under the ESP — pre-tax, after-tax and matching contributions (and rollover contributions, if any). If you fail to make any investment election but are contributing to the ESP, your Account will be invested in the BGI Money Market I Fund, which is managed by Barclays' Global Investors, N.A.

Your investment options under the ESP include the investment options described in Appendix A, including the Exelon Corporation Stock Fund. You can obtain information about the investment options, including mutual fund prospectuses, annual reports and the non-mutual fund investment highlight summaries, by contacting Fidelity Investments by phone or online.

You can also obtain the following information for any investment option:

- A description of any annual operating expenses, financial statements, reports and related information
- A list of assets that make up the portfolio and related values
- Information concerning the value of shares or units of the fund as well as past and current investment performance.

The mutual fund prospectuses also contain the names of the investment managers for those funds.

Appendix A provides information about the investment options under the ESP, as well as past performance information for these options. The *ESP Investment Options* brochure also describes the available funds in more detail. This brochure is provided to eligible employees in the ESP enrollment kit, and can also be obtained by contacting Fidelity by phone or online.

There is also a Company stock investment option under the ESP. The Exelon Corporation Stock Fund is invested primarily in shares of Exelon Corporation ("Common Stock"). The purchase of Common Stock is made by Fidelity on the open market. A portion of the fund's assets is invested in short-term liquid investments.

EX 001752

## SUMMARY PLAN DESCRIPTION

When you invest in the Exelon *Corporation* Stock Fund, you are not acquiring a specific number of shares of Common Stock. Instead, you are acquiring a specific number of units of participation, which represent a proportionate interest in the assets of a fund holding primarily Common Stock and some short-term liquid investments. The fluctuations and differences in value in the units of the Exelon Corporation Stock Fund may not be directly proportional to changes in value of Common Stock, due to the fund's short-term investment holdings, and the timing of purchases and redemptions of units in the fund and the subsequent purchases and sales of Common Stock for the fund.

The Committee has the right to discontinue any investment fund under the ESP and to make other investment funds available from time to time. Before investing in any fund, please read the fund prospectuses and/or fund highlight summaries and additional performance information available from Fidelity. You can contact Fidelity to request this information by phone or online.

By providing you with an array of investment choices with different risk and reward characteristics, combined with your ability to change the mix of those investments at any time, the ESP is intended to satisfy section 404(c) of the Employee Retirement Income Security Act of 1974, as amended (ERISA). Accordingly, Exelon and the Employers, the Trustee and other ESP fiduciaries are relieved of liability for any losses that are the direct and necessary result of your (or your beneficiary's) investment instructions. You have a right to more detailed information regarding the ESP's investment alternatives at any time by contacting Fidelity Investments by phone as indicated on page 3.

**An Important Note About Investing:** Even though the investment funds are designed to help your money grow, investments can go both up and down because investment involves some degree of risk. Review the prospectus and/or fund highlight summary and performance information for each investment fund carefully, and consult a tax and/or financial advisor before making investment elections or changes.

EX 001753

# Employee Savings Plan

## Plan Costs

Your Account balance will be charged with a proportionate share of the general expenses of administering the ESP. Your Account balance will also be charged with a proportionate share of any applicable fees and expenses attributable to the investment funds in which your Account is invested.

There are no Account maintenance fees. However, participants are charged fund management fees. These fees are generally reflected as a reduction to the gross earnings of the investment options before the allocation of those earnings to the participants' Accounts in each of the funds. However, with respect to the Diversified Fund and the Exelon Corporation Stock Fund, the fund management fees are allocated proportionately to the participants' Accounts that are invested in these funds and subtracted from each partic-ipant's Account, rather than being reflected as a reduction to the gross earnings for these funds.

As of January 1, 2002, the fund management fee structure for the non-mutual fund options is:

| Fund | Annual Fee as a Percentage of Fund Balance[1] |
|---|---|
| BGI EAFE Equity Index Fund | .25% |
| BGI Equity Index Fund | .03% |
| BGI Extended Equity Market Fund | .10% |
| BGI Money Market I Fund | .15% |
| BGI U.S. Debt Index Fund | .10% |
| Exelon Corporation Stock Fund | .10%[2] |
| Managed Income Fund | .10% |
| UBS Diversified Fund | .54% |

[1]Fees subject to change at any time due to increase or decrease of assets.

[2]Payable quarterly, up to $7,500 per quarter ($30,000 per year).

EX 001754



The fund management fees for the mutual fund options can be found in the prospectus for each of these mutual funds. Copies of the mutual fund prospectuses can be obtained by calling Fidelity Investments at 1-800-354-8072.

There are generally no transaction fees or expenses (meaning, for example, sales loads or redemption fees) that affect your Account balance in connection with purchases or sales of interests in any of the investment funds. Any sales loads described in a mutual fund prospectus have been waived for investments made through the ESP. The Fidelity Low-Priced Stock Fund imposes a 1.5% short-term trading fee on fund shares held less than 90 days.

### Changing Your Investments

You may change how your Account is invested at any time by contacting Fidelity by phone or online. Unless otherwise noted, transaction requests confirmed after the close of the financial markets (normally 4:00 p.m., Eastern Time) or on weekends or holidays will receive the next business day's available closing price. You will need the applicable fund codes, which you can get from Fidelity, for any changes you want to make. You also can check your current Account balance and investment elections, receive up-to-date investment fund performance information, and transfer money among investment options by contacting Fidelity by phone (as described on page 3). Shortly after the end of each quarter, you will receive a statement that shows your starting and ending Account balances, and all activity during the quarter.

### Dividends with Respect to Exelon Corporation Stock Fund

Because the ESP is also an employee stock ownership plan, it can distribute dividends payable from the Exelon Corporation Stock Fund. These dividends must be reinvested or distributed. If you elect to invest any portion of your Account in the Exelon Corporation Stock Fund, and are eligible to receive dividend distributions from the ESP, then effective January 1, 2002, you will be deemed to have elected to have the dividends reinvested in the Exelon Corporation Stock Fund. If you prefer to receive any such dividends in cash, you can so elect by contacting Fidelity by phone or online, as described on page 3. The checks will be mailed by Fidelity. Dividends distributed to you in cash from the ESP are subject to income tax as a dividend, and affected participants receive an IRS Form 1099DIV for the dividends in the year following receipt (Form 1099R if the participant takes a full distribution of his or her ESP Account). The dividends are not subject to the 10% penalty tax on early withdrawals from a qualified plan. The dividends cannot be rolled over.

The amount of a participant's dividend is based on the number of units the participant had in the Exelon Corporation Stock Fund as of the close of business on the business day before the ex-dividend date for the dividend. (The ex-dividend date is the third business day before the record date designated by the Board of Directors of Exelon for the dividend.) A dividend amount per unit is calculated using the total amount of the dividend that is to be received by the

EX 001755



SUMMARY PLAN DESCRIPTION

APPENDIX A

EXELON CORPORATION EMPLOYEE SAVINGS PLAN INVESTMENT OPTIONS

| *Categories to left have potentially MORE inflation risk and LESS investment risk* | | | | | | | | *Categories to right have potentially LESS inflation risk and MORE investment risk* | |
|---|---|---|---|---|---|---|---|---|---|
| **MONEY MARKET** | **MANAGED INCOME** | **INCOME** | **BALANCED** | **DOMESTIC EQUITY** | | | | **INTER-NATIONAL** | **COMPANY STOCK** |
| **BGI Money Market I Fund** | Managed Income Fund | **BGI U.S. Debt Index Fund** | T. Rowe Price Capital Appreciation Fund | **Large Cap Value** Legg Mason Value Trust, Inc. | Large Cap Blend BGI Equity Index Fund | **Large Cap Growth Fidelity Growth Company Fund** | Equity BGI EAFE Equity Index Fund | **Exelon Corporation Stock Fund** |
| | | **PIMCO Total Return Fund** | International/Global UBS Diversified Fund | **Small Cap Value Fidelity Low-Priced Stock Fund*** | Fidelity Contrafund® | **Mid Cap Growth Franklin Small-Mid Cap Growth Fund** | Morgan Stanley Institutional Fund, Inc. International Equity Portfolio | |
| | | **High Yield T. Rowe Price High Yield Fund** | | | Fidelity Dividend Growth Fund | | | |
| | | | | | Fidelity Magellan® Fund | | | |
| | | | | | Small Cap Blend BGI Extended Equity Market Fund | | | |

*This spectrum, with the exception of the Domestic Equity category, is based on Fidelity's analysis of the characteristics of the general investment categories and not on the actual investment options and their holdings, which can change frequently. Investment options in the Domestic Equity category are based on the options' Morningstar categories as of 3/31/02. Morningstar categories are based on a fund's style as measured by its underlying portfolio holdings over the past three years and may change at any time. These style calculations do not represent the investment options' objectives and do not predict the investment options' future styles. Investment options are listed in alphabetical order within each investment category. Risk associated with the investment options can vary significantly within each particular investment category, and the relative risk of categories may change under certain economic conditions. For a more complete discussion of risk associated with the mutual fund options, please read the prospectus before making your investment decision. The spectrum does not represent actual or implied performance.*

*Please note that the Legg Mason Value Institutional Portfolio has merged with the Legg Mason Value Trust – Financial Intermediary Class.*

*\*This fund carries a short-term trading fee. Please read the fund's description contained in this appendix for more detailed information before investing in this fund.*

*The BGI Money Market I Fund is not an SEC registered money market mutual fund and is not subject to the SEC's requirements regarding the maturity, quality and diversification of a money market fund's underlying investments. In addition, there is no guarantee that this product will maintain a stable value and the value of a share may vary.*

**EX 001779**

35



# Employee Savings Plan

## INVESTMENT GLOSSARY

### Actively Managed Investment Options

A money-management approach based on informed, independent investment judgment, as opposed to passive management (indexing), which seeks to match the perform-ance of the overall market (or some part of it) by mirroring its composition or by being broadly diversified.

### Asset Allocation Investment Option

Asset allocation options seek high return over the long term by allocating assets among stocks, bonds and short-term instruments. Typically, these funds maintain a neutral mix of asset classes and will shift the assets in response to market conditions.

### Balanced Investment Option

An investment option that tries to invest in a broadly diversified portfolio of high-yielding securi-ties, such as common stocks, preferred stocks, and bonds. Its share price and return will vary. Its goal is to blend long-term growth from stocks with income from dividends. Because it must have at least one-fourth of its money invested in bonds and other debt obligations, its price usually will not vary as much as that of a growth fund.

### Blend

Investment options which invest in both growth and value stocks.

### Fixed Income Investment Option

Investment options which invest in securities that pay a fixed rate of return by investing in government, corporate or municipal bonds, which pay such a fixed rate. These investments could offer you an advantage in times of low inflation, but are not likely to protect you against the declining buying power of your money during times of high inflation.

### Growth

Investment options which try to make money from increases in the prices of stock that they hold rather than from dividends. They are more risky than more conserva-tive funds; their value can rise and fall quickly, and they pay little or no dividends. However, over time these funds have the potential to offer higher returns. Some compa-nies' stocks have shown or are expected to show quick earnings and revenue growth. These stocks may be more risky investments than most other stocks, and you usually receive little or no dividend payments. An equity growth fund invests primarily in growth stocks.

### High-Yield Bond Options

These investment options invest in high-yield bonds, sometimes known as "junk" bonds. The chance that the company issuing such bonds will default on that loan is higher than with other bonds. That's why higher-yield bonds usually pay a higher interest rate to get people to buy them, but these bonds also have greater risk associated with them due to greater risk of default or price change in the credit quality of the issuer.

EX 001780

### International Equity Options

These investment options invest assets in securities whose primary trading markets are outside of the United States. Foreign investments involve greater risks than U.S. investments. These risks, especially in emerging markets, include political and economic uncertainties of foreign countries as well as the risk of currency fluctuations.

### Investment Grade Fixed Income Options

These investment options invest in bonds which have a high bond rating such as BBB or above.

### Large Cap Equity Options

These investment options generally invest in companies with over $9 billion outstanding shares.

### Mid-Cap Equity Options

These investment options generally invest in companies whose total outstanding share value is between $1.4 billion and $9 billion.

### Passive Management

A money management strategy that seeks to match the return and risk characteristics of a market segment or index, by mirroring its composition.

### Small Cap Disclosure

Investments in smaller companies may involve greater risks than those of larger, more well-known companies.

### Small Cap Equity Options

These investment options generally invest in companies with under $1.4 billion outstanding shares. Investments in smaller companies may involve greater risks than those in larger, more well-known companies.

### Value

Investment options that seek out companies that the fund manager believes are undervalued relative to their book value or their current or projected earnings. These companies may appear to be good opportunities because they have new management, or a new product, or have made some important change in their business.

EX 001781

# Employee Savings Plan



## Money Market Investment Option

### BGI MONEY MARKET I FUND

**Fund code: 44893**

**What it is:** A collective investment fund.

**Goal:** To provide current income while preserving the value of your investment.

**What it invests in:** The fund invests in short-term debt securities with high credit ratings known as money market instruments. These securities are issued by U.S. and foreign corporations, governments, banks and U.S. agencies such as Fannie Mae and the Student Loan Marketing Association. These investments are considered low-risk due to the financial strength of the issuers and the short-term maturity of the investments.

*This fund is not a mutual fund, but is a collective investment trust offered to participants in defined contribution retirement plans. The fund is managed by Barclays' Global Investors, N.A., which provided the description for this fund. Class K shares are available through the plan.*

*The BGI Money Market I Fund is not an SEC registered money market mutual fund and is not subject to the SEC's requirements regarding the maturity, quality and diversification of a money market fund's underlying investments.*

*There is no guarantee that this product will maintain a stable value, and the value of a share may vary.*

## Managed Income Investment Option

### MANAGED INCOME FUND

**Fund code: 07850**

**What it is:** A combination of Fidelity's Managed Income Portfolio II and investment contracts previously purchased by this plan. It is not a mutual fund. The Managed Income Portfolio II (MIP II) is managed by Fidelity Management Trust Company (FMTC).

**Goal:** Seeks to provide a competitive level of income over time while preserving the value of your investment. The fund will try to maintain a stable $1 unit price. However, the fund cannot guarantee this stable unit price and its yield will fluctuate.

**What it invests in:** MIP II invests in investment contracts offered by major insurance companies and other approved financial institutions and in certain types of fixed income securities. A small portion of MIP II is invested in a money market fund to provide daily liquidity. Investment contracts provide for the payment of a specified rate of interest to MIP II and for the repayment of principal, when the contract matures. Participant withdrawals and investment exchanges are paid at book value (principal and interest accrued to date) during the life of the contract. Some investment contracts are structured solely as a general debt obligation of the issuer. Other investment contracts ("wrap contracts") are purchased in conjunction with an investment

EX 001782



by MIP II in fixed income securities, which may include United States treasury bonds, corporate bonds, mortgage-backed securities and bond funds. Interest is credited to MIP II under the wrap contract.

There is no immediate recognition of investment gains and losses on the fixed income securities. Instead, the gain or loss is recognized over time by adjusting the interest rate credited to MIP II under the wrap contract. The wrap contract also provides for the payment of participant withdrawals and exchanges at book value. All investment contracts and fixed income securities purchased for MIP II must satisfy the credit quality standards of FMTC. The investment contract and fixed income security commitments are backed solely by the financial resources of the issuer. In addition, investment contract issuers may impose a contract penalty on withdrawals or exchanges from the fund caused by an extraordinary corporate event (layoff, sale of a line of business, etc.). As previously purchased investment contracts mature, all proceeds will be invested in the MIP II.

*Units of the fund are not guaranteed by FMTC or the plan sponsor.*

## Income Investment Options

### BGI U.S. DEBT INDEX FUND – CLASS K

**Fund code: 44901**

**What it is:** A fund that invests in bonds within the U.S.

**Goal:** To provide investment results that match the performance (minus fees and expenses) of the Lehman Brothers Aggregate Bond Index.

**What it invests in:** Investment-grade securities with maturities of at least one year, including U.S. Treasury and U.S. agency securities, corporate bonds, and asset-backed and mortgage-backed securities. The fund will invest in these types of investments in approximately the same proportion as the Index. The Lehman Brothers Aggregate Bond Index is a broad unmanaged index that measures the aggregate performance of the U.S. market for investment-grade bonds. Share price, yield and return will vary over time.

*This fund is not a mutual fund, but is a collective investment trust, offered to participants in defined contribution retirement plans. The fund is managed by Barclays' Global Investors, N.A., which provided the description for this fund. Class K shares are available through the plan.*

*Lehman Brothers Aggregate Bond Index is an unmanaged market value weighted index of investment-grade fixed-rate debt issues, including government, corporate, asset-backed, and mortgage-backed securities, with maturities of one year or more.*

EX 001783



# Employee Savings Plan

## PIMCO TOTAL RETURN FUND – INSTITUTIONAL CLASS
**Fund code: 99622**
**What it is:** An income mutual fund.

**Goal:** To provide high total return that exceeds general bond market indices.

**What it invests in:** All types of bonds, including U.S. government, corporate, mortgage and foreign. While the fund maintains an average portfolio duration of three to six years (approximately equal to an average maturity of five to 12 years), investments may also include short- and long-maturity bonds. Share price, yield, and return will vary.

*Institutional Class shares are available through the plan. Managed by Pacific Investment Management Company, which provided the description for this fund.*

## Income Investment Options
### HIGH YIELD
### T. ROWE PRICE HIGH YIELD FUND
**Fund code: 99544**
**What it is:** An income mutual fund.

**Goal:** Seeks to provide high current income and, secondarily, capital appreciation.

**What it invests in:** The fund normally invests at least 80% of its total assets in a diversified portfolio of high-yield corporate, or "junk," bonds, income-producing convertible securities, and preferred stocks. High-yield bonds are rated below investment grade, represent a much greater risk of

default, and tend to be more volatile than higher-rated bonds. Dollar-weighted average maturity generally is expected to be in the eight- to 12-year range. Share price, yield and return will vary.

*Managed by T. Rowe Price Associates, Inc., which provided the description for this fund.*

*Lower-quality debt securities involve greater risk of default or price changes due to changes in the credit quality of the issuer.*

## Balanced Investment Options
### T. ROWE PRICE CAPITAL APPRECIATION FUND
**Fund code: 91151**
**What it is:** A growth mutual fund.

**Goal:** Seeks to maximize long-term capital appreciation by investing primarily in common stocks.

**What it invests in:** Invests primarily in common stocks of established U.S. companies the manager believes to have above-average potential for capital growth. The fund may hold fixed income and other securities to help preserve principal value in uncertain or declining markets. Common stocks typically constitute at least half of total assets. The remaining assets are generally invested in other securities, including convertible securities, corporate and government debt, foreign securities, and futures and options. Share price and return will vary.

*Managed by T. Rowe Price Associates, Inc., which provided the description for this fund.*

EX 001784

1:06-cv-04900 Document #: 132 Filed: 09/11/09 Page 103 of 141 PageID #:1525



SUMMARY PLAN DESCRIPTION

## INTERNATIONAL/GLOBAL
### UBS DIVERSIFIED FUND – CLASS A
Fund code: 99371

**What it is:** A global balanced asset allocation collective fund (not a mutual fund).

**Goal:** To provide the maximum amount of total return (total return is the combination of income — from dividends, interest and capital gains — and the change in the value of the share price of the fund), without assuming unnecessary risk.

**What it invests in:** The fund is a broadly diversified portfolio of stocks, bonds, real estate and private market investments in the United States and a broad range of other countries, including a small allocation in emerging markets. This portfolio involves extensive application of an integrated global investment process. The fund is actively managed within an asset allocation framework that encompasses the full range of market, currency, and security exposures within the world capital markets. The global perspective is intended to take advantage of investment opportunities around the world while reducing the overall risk of the portfolio through global diversification. The fund is invested in the Multi-Asset Portfolio offered through UBS Global Asset Management Trust Company (the portfolio's manager) and UBS Global Asset Management (Americas) Inc. (the portfolio's adviser) and is not a mutual fund. The fund historically has maintained a fairly consistent level of

reduced volatility or investment risk. Of course, past performance is no guarantee of future results.

*Managed by UBS Global Asset Management (Americas) Inc., which provided the description for this fund.*

Domestic Equity
Investment Options
LARGE CAP VALUE
### LEGG MASON VALUE TRUST, INC. – INSTITUTIONAL CLASS
Fund code: 93732

**What it is:** A large-cap equity mutual fund which uses the "value approach" to investing.

**Goal:** Long-term capital appreciation.

**What it invests in:** Stocks that the adviser believes are undervalued, and therefore offer above-average potential for capital appreciation. Share price and return will vary.

*Institutional Class shares are available through the plan. Managed by Legg Mason Funds Management Inc., which provided the description for this fund.*

**EX 001785**

41



## SMALL CAP VALUE
### FIDELITY LOW-PRICED STOCK FUND
**Fund code: 00316**

**What it is:** A growth mutual fund.

**Goal:** Seeks to provide capital appreciation.

**What it invests in:** Normally invests at least 80%* of total assets in low-priced common stocks (those priced at or below $35 per share), which can lead to investments in small and medium-sized companies. The fund may potentially invest in stocks not considered low-priced. Investments in smaller companies may involve greater risk than those of larger, more well-known companies. The fund may invest in securities of domestic and foreign issuers. The fund may invest in "growth" or "value" stocks or both. This fund carries a short-term trading fee, which is charged to discourage short-term buying and selling of fund shares. If you sell your shares after holding them for less than 90 days, the fund will deduct a short-term trading fee from your account equal to 1.5% of the value of the shares you sold. Share price and return will vary.

*Effective on or before July 31, 2002, the Fidelity Low-Priced Stock Fund will normally invest at least 80% of its assets in low-priced stocks.*

## LARGE CAP BLEND
### BGI EQUITY INDEX FUND – CLASS T
**Fund code: 44897**

**What it is:** A growth and income commingled fund (not a mutual fund).

**Goal:** Tries to duplicate the composition (investments) and total returns of the Standard & Poor's 500 Index (S&P 500®).

**What it invests in:** Primarily invests in the broadly diversified common stocks of the 500 companies that make up the S&P 500®. This option holds each stock in the same proportion in which it is represented in the Index — that is, weighted by stock price times shares outstanding. Stocks are selected based on the composition of the Index rather than according to subjective opinions about individual companies or industries. The only trading requirements within this fund are for the reinvestment of dividends and tender proceeds, and for accommodation of the Index to changes within companies. Share price, yield, and return will vary.

*The fund is managed by Barclays' Global Investors, N.A., which provided the description for this fund. Class T shares are available through the plan.*

*The S&P 500® is a registered service mark of the McGraw-Hill Companies, Inc., and has been licensed for use by Fidelity Distributors Corporation and its affiliates. It is a widely recognized, unmanaged index of 500 U.S. common stocks.*

EX 001786

## S U M M A R Y   P L A N   D E S C R I P T I O N

### FIDELITY *CONTRAFUND*®
**Fund code: 00022**
**What it is:** A growth mutual fund.

**Goal:** Seeks to provide capital appreciation.

**What it invests in:** Normally invests primarily in common stocks. The fund may invest in securities of domestic and foreign issuers. The fund invests in securities of companies whose value the manager believes is not fully recognized by the public. The fund may invest in "growth" or "value" stocks or both. Share price and return will vary.

### FIDELITY DIVIDEND GROWTH FUND
**Fund code: 00330**
**What it is:** A growth mutual fund.

**Goal:** Seeks to provide capital appreciation.

**What it invests in:** Normally invests primarily in common stocks. Normally invests at least 80%* of total assets in companies that Fidelity Management Research (FMR) believes have the potential for dividend growth by either increasing dividends or by commencing dividends, if none are currently paid. The fund may invest in securities of domestic and foreign issuers. It is important to note that the fund does not invest for income. Share price and return will vary.

*Effective on or about May 20, 2002, Fidelity Dividend Growth Fund will normally invest at least 80% of its assets in equity securities.*

### FIDELITY *MAGELLAN*® FUND
**Fund code: 00021**
**What it is:** A growth mutual fund.

**Goal:** Seeks to provide capital appreciation.

**What it invests in:** Normally invests primarily in common stocks. The fund may invest in securities of domestic and foreign issuers. The fund may invest in "growth" or "value" stocks or both. Not more than 40% of the fund's assets may be invested in companies operating exclusively in any one foreign country. Share price and return will vary.

EX 001787



# Employee Savings Plan

## SMALL CAP BLEND

### BGI EXTENDED EQUITY MARKET FUND – CLASS K

**Fund code: 44895**

**What it is:** A fund that invests in small and mid-sized U.S. stocks.

**Goal:** To provide investment results that match the performance (minus fees and expenses) of the stocks in the BGI Extended Market Index, which is very similar to the Wilshire 4500 Equity Index.

**What it invests in:** The stocks that comprise the BGI Extended Market Index. The Fund will invest in these types of investments in approximately the same proportion as the Index. The BGI Extended Market Index is an unmanaged, market-capitalization weighted index of approximately 6,500 U.S. equity securities. It includes most of the stocks in the Wilshire 5000 except for those included in the S&P 500® Share price and return will vary over time.

*This fund is not a mutual fund, but is a collective investment trust, offered to participants in defined contribution retirement plans. The fund is managed by Barclays' Global Investors, N.A., which provided the description for this fund. Class K shares are available through the plan.*

*Investments in smaller companies may involve greater risks than those of larger, more well-known companies.*

## LARGE CAP GROWTH

### FIDELITY GROWTH COMPANY FUND

**Fund code: 00025**

**What it is:** A growth mutual fund.

**Goal:** Seeks to provide capital appreciation.

**What it invests in:** Normally invests primarily in common stocks. The fund invests in companies that the manager believes have above-average growth potential. The fund may invest in securities of domestic and foreign issuers. Share price and return will vary.

## MID CAP GROWTH

### FRANKLIN SMALL–MID CAP GROWTH FUND – ADVISOR CLASS

**Fund code: 93392**

**What it is:** A growth mutual fund.

**Goal:** To increase the value of your investment over the long term through capital growth.

**What it invests in:** Under normal market conditions the fund will invest at least 80% of its total assets in the equity securities of U.S. small capitalization companies and in the equity securities of U.S. mid-capitalization companies. For this fund, mid-cap companies are those companies with market cap values not exceeding $8.5 billion and small cap companies are those companies with market cap values not exceeding: (i) $1.5 billion; or (ii) the highest market cap value in the Russell 2000® Growth Index, whichever is greater, at the time of purchase. A team of analysts per-

EX 001788

forms in-depth company research seeking to identify companies that have distinct and sustainable competitive advantages, which are likely to lead to growth in earnings and/or share price. Small company stocks have historically exhibited greater price volatility than larger company stocks, especially over the short term. Investments in smaller companies may involve greater risks than those of larger, more well-known companies. The risks involved in seeking long-term capital growth from small or relatively new or unseasoned companies, such as relatively small revenues, limited product lines, and small market share, are described in the prospectus. Keep in mind that the technology sector has been among the most volatile sectors of the market. The fund's investment in this sector involves special risks as discussed in the prospectus. The fund may invest up to 10% of its net assets in foreign securities, which involve special risks including political uncertainty and currency volatility. Share price and return will vary.

*Advisor Class shares are available through the plan. Managed by Franklin Advisers, Inc., which provided the description for this fund.*

*"The Russell 2000® Growth Index is an unmanaged market capitalization weighted index that measures the performance of 2,000 small company stocks with relatively high price-to-book ratios and forecasted growth values.*

*Formerly known as the Franklin Small Cap Growth Fund I – Advisor Class.*

## International Investment Options
### EQUITY

### BGI EAFE EQUITY INDEX FUND – CLASS K
**Fund code: 44899**

**What it is:** A fund that invests in stocks outside the U.S.

**Goal:** To provide investment results that match the performance (minus fees and expenses) of the Morgan Stanley Capital International Europe, Australasia, Far East Index (EAFE Index).

**What it invests in:** The stocks that comprise the EAFE Index. The fund will invest in these types of investments in approximately the same proportion as the Index. The EAFE Index is an unmanaged index representing over 1,000 companies within 20 developed countries. Share price and return will vary over time.

*This fund is not a mutual fund, but is a collective investment trust, offered to participants in defined contribution retirement plans. The fund is managed by Barclays' Global Investors, N.A., which provided the description for this fund. Class K shares are available through the plan.*

*Foreign investments, especially those in emerging markets, involve greater risks and may offer greater potential returns than U.S. investments. These risks include political and economic uncertainties of foreign countries, as well as the risk of currency fluctuations.*

EX 001789

# Employee Savings Plan



**MORGAN STANLEY INSTITUTIONAL FUND, INC. INTERNATIONAL EQUITY PORTFOLIO – CLASS A**

**Fund code: 99966**

**What it is:** A value-oriented mutual fund that invests in stocks of companies outside the U.S.

**Goal:** To increase the value of your investment over the long term through growth of capital.

**What it invests in:** Primarily in equity securities of companies in developed markets outside the U.S. Investing internationally involves certain risks not associated with investing in the United States, including restrictions on repatriation, price volatility and lesser liquidity of shares, currency fluctuations, political and economic uncertainties, and limited publicly available information. Share price and return will vary.

*Class A shares are available through the plan. Managed by Morgan Stanley Investment Management Inc., which provided the description for this fund.*

*Formerly known as Morgan Stanley Dean Witter Institutional Fund, Inc. International Equity Portfolio Class A.*

*Foreign investments, especially those in emerging markets, involve greater risks and may offer greater potential returns than U.S. investments. These risks include political and economic uncertainties of foreign countries, as well as the risk of currency fluctuations.*

## Company Stock Investment Option

**EXELON CORPORATION STOCK FUND**

**Fund code: 20658**

**What it is:** A fund that pools your money with that of other employees to buy shares of stock of Exelon Corporation and an amount of short-term investments designed to allow you to buy or sell without the usual trade settlement period for individual stock transactions. Your ownership is measured in units of the fund instead of shares of stock. This is neither a mutual fund nor a diversified or managed investment option. On days of unexpectedly heavy outflows, the fund may not have enough short-term investments for liquidity. If that happens, requests to sell units received by Fidelity before the market close on a business day may not be processed on that day. In that case, requested sales of units will be suspended and, as liquidity is restored, suspended transactions will be processed, generally on a first-in first-out basis, at the closing price for the processing date. In unusual circumstances, the fund may be closed to purchases or sales.

EX 001790



# SUMMARY PLAN DESCRIPTION

**Goal:** Seeks to increase the value of your investment over the long term by investing in the common stock of Exelon Corporation.

**What it invests in:** Under normal circumstances, primarily in the stock of Exelon Corporation as well as short-term investments. The amount of short-term investments is based upon a target established by the plan sponsor, but the actual amount of short-term investments on any given business day will vary with the amount of cash awaiting investment and participant activity of the fund (contributions, redemption, exchanges, withdrawals, etc.).

The value of your investment will vary depending on the performance of the Company, the overall stock market, and the performance and amount of investments held by the fund, less any expenses accrued against the fund. Investing in a non-diversified single stock fund involves more risk than investing in a diversified fund.

EX 001791



# Employee Savings Plan

| MORE CONSERVATIVE<br>Potentially LESS investment<br>risk and MORE inflation risk | | | | MORE AGGRESSIVE<br>Potentially MORE investment<br>risk and LESS inflation risk | |
|---|---|---|---|---|---|
| FIDELITY FREEDOM FUNDS® | | | | | |
| **Fidelity Freedom Income Fund®** | Fidelity Freedom 2000 Fund® | **Fidelity Freedom 2010 Fund®** | Fidelity Freedom 2020 Fund® | **Fidelity Freedom 2030 Fund®** | Fidelity Freedom 2040 Fund® |

*The Fidelity Freedom Funds® are represented on a separate spectrum because each fund (except Fidelity Freedom Income) will gradually adjust the asset allocation to be more conservative as the funds approach their target dates. Approximately six years after the target date, the asset allocation of each fund will match the allocation of the Freedom Income Fund. The spectrum illustrates the relative risk and return of each fund as compared to the funds in the Freedom family.*

*For a more complete discussion of the risks associated with the mutual fund options, please read the prospectus before making your investment decision. The spectrum does not represent actual or implied performance.*

## Fidelity Freedom Funds®

offer a blend of stocks, bonds and short-term investments within a single fund.

**FIDELITY FREEDOM INCOME FUND®**

**FIDELITY FREEDOM 2000 FUND®**

**FIDELITY FREEDOM 2010 FUND®**

**FIDELITY FREEDOM 2020 FUND®**

**FIDELITY FREEDOM 2030 FUND®**

**FIDELITY FREEDOM 2040 FUND®**

**What they are:** The Fidelity Freedom Funds® invest in other Fidelity mutual funds to provide moderate asset allocation. They are designed for investors who want a simple, yet diversified approach to investing for retirement. The allocation strategy among the underlying stock, bond, and money market mutual funds contained in each Freedom Fund with a target retirement date is based on the number of years until the Freedom Fund's target retirement date. Each Freedom Fund with a target retire-ment date will gradually adopt a more conservative asset allocation over time. Therefore, their target asset allocation percentages will change over time to become more conservative, by gradually reducing allocations to stock funds and increasing allocations to bond and money market funds. The Fidelity Freedom Income Fund®, designed for those already in retirement, emphasizes bond and money market mutual funds and seeks to maintain a stable asset allocation from year to year.

**Goal:** The Freedom Funds with target retirement dates seek to provide high total returns. The goal of the Freedom Income Fund is to seek high current income and, secondarily, capital appreciation.

EX 001792

**What they invest in:** Each Freedom Fund invests in a combination of underlying Fidelity stock, bond, and money market mutual funds. Fidelity Freedom 2040, with the longest time horizon, invests primarily in stock mutual funds to take advantage of potentially greater growth opportunities. The asset mix of each Freedom Fund with a retirement horizon (Freedom 2040, 2030, 2020, 2010, 2000) will gradually become more conservative over time so investors can stay with the same fund before and after retirement. After reaching the target retirement horizon year, these Freedom Funds continue to be managed more conservatively for five to ten more years until their asset mix is approximately the same as the Freedom Income Fund. Ultimately, the funds will merge into the Freedom Income Fund after notifying the fund's investors. The Freedom Income Fund, designed for those already retired, is invested more conservatively with a larger percentage in bond and money market funds and a smaller percentage of equity mutual funds. The fund managers must invest in the group of underlying funds named in the prospectus, and will aim for the projected target asset allocation percentages announced to investors in the funds' free annual and semi-annual reports. Freedom Funds with retirement target dates may invest in domestic and foreign stock funds and high-yield and investment-grade bond funds. The Freedom Income Fund invests in domestic stock funds and investment-grade bond funds as well as a money market fund. Foreign investments, especially those in emerging markets, involve greater risks and may offer greater potential returns than U.S. investments. These risks include political and economic uncertainties of foreign countries, as well as the risk of currency fluctuations. Investments in lower-rated securities involve greater risk than other debt securities, including the risk of default. Share price and return of each Freedom Fund will vary.

**FIDELITY FREEDOM INCOME FUND®**
**Fund code: 00369**
**What it is:** An asset allocation mutual fund.

**Goal:** Seeks to provide high current income and, as a secondary objective, some capital appreciation for those already in retirement.

**What it invests in*:**

- Approximately 20% in Fidelity stock mutual funds.
- Approximately 40% in Fidelity bond mutual funds.
- Approximately 40% in Fidelity money market mutual funds.

*The percentages represent target asset allocation for September 30, 2002.

Strategic Advisers, Inc., a subsidiary of FMR Corp., manages the Fidelity Freedom Funds®.

EX 001793



# Employee Savings Plan

**FIDELITY FREEDOM 2000 FUND®**

**Fund code: 00370**

**What it is:** An asset allocation mutual fund.

**Goal:** Seeks to provide high total returns for those planning to retire around 2000.

**What it invests in\*:**

- Approximately 24% in Fidelity stock mutual funds.
- Approximately 42% in Fidelity bond mutual funds.
- Approximately 34% in Fidelity money market mutual funds.

*\*The percentages represent target asset allocation for September 30, 2002.*

*Strategic Advisers, Inc., a subsidiary of FMR Corp., manages the Fidelity Freedom Funds®.*

**FIDELITY FREEDOM 2010 FUND®**

**Fund code: 00371**

**What it is:** An asset allocation mutual fund.

**Goal:** Seeks to provide high total returns for those planning to retire around 2010.

**What it invests in\*:**

- Approximately 46% in Fidelity stock mutual funds.
- Approximately 45% in Fidelity bond mutual funds.
- Approximately 9% in Fidelity money market mutual funds.
- The mix of underlying funds will gradually become more conservative over time.

*\*The percentages represent target asset allocation for September 30, 2002.*

*Strategic Advisers, Inc., a subsidiary of FMR Corp., manages the Fidelity Freedom Funds®.*

**FIDELITY FREEDOM 2020 FUND®**

**Fund code: 00372**

**What it is:** An asset allocation mutual fund.

**Goal:** Seeks to provide high total returns for those planning to retire around 2020.

**What it invests in\*:**

- Approximately 70% in Fidelity stock mutual funds.
- Approximately 30% in Fidelity bond mutual funds.
  The mix of underlying funds will gradually become more conservative over time.

*\*The percentages represent target asset allocation for September 30, 2002.*

*Strategic Advisers, Inc., a subsidiary of FMR Corp., manages the Fidelity Freedom Funds®.*

**FIDELITY FREEDOM 2030 FUND®**

**Fund code: 00373**

**What it is:** An asset allocation mutual fund.

**Goal:** Seeks to provide high total returns for those planning to retire around 2030.

**What it invests in\*:**

- Approximately 83% in Fidelity stock mutual funds.
- Approximately 17% in Fidelity bond mutual funds.

EX 001794



S U M M A R Y   P L A N   D E S C R I P T I O N

The mix of underlying funds will gradually become more conservative over time.

*The percentages represent target asset allocation for September 30, 2002.*

*Strategic Advisers, Inc., a subsidiary of FMR Corp., manages the Fidelity Freedom Funds®.*

### FIDELITY FREEDOM 2040 FUND®
### Fund code: 00718

**What it is:** An asset allocation mutual fund.

**Goal:** Seeks to provide high total returns for those planning to retire around 2040.

**What it invests in*:**

- Approximately 90% in Fidelity stock mutual funds.
- Approximately 10% in Fidelity bond mutual funds.
- The mix of underlying funds will gradually become more conservative over time.

*The percentages represent target asset allocation for September 30, 2002.*

*Strategic Advisers, Inc., a subsidiary of FMR Corp., manages the Fidelity Freedom Funds®.*

*Unless otherwise noted, transaction requests confirmed after the close of the market, normally 4 p.m. Eastern Time, or on weekends or holidays will receive the next available closing price. Requests to sell units of a unitized stock fund received by Fidelity before the close of the market will be processed at that day's closing price only if there is sufficient liquidity in the fund. If not, requests to sell units of the stock fund will be suspended. As liquidity is restored, suspended transactions will be processed, generally on a first-in, first-out basis, at the closing price for the processing date. Please contact Fidelity to learn if your request to sell units of your plan's unitized stock fund has been suspended.*

*Fidelity Management & Research Company manages Fidelity mutual funds.*

*The investment options available through the plan reserve the right to modify or withdraw the exchange privilege.*

*Remember, it's always your responsibility to research, evaluate, select and monitor your investment choices to ensure that they continue to meet their investment objectives.*

*Diversification does not ensure a profit or guarantee against loss.*

*Performance of the indices are not illustrative of any particular investment and an investment cannot be made in any index.*

*For more complete information about any of the mutual funds available through the plan, including fees and expenses, call or write Fidelity for free prospectuses/fund summaries. Read them carefully before you make your investment choices.*

EX 001795

# Employee Savings Plan

| INVESTMENT RESULTS | | | | | | |
|---|---|---|---|---|---|---|
| **Fund Name** **(Inception Date)** | | | | | | |
| | **ANNUAL RETURNS %** **PERIOD ENDING DEC. 31** | | | | | |
| | 2001 | 2000 | 1999 | 1998 | 1997 | 1996 |
| *BGI Money Market I Fund (11/9/1993)* | 4.24 | 6.49 | 5.2 | 5.6 | 5.66 | 5.46 |
| *Managed Income Fund (1/31/1995)* | 6.17 | 6.26 | 6.03 | 6.19 | 6.21 | N/A |
| *BGI U.S. Debt Index Fund – Class K (1/3/1994)* | 8.54 | 11.53 | -0.99 | 8.63 | 9.35 | 3.58 |
| *PIMCO Total Return Fund – Institutional Class (5/11/1987)* | 9.49 | 12.09 | -0.28 | 9.77 | 10.17 | N/A |
| *T. Rowe Price High Yield Fund (12/31/1984)* | 6.10 | -3.25 | 4.18 | 4.46 | 14.46 | N/A |
| *T. Rowe Price Capital Appreciation Fund (6/30/1986)* | 10.26 | 22.17 | 7.07 | 5.77 | 16.2 | N/A |
| *UBS Diversified Fund – Class A (12/31/1981)* | 3.72 | 12.18 | 4.25 | 8.85 | 12.36 | 15.91 |
| *Legg Mason Value Trust, Inc. – Institutional Class (12/1/1994)* | -8.39 | -6.24 | 27.99 | 49.4 | 38.24 | N/A |
| *Fidelity Low-Priced Stock Fund (12/27/1989)* | 26.71 | 18.83 | 5.08 | 0.53 | 26.73 | 26.89 |
| *BGI Equity Index Fund – Class T (12/18/1997)* | -11.88 | -9.12 | 21.01 | 28.59 | N/A | N/A |
| *Fidelity Contrafund® (8/17/1967)* | -12.59 | -6.8 | 25.03 | 31.57 | 23 | N/A |
| *Fidelity Dividend Growth Fund (4/27/1993)* | -3.74 | 12.25 | 8.81 | 35.85 | 27.9 | 30.14 |
| *Fidelity Magellan® Fund (5/2/1963)* | -11.65 | -9.29 | 24.05 | 33.63 | 26.59 | 11.69 |
| *BGI Extended Equity Market Fund – Class K (1/3/1994)* | -6.69 | -8.94 | 32.55 | 7.64 | 26.11 | 16.85 |
| *Fidelity Growth Company Fund (1/17/1983)* | -25.31 | -6.32 | 79.48 | 27.23 | 21.13 | 16.81 |
| *Franklin Small–Mid Cap Growth Fund – Advisor Class (2/14/1992)* | -20.53 | -9.8 | 97.08 | -0.02 | 15.79 | N/A |
| *BGI EAFE Equity Index Fund – Class K (1/4/1994)* | -21.74 | -14.88 | 26.49 | 20.17 | 1.2 | 6 |
| *Morgan Stanley Institutional Fund, Inc. International Equity Portfolio – Class A (8/4/1989)* | -9.74 | 9.23 | 16.97 | 18.3 | 13.98 | 19.65 |
| *Exelon Corporation Stock Fund® (10/20/2000)* | -29.21 | 97.7 | -9.11 | 25.18 | 13.13 | -16.89 |
| *Fidelity Freedom Income Fund® (10/17/1996)* | 2.22 | 6.28 | 7.19 | 11.1 | 10.91 | N/A |
| *Fidelity Freedom 2000 Fund® (10/17/1996)* | -0.09 | 3.98 | 12.16 | 15.26 | 15.29 | N/A |
| *Fidelity Freedom 2010 Fund® (10/17/1996)* | -4.34 | 0.67 | 19.04 | 19.31 | 19.36 | N/A |
| *Fidelity Freedom 2020 Fund® (10/17/1996)* | -9.07 | -3.03 | 25.31 | 21.67 | 21.24 | N/A |
| *Fidelity Freedom 2030 Fund® (10/17/1996)* | -11.69 | -5.07 | 28.5 | 22.12 | 21.4 | N/A |
| *Fidelity Freedom 2040 Fund® (9/6/2000)* | -13.50 | N/A | N/A | N/A | N/A | N/A |
| | | | | | | |
| **Market Indices** | | | | | | |
| **Dow Jones Index** | -5.39 | -4.71 | 27.13 | 18.07 | 24.86 | 28.7 |
| **Russell 2000 Index** | 2.49 | -3.02 | 21.26 | -2.55 | 22.36 | N/A |
| **S&P 500 Index** | -11.89 | -9.1 | 21.04 | 28.58 | 33.36 | 22.96 |
| **MSCI EAFE Index** | -21.27 | -14.01 | 27.22 | 20.27 | 2.01 | N/A |
| **LB Government Bond Index** | 7.23 | 13.24 | -2.23 | 9.85 | 9.59 | 2.77 |
| **SB 3 Month T-Bill** | 4.09 | 5.96 | 4.74 | 5.06 | 5.25 | 5.25 |

*Return information for performance prior to 10/20/2000 reflects returns on the Unicom Corporation Stock Fund, which is the predecessor to the current Exelon Corporation Stock Fund.

EX 001796

# EXHIBIT D

# Barclays Global Investors *Collective Funds*

MARCH 31, 2006

## Equity Index Fund

### What the fund invests in:

This is an index fund that seeks to match the performance of the S&P 500® Index by investing in stocks that make up the index. The S&P 500 Index, considered a large-capitalization benchmark, is comprised of a sample of leading US companies in leading industries, and accounts for more than 75% of the market value of all publicly traded stocks in the US.



Stocks 100%

### Performance Returns (%)

|  | FUND | BENCHMARK[1] |
|---|---|---|
| First Quarter | 4.21 | 4.21 |
| Year to Date | 4.21 | 4.21 |
| One Year | 11.74 | 11.73 |
| Three Year* | 17.21 | 17.22 |
| Five Year* | 3.97 | 3.97 |
| Ten Year* | 8.95 | 8.95 |

*Average annualized return
[1]Source - S&P 500 Index

### Why invest in large-capitalization US stocks?

Investing in large-capitalization stocks is the most efficient way to participate in earnings from large US companies. These stocks have the potential for more stable earnings than that of small- or mid-capitalization stocks, and their prices tend to be less volatile.

### Who should consider investing in this fund?

This fund is intended for long-term investors seeking to capture the earnings and growth potential of large US companies.

### Top 10 Holdings (%)

| | |
|---|---|
| Exxon Mobil Corporation | 3.19 |
| General Electric Co | 3.11 |
| Microsoft Corp | 2.07 |
| Citigroup Inc | 2.02 |
| Bank of America Corp | 1.81 |
| Procter & Gamble Co | 1.63 |
| Pfizer Inc | 1.57 |
| Johnson & Johnson | 1.51 |
| American International Group | 1.47 |
| Altria Group Inc | 1.27 |

### Risk/Return Potential

Higher Expected Risk/Return (stocks)

Moderate Expected Risk/Return (bonds)

Lower Expected Risk/Return (money market)

*This chart is for illustrative purposes only and does not predict future risk or performance.*

BARCLAYS GLOBAL INVESTORS

EX 000297

BARCLAYS GLOBAL INVESTORS *Equity Index Fund*                    MARCH 31, 2006



Growth of $10,000

This graph represents the growth of a hypothetical investment of $10,000. It assumes reinvestment of all income, and does not take into consideration any management fees. Past performance is no guarantee of future results.

## Performance Notes
All values are unaudited and subject to revision. All income is reinvested in the fund. The fund's inception is 12/18/97. Fund returns since inception are reported net of management fees and certain transaction costs and expenses charged to the fund. Returns prior to inception are those of a fund with similar investment strategy and are calculated gross of investment management fees. The S&P 500 Index returns do not reflect any management fees, transaction costs or expenses. The Index consists of 500 stocks selected to be representative of the major industry groups. Past performance does not guarantee future results. Any returns shown as less than one year are cumulative returns.

## Trademarks
"Standard & Poor's®", "S&P®", "S&P 500®", "Standard & Poor's 500", and "500" are trademarks of The McGraw-Hill Companies, Inc. and have been licensed for use by Barclays Global Investors, N.A. The Product is not sponsored, endorsed, sold or promoted by Standard & Poor's and Standard & Poor's makes no representation regarding the advisability of investing in the Product.

## Additional Information

| | |
|---|---|
| Yield | 1.78% |
| Beta | 1.00 |
| Number of Holdings | 501 |

## Sector Diversification (%)

| | |
|---|---|
| Consumer, Non-cyclical | 21.00 |
| Financial | 20.96 |
| Industrial | 11.69 |
| Technology | 11.01 |
| Communications | 10.68 |
| Energy | 9.81 |
| Consumer, Cyclical | 8.63 |
| Utilities | 3.18 |
| Basic Materials | 3.04 |

## Fees and Expenses
Total management fees and other expenses charged to the fund were approximately 0.03% of the fund's estimated average assets.

## Fund Manager
Barclays Global Investors, N.A. is the Fund's manager and trustee. Barclays Global Investors is headquartered in San Francisco, CA, and is owned by Barclays Bank PLC, one of the UK's largest companies. Barclays Global Investors employs more than 2,000 people around the world, and manages assets for many of the world's leading institutional investors. Barclays Global Investors uses a team approach in managing investment portfolios. For more information about BGI, please go to www.barclaysglobal.com.

## Disclaimers
The fund is NOT FDIC insured, is NOT an obligation or deposit of, or guaranteed by, Barclays Global Investors or its affiliates and involves investment risk, including possible loss of principal.

The fund is a collective investment fund and is privately offered. Prospectuses are not required and prices are not available in local publications. To obtain pricing information, please contact your service representative.

www.barclaysglobal.com

EX 000298

BARCLAYS

# EXHIBIT E

## Supplement to the
## Fidelity® Growth Company Fund
## January 29, 2006
## Prospectus

Effective the close of business on April 28, 2006, new positions in the fund may no longer be opened. Shareholders of the fund on that date may continue to add to their fund positions existing on that date. Investors who did not own shares of the fund on April 28, 2006, generally will not be allowed to buy shares of the fund except that new fund positions may be opened: 1) by participants in most group employer retirement plans (and their successor plans) if the fund had been established (or was in the process of being established) as an investment option under the plans (or under another plan sponsored by the same employer) by April 28, 2006, 2) for accounts managed on a discretionary basis by certain registered investment advisers that have discretionary assets of at least $500 million invested in mutual funds and have included the fund in their discretionary account program since April 28, 2006, 3) by a mutual fund or a qualified tuition program for which FMR or an affiliate serves as investment manager, and 4) by a portfolio manager of the fund. These restrictions generally will apply to investments made directly with Fidelity and investments made through intermediaries. Investors may be required to demonstrate eligibility to buy shares of the fund before an investment is accepted.

GCF-06-01 April 18, 2006
1.734042.107

# End of Supplement

---

# Beginning of Prospectus

**Like securities of all mutual funds, these securities have not been approved or disapproved by the Securities and Exchange Commission, and the Securities and Exchange Commission has not determined if this prospectus is accurate or complete. Any representation to the contrary is a criminal offense.**

**Fidelity®**

# Growth Company

**Fund**

(fund number 025, trading symbol FDGRX)

**Prospectus**

EX 000333

January 29, 2006



82 Devonshire Street, Boston, MA 02109

# Contents

| Fund Summary | <Click Here> | Investment Summary |
|---|---|---|
| | <Click Here> | Performance |
| | <Click Here> | Fee Table |
| Fund Basics | <Click Here> | Investment Details |
| | <Click Here> | Valuing Shares |
| Shareholder Information | <Click Here> | Buying and Selling Shares |
| | <Click Here> | Exchanging Shares |
| | <Click Here> | Features and Policies |
| | <Click Here> | Dividends and Capital Gain Distributions |
| | <Click Here> | Tax Consequences |
| Fund Services | <Click Here> | Fund Management |
| | <Click Here> | Fund Distribution |
| Appendix | <Click Here> | Financial Highlights |
| | <Click Here> | Additional Performance Information |

# Fund Summary

## Investment Summary

*Investment Objective*

**Growth Company Fund** seeks capital appreciation.

*Principal Investment Strategies*

· Normally investing primarily in common stocks.

· Investing in companies that Fidelity Management & Research Company (FMR) believes have above-average growth potential (stocks of these companies are often called "growth" stocks).

**EX 000334**

· Investing in domestic and foreign issuers.

· Using fundamental analysis of each issuer's financial condition and industry position and market and economic conditions to select investments.

***Principal Investment Risks***

· *Stock Market Volatility.* Stock markets are volatile and can decline significantly in response to adverse issuer, political, regulatory, market, or economic developments. Different parts of the market can react differently to these developments.

· *Foreign Exposure.* Foreign markets can be more volatile than the U.S. market due to increased risks of adverse issuer, political, regulatory, market, or economic developments and can perform differently from the U.S. market.

· *Issuer-Specific Changes.* The value of an individual security or particular type of security can be more volatile than the market as a whole and can perform differently from the value of the market as a whole.

· *"Growth" Investing.* "Growth" stocks can perform differently from the market as a whole and other types of stocks and can be more volatile than other types of stocks.

An investment in the fund is not a deposit of a bank and is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency.

When you sell your shares they may be worth more or less than what you paid for them, which means that you could lose money.

# Performance

The following information is intended to help you understand the risks of investing in the fund. The information illustrates the changes in the fund's performance from year to year and compares the fund's performance to the performance of a market index and an average of the performance of similar funds over various periods of time. Returns (before and after taxes) are based on past results and are not an indication of future performance.

## Year-by-Year Returns

| Growth Company | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Calendar Years | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
| | 16.81% | 18.91% | 27.23% | 79.48% | -6.32% | -25.31% | -33.45% | 41.36% | 12.12% | 13.50% |

EX 000335



Percentage (%)

| During the periods shown in the chart for Growth Company | Returns | Quarter ended |
|---|---|---|
| Highest Quarter Return | 44.52% | December 31, 1999 |
| Lowest Quarter Return | -26.49% | March 31, 2001 |

## Average Annual Returns

After-tax returns are calculated using the historical highest individual federal marginal income tax rates, but do not reflect the impact of state or local taxes. Return After Taxes on Distributions and Sale of Fund Shares may be higher than other returns for the same period due to a tax benefit of realizing a capital loss upon the sale of fund shares. Actual after-tax returns may differ depending on your individual circumstances. The after-tax returns shown are not relevant if you hold your shares in a retirement account or in another tax-deferred arrangement.

| For the periods ended December 31, 2005 | Past 1 year | Past 5 years | Past 10 years |
|---|---|---|---|
| **Growth Company** | | | |
| Return Before Taxes | 13.50% | -2.21% | 10.27% |
| Return After Taxes on Distributions | 13.50% | -2.22% | 9.17% |
| Return After Taxes on Distributions and Sale of Fund Shares | 8.78% | -1.87% | 8.60% |
| Russell 3000® Growth Index (reflects no deduction for fees, expenses, or taxes) | 5.17% | -3.15% | 6.48% |
| Lipper[SM] Growth Funds Average (reflects no deduction for sales charges or taxes) | 6.53% | -0.95% | 7.73% |

If FMR were to reimburse certain expenses, returns would be higher during these periods.

Russell 3000® Growth Index is a market capitalization-weighted index of those stocks of the 3,000 largest U.S. domiciled companies that exhibit growth-oriented characteristics.

The Lipper Funds Average reflects the performance of mutual funds with similar objectives.

# Fee Table

The following table describes the fees and expenses that are incurred when you buy, hold, or sell shares of the fund. The annual fund operating expenses provided below for the fund do not reflect the effect of any reduction of certain expenses during the period.

EX 000336

**Shareholder fees** (paid by the investor directly)

| Sales charge (load) on purchases and reinvested distributions | None |
|---|---|
| Deferred sales charge (load) on redemptions | None |

**Annual operating expenses** (paid from fund assets)

| Management fee | 0.72% |
|---|---|
| Distribution and/or Service (12b-1) fees | None |
| Other expenses | 0.24% |
| Total annual fund operating expenses | 0.96% |

This **example** helps you compare the cost of investing in the fund with the cost of investing in other mutual funds.

Let's say, hypothetically, that the fund's annual return is 5% and that your shareholder fees and the fund's annual operating expenses are exactly as described in the fee table. This example illustrates the effect of fees and expenses, but is not meant to suggest actual or expected fees and expenses or returns, all of which may vary. For every $10,000 you invested, here's how much you would pay in total expenses if you sell all of your shares at the end of each time period indicated:

| 1 year | $ 98 |
|---|---|
| 3 years | $ 306 |
| 5 years | $ 531 |
| 10 years | $ 1,178 |

A portion of the brokerage commissions that the fund pays may be reimbursed and used to reduce the fund's expenses. In addition, through arrangements with the fund's custodian and transfer agent, credits realized as a result of uninvested cash balances are used to reduce custodian and transfer agent expenses. Including these reductions, the total fund operating expenses would have been 0.94%.

# Fund Basics

## Investment Details

*Investment Objective*

**Growth Company Fund** seeks capital appreciation.

*Principal Investment Strategies*

FMR normally invests the fund's assets primarily in common stocks.

EX 000337

# EXHIBIT F

## Supplement to the
## Fidelity® Contrafund®
## February 28, 2006
## Prospectus

Effective the close of business on April 28, 2006, new positions in the fund may no longer be opened. Shareholders of the fund on that date may continue to add to their fund positions existing on that date. Investors who did not own shares of the fund on April 28, 2006, generally will not be allowed to buy shares of the fund except that new fund positions may be opened: 1) by participants in most group employer retirement plans (and their successor plans) if the fund had been established (or was in the process of being established) as an investment option under the plans (or under another plan sponsored by the same employer) by April 28, 2006, 2) for accounts managed on a discretionary basis by certain registered investment advisers that have discretionary assets of at least $500 million invested in mutual funds and have included the fund in their discretionary account program since April 28, 2006, 3) by a mutual fund or a qualified tuition program for which FMR or an affiliate serves as investment manager, and 4) by a portfolio manager of the fund. These restrictions generally will apply to investments made directly with Fidelity and investments made through intermediaries. Investors may be required to demonstrate eligibility to buy shares of the fund before an investment is accepted.

CON-06-01 April 4, 2006
1.729576.111

# End of Supplement

# Beginning of Prospectus

**Like securities of all mutual funds, these securities have not been approved or disapproved by the Securities and Exchange Commission, and the Securities and Exchange Commission has not determined if this prospectus is accurate or complete. Any representation to the contrary is a criminal offense.**

Fidelity®

# Contrafund®

(fund number 022, trading symbol FCNTX)

**Prospectus**

**February 28, 2006**

EX 000377



82 Devonshire Street, Boston, MA 02109

# Contents

| | | |
|---|---|---|
| Fund Summary | <Click Here> | Investment Summary |
| | <Click Here> | Performance |
| | <Click Here> | Fee Table |
| Fund Basics | <Click Here> | Investment Details |
| | <Click Here> | Valuing Shares |
| Shareholder Information | <Click Here> | Buying and Selling Shares |
| | <Click Here> | Exchanging Shares |
| | <Click Here> | Features and Policies |
| | <Click Here> | Dividends and Capital Gain Distributions |
| | <Click Here> | Tax Consequences |
| Fund Services | <Click Here> | Fund Management |
| | <Click Here> | Fund Distribution |
| Appendix | <Click Here> | Financial Highlights |
| | <Click Here> | Additional Performance Information |

# Fund Summary

## Investment Summary

*Investment Objective*

**Contrafund** seeks capital appreciation.

*Principal Investment Strategies*

· Normally investing primarily in common stocks.

· Investing in securities of companies whose value Fidelity Management & Research Company (FMR) *believes is not fully recognized by the public.*

· Investing in domestic and foreign issuers.

EX 000378

· Investing in either "growth" stocks or "value" stocks or both.

· Using fundamental analysis of each issuer's financial condition and industry position and market and economic conditions to select investments.

### Principal Investment Risks

· *Stock Market Volatility.* Stock markets are volatile and can decline significantly in response to adverse issuer, political, regulatory, market, or economic developments. Different parts of the market can react differently to these developments.

· *Foreign Exposure.* Foreign markets can be more volatile than the U.S. market due to increased risks of adverse issuer, political, regulatory, market, or economic developments and can perform differently from the U.S. market.

· *Issuer-Specific Changes.* The value of an individual security or particular type of security can be more volatile than the market as a whole and can perform differently from the value of the market as a whole.

An investment in the fund is not a deposit of a bank and is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency.

When you sell your shares they may be worth more or less than what you paid for them, which means that you could lose money.

# Performance

The following information is intended to help you understand the risks of investing in the fund. The information illustrates the changes in the fund's performance from year to year and compares the fund's performance to the performance of a market index and an average of the performance of similar funds over various periods of time. Returns (before and after taxes) are based on past results and are not an indication of future performance.

### Year-by-Year Returns

| Contrafund | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Calendar Years | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
| | 21.94% | 23.00% | 31.57% | 25.03% | -6.80% | -12.59% | -9.63% | 27.95% | 15.07% | 16.23% |



EX 000379

| During the periods shown in the chart for Contrafund: | Returns | Quarter ended |
|---|---|---|
| Highest Quarter Return | 23.73% | December 31. 1998 |
| Lowest Quarter Return | -13.18% | March 31. 2001 |

## Average Annual Returns

After-tax returns are calculated using the historical highest individual federal marginal income tax rates, but do not reflect the impact of state or local taxes. Return After Taxes on Distributions and Sale of Fund Shares may be higher than other returns for the same period due to a tax benefit of realizing a capital loss upon the sale of fund shares. Actual after-tax returns may differ depending on your individual circumstances. The after-tax returns shown are not relevant if you hold your shares in a retirement account or in another tax-deferred arrangement.

| For the periods ended December 31. 2005 | Past 1 year | Past 5 years | Past 10 years |
|---|---|---|---|
| **Contrafund** | | | |
| Return Before Taxes | 16.23% | 6.21% | 12.01% |
| Return After Taxes on Distributions | 15.91% | 6.10% | 10.31% |
| Return After Taxes on Distributions and Sale of Fund Shares | 10.97% | 5.33% | 9.74% |
| S&P 500 Index® (reflects no deduction for fees. expenses. or taxes) | 4.91% | 0.54% | 9.07% |
| Lipper℠ Growth Funds Average (reflects no deduction for sales charges or taxes) | 6.53% | -0.95% | 7.73% |

If FMR were to reimburse certain expenses, returns would be higher during these periods.

Standard & Poor's 500℠ Index (S&P 500®) is a market capitalization-weighted index of 500 common stocks chosen for market size, liquidity, and industry group representation to represent U.S. equity performance.

The Lipper Funds Average reflects the performance of mutual funds with similar objectives.

# Fee Table

The following table describes the fees and expenses that are incurred when you buy, hold, or sell shares of the fund. The annual fund operating expenses provided below for the fund do not reflect the effect of any reduction of certain expenses during the period.

## Shareholder fees (paid by the investor directly)

| Sales charge (load) on purchases and reinvested distributions[A] | None |
|---|---|
| Deferred sales charge (load) on redemptions | None |

[A] The fund may impose a 3.00% sales charge on purchases upon 60 days notice to shareholders.

## Annual operating expenses (paid from fund assets)

EX 000380

| Management fee | 0.71% |
| Distribution and/or Service (12b-1) fees | None |
| Other expenses | 0.20% |
| Total annual fund operating expenses | 0.91% |

This **example** helps you compare the cost of investing in the fund with the cost of investing in other mutual funds.

Let's say, hypothetically, that the fund's annual return is 5% and that your shareholder fees and the fund's annual operating expenses are exactly as described in the fee table. This example illustrates the effect of fees and expenses, but is not meant to suggest actual or expected fees and expenses or returns, all of which may vary. For every $10,000 you invested, here's how much you would pay in total expenses if you sell all of your shares at the end of each time period indicated:

| 1 year | $ 93 |
| 3 years | $ 290 |
| 5 years | $ 504 |
| 10 years | $ 1,120 |

A portion of the brokerage commissions that the fund pays may be reimbursed and used to reduce the fund's expenses. In addition, through arrangements with the fund's custodian and transfer agent, credits realized as a result of uninvested cash balances are used to reduce custodian and transfer agent expenses. Including these reductions, the total fund operating expenses, after reimbursement, would have been 0.88%.

---

# Fund Basics

## Investment Details

*Investment Objective*

**Contrafund** seeks capital appreciation.

*Principal Investment Strategies*

EX 000381

FMR normally invests the fund's assets primarily in common stocks.

FMR invests the fund's assets in securities of companies whose value it believes is not fully recognized by the public. The types of companies in which the fund may invest include companies experiencing positive fundamental change, such as a new management team or product launch, a significant cost-cutting initiative, a merger or acquisition, or a reduction in industry capacity that should lead to improved pricing; companies whose earnings potential has increased or is expected to increase more than generally perceived; companies that have enjoyed recent market popularity but which appear to have fallen temporarily out of favor for reasons that are considered non-recurring or short-term; and

# EXHIBIT G

# (filed separately under seal pursuant to Dock. Nos. 59, 60 and L.R. 26.2)

# EXHIBIT H

EXELON CORPORATION

EMPLOYEE SAVINGS PLAN

**Working copy incorporating Amendment Nos. 1 through 7**

EX 000938

# EXELON CORPORATION EMPLOYEE SAVINGS PLAN

## TABLE OF CONTENTS

Page

***ARTICLE 1*** ................................................................................................................ *1*

**TITLE, PURPOSE AND EFFECTIVE DATES** ........................................................ 1

***ARTICLE 2*** ................................................................................................................ *2*

**DEFINITIONS** ............................................................................................................ 2

***ARTICLE 3*** ................................................................................................................ *7*

**PARTICIPATION** ........................................................................................................ 7
Section 3.1 . Eligibility for Participation. ...................................................................... 7
Section 3.2 . Applications for Before-Tax Contributions and After-Tax Contributions. ................... 7
Section 3.3 . Transfer to Affiliates. ................................................................................ 9

***ARTICLE 4*** ................................................................................................................ *9*

**EMPLOYER CONTRIBUTIONS** ................................................................................ 9
Section 4.1 . Before-Tax Contributions. ........................................................................ 9
Section 4.2 . 402(g) Annual Limit on Before-Tax Contributions. ..................................... 13
Section 4.3 . Employer Matching Contributions. ............................................................ 15
Section 4.4 . Limitations on Contributions for Highly-Compensated Eligible Employees .............. 17
Section 4.5 . Limitation on Employer Contributions. ...................................................... 25

***ARTICLE 5*** ................................................................................................................ *26*

**EMPLOYEE CONTRIBUTIONS** ................................................................................ 26
Section 5.1 . After-Tax Contributions. .......................................................................... 26
Section 5.2 . Rollover Contributions. ............................................................................ 27
Section 5.3 . Special Accounting Rules for Rollover Contributions. ................................ 29

***ARTICLE 6*** ................................................................................................................ *29*

**TRUST AND INVESTMENT FUNDS** ........................................................................ 29
Section 6.1 . Trust. ...................................................................................................... 29
Section 6.2 . Investment Funds. .................................................................................... 30

***ARTICLE 7*** ................................................................................................................ *30*

**PARTICIPANT ACCOUNTS AND INVESTMENT ELECTIONS** ............................ 30
Section 7.1 . Participant Accounts and Investment Elections. .......................................... 30
Section 7.2 . Allocation of Net Income of Trust Fund and Fluctuation in Value of Trust Fund Assets. ...... 32
Section 7.3 . Allocations of Contributions Among Participants' Accounts. ........................ 33
Section 7.4 . Limitations on Allocations Imposed by Section 415 of the Code. ................. 34
Section 7.5 . Correction of Error. ................................................................................ 36

***ARTICLE 8*** ................................................................................................................ *36*

**WITHDRAWALS AND DISTRIBUTIONS** ................................................................ 36
Section 8.1 . Withdrawals and Distributions Prior to Termination of Employment. ........... 36
Section 8.2 . Loans to Participants. .............................................................................. 40
Section 8.3 . Distributions Upon Termination of Employment. ........................................ 43
Section 8.4 . Time of Distribution. ............................................................................... 47
Section 8.5 . Designation of Beneficiary. ...................................................................... 48
Section 8.6 . Distributions to Minor and Disabled Distributees. ...................................... 50
Section 8.7 . "Lost" Participants and Beneficiaries. ....................................................... 50

***ARTICLE 9*** ................................................................................................................ *51*

EX 000939

PARTICIPANTS' STOCKHOLDER RIGHTS ................................................................ 51
    Section 9.1 . Voting Shares of Common Stock............................................................... 51
    Section 9.2 . Tender Offers............................................................................................ 52

*ARTICLE 10* .................................................................................................................. *54*

SPECIAL PARTICIPATION AND DISTRIBUTION RULES RELATING TO
REEMPLOYMENT OF TERMINATED EMPLOYEES AND EMPLOYMENT BY RELATED
ENTITIES.......................................................................................................................... 54
    Section 10.1 . Change of Employment Status.................................................................. 54
    Section 10.2 . Reemployment of an Eligible Employee Whose Employment Terminated Prior to His or Her
    Becoming a Participant..................................................................................................... 54
    Section 10.3 . Reemployment of a Terminated Participant................................................ 54
    Section 10.4 . Employment by an Affiliate....................................................................... 55
    Section 10.5 . Leased Employees..................................................................................... 55
    Section 10.6 . Reemployment of Veterans........................................................................ 56

*ARTICLE 11* .................................................................................................................. *57*

ADMINISTRATION ......................................................................................................... 58
    Section 11.1 . The Administrator and the Investment Committee. ..................................... 58
    Section 11.2 . Claims Procedure...................................................................................... 63
    Section 11.3 . Procedures for Domestic Relations Orders. ................................................ 65
    Section 11.4 . Notices to Participants, Etc. ...................................................................... 66
    Section 11.5 . Notices to Administrator. .......................................................................... 67
    Section 11.6 . Records. .................................................................................................... 67
    Section 11.7 . Reports of Trustee and Accounting to Participants...................................... 67
    Section 11.8 . Electronic Media. ...................................................................................... 67

*ARTICLE 12* .................................................................................................................. *68*

PARTICIPATION BY OTHER EMPLOYERS ................................................................ 68
    Section 12.1 . Adoption of Plan....................................................................................... 68
    Section 12.2 . Withdrawal from Participation.................................................................... 68
    Section 12.3 . Company as Agent for Employers. ............................................................. 68

*ARTICLE 13* .................................................................................................................. *69*

CONTINUANCE BY A SUCCESSOR .............................................................................. 69

*ARTICLE 14* .................................................................................................................. *70*

MISCELLANEOUS ........................................................................................................... 70
    Section 14.1 . Expenses. .................................................................................................. 70
    Section 14.2 . Non-Assignability. .................................................................................... 70
    Section 14.3 . Employment Non-Contractual. .................................................................. 72
    Section 14.4 . Limitation of Rights. ................................................................................. 72
    Section 14.5 . Merger or Consolidation with Another Plan. .............................................. 72
    Section 14.6 . Gender and Plurals. .................................................................................. 73
    Section 14.7 . Applicable Law. ........................................................................................ 73
    Section 14.8 . Severability. .............................................................................................. 73
    Section 14.9 . No Guarantee. ........................................................................................... 73
    Section 14.10. Statute of Limitations for Actions under the Plan. ...................................... 73
    Section 14.11. Forum for Legal Actions under the Plan. ................................................... 74
    Section 14.12. Legal Fees. ............................................................................................... 74

*ARTICLE 15* .................................................................................................................. *75*

TOP-HEAVY PLAN REQUIREMENTS .......................................................................... 75
    Section 15.1 . Top-Heavy Plan Determination. ................................................................ 75
    Section 15.2 . Definitions and Special Rules. ................................................................... 75
    Section 15.3 . Minimum Contribution for Top-Heavy Years. ............................................ 76

EX 000940

*ARTICLE 16* .................................................................................................................... 78

    AMENDMENT, ESTABLISHMENT OF SEPARATE PLAN AND TERMINATION ................. 78

        Section 16.1 . Amendment. ................................................................................................78
        Section 16.2 . Establishment of Separate Plan. ................................................................78
        Section 16.3 . Termination and Distributions upon Termination of the Plan. ....................79
        Section 16.4 . Trust Fund to Be Applied Exclusively for Participants and Their Beneficiaries. ........................80

*SUPPLEMENT I* .................................................................................................................. 1

    Transfers from Other Plans ........................................................................................... 1

*SUPPLEMENT II*................................................................................................................. 3

    Elective Transfers Between This Plan and Plans of Affiliates or the TXU 401(k) Plan ..................... 3

*SUPPLEMENT III* ............................................................................................................... 5

    Merger of Certain AmerGen Plans into this Plan........................................................... 5

*SUPPLEMENT IV*............................................................................................................... 1

    Merger of New England Plan into this Plan ................................................................... 1

EX 000941

ADMINISTRATION

Section 11.1. The Administrator and the Investment Committee.

(a)    The Administrator. The Company's Director, Employee Benefit Plans & Programs, or such other person or committee appointed by the Compensation Committee of the Board of Directors from time to time (such director or other person or committee, the "Administrator"), shall be the "administrator" of the Plan, within the meaning of such term as used in ERISA. In addition, the Administrator shall be the "named fiduciary" of the Plan, within the meaning of such term as used in ERISA, solely with respect to administrative matters involving the Plan and not with respect to any investment of the Plan's assets. The Administrator shall have the following duties, responsibilities and rights:

(i)    The Administrator shall have the duty and discretionary authority to interpret and construe the Plan in regard to all questions of eligibility, the status and rights of Participants, distributees and other persons under the Plan, and the manner, time, and amount of payment of any distribution under the Plan. Benefits under the Plan shall be paid to a Participant or Beneficiary only if the Administrator, in its discretion, determines that such person is entitled to benefits.

(ii)    The Administrator shall direct the Trustee to make payments of amounts to be distributed from the Trust under Article 8.

(iii)    The Administrator shall supervise the collection of Participants' contributions made pursuant to Article 5 and the delivery of such contributions to the Trustee.

(iv)    The Administrator shall have all powers and responsibilities necessary to administer the Plan, except those powers that are specifically vested in the Investment Committee or the Trustee.

(v)    Each Employer shall, from time to time, upon request of the Administrator, furnish to the Administrator such data and information as the Administrator shall require in the performance of its duties.

(vi)    The Administrator may require a Participant or Beneficiary to complete and file certain applications or forms approved by the Administrator and to furnish such information requested by the Administrator. The

58

EX 000999

Administrator and the Plan may rely upon all such information so furnished to the Administrator.

(vii)   The Administrator shall be the Plan's agent for service of legal process and forward all necessary communications to the Trustee.

(b)     Appointment of the Administrator. Pursuant to a resolution of the Compensation Committee of the Board of Directors of the Company, the Compensation Committee shall appoint the Administrator. The Compensation Committee shall have the right at any time, with or without cause, to remove the Administrator (including any member of a committee that constitutes the Administrator). The Administrator may resign and the resignation shall be effective upon delivery of the written resignation to the Compensation Committee. Upon the resignation, removal or failure or inability for any reason of the Administrator to act hereunder, the Compensation Committee shall appoint a successor. Any successor Administrator member shall have all the rights, privileges and duties of the predecessor, but shall not be held accountable for the acts of the predecessor. The power and authority of the Compensation Committee with respect to the Plan shall be limited solely to the appointment and removal of the Administrator and the Compensation Committee shall have no other duties or responsibilities with respect to the Plan. None of the Company, any member of the Board of Directors who is not a member of the Compensation Committee, nor any other person shall have any responsibility regarding the appointment or removal of the Administrator.

(c)     The Investment Committee. The Investment Committee shall be the "named fiduciary" of the Plan, within the meaning of such term as used in ERISA, solely with respect to matters involving the investment of assets of the Plan and, any contrary provision of the Plan notwithstanding, in all events subject to the limitations contained in Sections 404(a)(2) and 404(c)

EX 001000

of ERISA and all other applicable limitations. The Investment Committee shall have the

following duties, responsibilities and rights:

> (i) The Investment Committee shall be the "named fiduciary" for purposes of designating the investment funds under Section 6.2 and for purposes of appointing one or more investment managers as described in ERISA.

> (ii) The Investment Committee shall be solely responsible for all matters involving investment of the Employer Stock Fund described in Section 6.2 and neither the Company nor any other person shall have any responsibility with respect to investment of such fund.

> (iii) Each Employer shall, from time to time, upon request of the Investment Committee, furnish to the Investment Committee such data and information as the Investment Committee shall require in the performance of its duties.

(d) Appointment of the Investment Committee. Pursuant to a resolution of the Risk

Management Committee of the Board of Directors of the Company, the Risk Management

Committee shall appoint the Investment Committee, which shall consist of not less than three

members. The Risk Management Committee shall have the right at any time, with or without

cause, to remove one or more members of the Investment Committee. Any member of the

Investment Committee may resign and the resignation shall be effective upon delivery of the

written resignation to the Risk Management Committee. Upon the resignation, removal or failure

or inability for any reason of any member of the Investment Committee to act hereunder, the Risk

Management Committee shall appoint a successor. Any successor Investment Committee member

shall have all the rights, privileges and duties of the predecessor, but shall not be held accountable

for the acts of the predecessor. The power and authority of the Risk Management Committee with

respect to the Plan shall be limited solely to the appointment and removal of the members of the

Investment Committee and the Risk Management Committee shall have no other duties or

responsibilities with respect to the Plan. None of the Company, any member of the Board of

Directors who is not a member of the Risk Management Committee, nor any other person shall

60

EX 001001

have any responsibility regarding the appointment or removal of the members of Investment Committee.

(e)     Status of Administrator and Members of the Investment Committee.  The Administrator and any member of the Investment Committee may, but need not, be an Employee, trustee or officer of an Employer and such status shall not disqualify such person from taking any action hereunder or render such person accountable for any distribution or other material advantage received by him or her under this Plan, provided that no Administrator or member of the Investment Committee who is a Participant shall take part in any action of the Administrator or the Investment Committee or any matter involving solely his or her rights under this Plan.

(f)     Notice to Trustee of Members.  Promptly after the appointment of the Administrator or the Investment Committee and from time to time thereafter, and promptly after the appointment of any successor member of either the Administrator or the Investment Committee, the Trustee shall be notified as to the names of the persons so appointed by delivery to the Trustee of a written instrument duly adopted by the Compensation Committee of the Board of Directors or Risk Management Committee of the Board of Directors, as applicable, making such appointments.

(g)     Allocation of Responsibilities.  Each of the Administrator and the Investment Committee may allocate its respective responsibilities and may designate any person, persons, partnership or corporation to carry out any of such responsibilities with respect to the Plan.  Any such allocation or designation shall be reduced to writing and such writing shall be kept with the records of the Plan.

(h)     General Governance.  Each of the Administrator and the Investment Committee may act at a meeting or by written consent approved by a majority of its respective members.  The

EX 001002

61

Investment Committee shall elect one of its members as chairman and appoint a secretary, who may or may not be a member of such committee. The secretary of the Investment Committee shall keep a record of all meetings and forward all necessary communications to the Employers or the Trustee. All decisions of the Investment Committee shall be made by the majority, including actions taken by written consent. The Administrator and the Investment Committee may adopt such rules and procedures as it deems desirable for the conduct of its affairs, provided that any such rules and procedures shall be consistent with the provisions of the Plan.

(i)     Indemnification. The Employers hereby jointly and severally indemnify the Administrator, the Investment Committee, the Risk Management Committee of the Board of Directors of the Company, the Compensation Committee of the Board of Directors of the Company, and the directors, officers and employees of the Employers and each of them, from the effects and consequences of their acts, omissions and conduct in their official capacity with respect to the Plan (including but not limited to judgments, attorney fees and costs with respect to any and all related claims, subject to the Company's notice of and right to direct any litigation, select any counsel or advisor, and approve any settlement), except to the extent that such effects and consequences result from their own willful misconduct. The foregoing indemnification shall be in addition to (and secondary to) such other rights such persons may enjoy as a matter of law or by reason of insurance coverage of any kind.

(j)     No Compensation. Neither the Administrator nor any member of the Investment Committee may receive any compensation or fee from the Plan for services as the Administrator or a member of the Investment Committee. The Employers shall reimburse the Administrator and the members of the Investment Committee for any reasonable expenditures incurred in the discharge of their duties hereunder.

EX 001003

62

(k)    <u>Employ of Counsel and Agents</u>. The Administrator and the Investment Committee may employ such counsel (who may be counsel for an Employer) and agents and may arrange for such clerical and other services as each may require in carrying out its respective duties under the Plan.

Section 11.2.  <u>Claims Procedure</u>.

Any Participant or distributee who believes he or she is entitled to benefits in an amount greater than those which he or she is receiving or has received may file a claim with the Administrator. Such a claim shall be in writing and state the nature of the claim, the facts supporting the claim, the amount claimed, and the address of the claimant. The Administrator shall review the claim and, unless special circumstances require an extension of time, within 90 days after receipt of the claim, give notice to the claimant, either in writing by registered or certified mail or in an electronic notification, of the Secretary's decision with respect to the claim. Any electronic notice delivered to the claimant shall comply with the standards imposed by applicable Regulations. If the Administrator determines that special circumstances require an extension of time for processing the claim, the claimant shall be so advised in writing within the initial 90-day period and in no event shall such an extension exceed 90 days. The extension notice shall indicate the special circumstances requiring an extension of time and the date by which the Administrator expects to render the benefit determination. The notice of the decision of the Administrator with respect to the claim shall be written in a manner calculated to be understood by the claimant and, if the claim is wholly or partially denied, the Administrator shall notify the claimant of the adverse benefit determination and shall set forth the specific reasons for the adverse determination, the references to the specific Plan provisions on which the determination is based, a description of any additional material or information necessary for the claimant to perfect

63

**EX 001004**